# APPENDIX

# INDEX TO APPENDIX


Declaration of Kathryn M. Bader . . . . . . . . . . 1

Declaration of LuAnn Bocsy . . . . . . . . . . 3

Declaration of Phyllis E. Moore . . . . . . . . . . 5

Declaration of Lynne T. Rahtes . . . . . . . . . . 8

November 9, 1999 facsimile from Thelma Williams to LuAnn Bocsy . . . . . . . . . . 11

November 10, 1999 escrow agreement . . . . . . . . . . 12

November 10, 1999 letter from Thelma Williams to LuAnn Bocsy . . . . . . . . . . 15

November 15, 1999 facsimile from Thelma Williams to LuAnn Bocsy . . . . . . . . . . 16

Purchase Order 4191 . . . . . . . . . . 17

FAR 52.232-33 . . . . . . . . . . 27

March 10, 2000 ALERT message . . . . . . . . . . 30

March 24, 2000 e-mail from Phyllis Moore to DCMC CLEARWATER/SLACK . . . . . . . . . . 31

March 30, 2000 facsimile from Kathryn Bader to Mike Taylor . . . . . . . . . . 34

April 12, 2000 handwritten notes by Phyllis Moore . . . . . . . . . . 35

June 15, 2000 e-mail from Philip Kover to Phyllis Moore . . . . . . . . . . 37

Excerpts from July 16, 2003 deposition of LuAnn Bocsy . . . . . . . . . . 38

Excerpts from July 16, 2003 deposition of Phyllis E. Moore (Volume I) . . . . . . . . . . 40

Excerpts from July 17, 2003 deposition of Phyllis E. Moore (Volume II) . . . . . . . . . . 43

Excerpts from May 10, 2004 JGB Enterprises trial transcript (Volume I) . . . . . . . . . . 48

Excerpts from May 11, 2004 JGB Enterprises trial transcript (Volume II) . . . . . . . . . . 57

January 13, 2006 letter from LuAnn Bocsy to Michael Kawa . . . . . . . . . . 72

Excerpts from December 7, 2007 deposition of Michael Kawa . . . . . . . . . . 73

Excerpts from January 8, 2008 deposition of Kathryn Bader . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Excerpts from January 8, 2008 deposition of LuAnn Bocsy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

Excerpts from April 23, 2008 deposition of Phyllis E. Moore . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Excerpts from April 23, 2008 deposition of Lynne Rahtes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF KATHRYN M. BADER**

Pursuant to 28 U.S.C. § 1746, I, Kathryn M. Bader, declare that the following is true and correct and based upon my personal knowledge and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I am a performance advocate in contracting for Defense Contract Management Agency ("DCMA") headquarters, located in Alexandria, Virginia, and have served in that position for approximately one and a half years. From October 1998 to June 2004, I was a Contract Specialist at Defense Contract Management Command ("DCMC") St. Petersburg, located in St. Petersburg, Florida.
2. I am over the age of eighteen (18) and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. In my role as a Contracting Specialist, I was responsible for administering several Capital City Pipes, Inc. ("Capital City") contracts, including Contract SP0750-99-C-2508 ("Contract 2508") and Purchase Order SP0750-00-M-4191 ("PO 4191").
4. I was a contracting officer by appointment dated January 19, 2005. My appointment was rescinded by letter dated August 8, 2006. Other than during that

time period, I have never been a contracting officer or had authority to bind the Government in contract.

5. As a Contract Specialist at DCMC St. Petersburg, I had no authority to make changes to a contract which I was responsible for administering without authorization from the Administrative Contracting Officer ("ACO").

6. As a Contract Specialist at DCMC St. Petersburg, I had no responsibilities related to a contract's remittance address. My only duties related to contract payment were to review and ensure obligated funds on a contract were mathematically correct, and to ensure that contractor requests for payment were in compliance with the unit cost(s), total cost(s), submittal timeframes, and similar aspects of the contract. I had no other duties related to contract payment, such as where or to whom payment was to be sent.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of May 2008, in Alexandria, Virginia.

Kathryn M. Bader
Performance Advocate in
Contracting
Defense Contract Management
Agency

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-448C (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF LUANN BOCSY**

Pursuant to 28 U.S.C. § 1746, I, LuAnn Bocsy, declare that the following is true and correct and based upon my personal knowledge and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I am a contracting officer for Defense Supply Center Columbus ("DSCC") and have held that position for 15 years.
2. I am over the age of eighteen (18) and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. I was the pre-award contracting officer assigned to SP0750-00-M-4191 ("PO 4191").
4. On November 9, 1999, I received a facsimile from Capital City Pipes, Inc. ("Capital City") requesting a change to the remittance address of PO 4191. Following receipt of this facsimile, I contacted Capital City because the number of lines requested exceeded that which could be typed into the remittance address. I received two subsequent letters/facsimiles requesting that the remittance address be changed. None of these three written communications gave any explanation

for the requested change nor indicated Mr. Kawa's relationship to J.G.B. Enterprises, Inc. ("JGB").

5. I did not ask who Mr. Kawa was or the reason for the address change.

6. I believed Mr. Kawa to be an employee of Capital City; I did not know that he was an attorney for JGB or an escrow agent.

7. I made the requested address change, and shortly thereafter, on November 24, 1999, I awarded PO 4191 to Capital City.

8. Once PO 4191 was awarded, the post-award contracting officer took over responsibility for it.

9. I was not responsible for ensuring that payment was made pursuant to the contract.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of May 2008, in Columbus, Ohio.

LuAnn Bocsy
Contracting Officer
Defense Supply Center Columbus

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF PHYLLIS E. MOORE**

Pursuant to 28 U.S.C. § 1746, I, Phyllis E. Moore, declare that the following is true and correct and based upon my personal knowledge and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I am a contract specialist buyer for Cherokee Information Services, located in Columbus, Ohio, and have served in that position since February 2008. From 2000 until 2007, I was a post-award contracting officer for Defense Supply Center Columbus ("DSCC").
2. I am over the age of eighteen (18) and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. As a post-award contracting officer, I was responsible for implementing the terms of the contract. Ordinarily, I would not take any action with respect to a contract unless a problem arose.
4. As a post-award contracting officer, I had no responsibilities related to payment of contracts. It was not my responsibility to ensure that payment was made according to the terms of the contract. Payment was handled by the Defense

Finance and Accounting Service ("DFAS"). I only became involved in payment if I was contacted by DFAS or the contractor regarding a problem with payment.

5. Sometime in March or April of 2000, I became the post-award contracting officer for SP0750-00-M-4191 ("PO 4191").
6. While I was the post-award contracting officer assigned to PO 4191, I did not have any discussions with Carolyn Mathews, LuAnn Bocsy, Michael Taylor, or Lynne Rahtes regarding Capital City Pipes, Inc. ("Capital City").
7. I did not have any communications with J.G.B. Enterprises, Inc. ("JGB") prior to receiving its request for equitable adjustment.
8. I have never had any communications with Mr. Kawa.
9. I do not recall reviewing the PO 4191 file.
10. I did not take any actions with respect to PO 4191 prior to JGB's claim for equitable adjustment except for sending the March 10, 2000 and March 24, 2000 ALERT messages to DCMC Clearwater. Sending these types of ALERT messages was my usual practice for all 8(a) contractors, particularly those that were delinquent. Sending the ALERT messages had nothing to do with JGB's alleged payment problems.
11. I was not involved in accepting shipment of the hose assemblies pursuant to PO 4191.
12. I never made any changes to PO 4191.
13. I was not contacted about a payment problem regarding PO 4191prior to JGB's request for equitable adjustment.

14. I did not know the remittance address on PO 4191 prior to JGB's request for equitable adjustment.

15. I did not know to whom payment was made on PO 4191 prior to JGB's request for equitable adjustment.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed on this 2ND day of May 2008, in Columbus, Ohio.

Phyllis E. Moore
Contract Specialist Buyer
Cherokee Information Systems

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ., | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-448C (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF LYNNE T. RAHTES**

Pursuant to 28 U.S.C. § 1746, I, Lynne T. Rahtes, declare that the following is true and correct and based upon my personal knowledge and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I am an Administrative Contracting Officer ("ACO") for Defense Contract Management Agency ("DCMA") St. Petersburg, located in St. Petersburg, Florida, and have served in that position for approximately 13 years.
2. I am over the age of eighteen (18) and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. DCMA was previously known as the Defense Contract Management Command ("DCMC").
4. The DCMA St. Petersburg office was previously known as the DCMC Clearwater office.
5. As an ACO, I have no authority to substantively modify contracts without authorization from the DSCC contracting officer.

6. I only had authority to change the payee of a contract if a proper assignment was completed or with authorization from the DSCC contracting officer.

7. The contract administrators on my team, including Kathryn Bader, did not have authority to modify contracts.

8. Other than changing the payee following completion of a proper assignment, I have no authority concerning to whom payment should be made. The Defense Finance and Accounting Service ("DFAS") was responsible for payment.

9. I was the ACO assigned to administer Purchase Order SP0750-00-M-4191 ("PO 4191"). At the same time, I was also assigned to administer hundreds of other contracts.

10. I do not recall anything specific concerning PO 4191, Contract 2508, JGB, or Mr. Kawa.

11. I did not make any changes to PO 4191.

12. I do not recall seeing the March 24, 2000 ALERT message from Phyllis Moore to "DCMC CLEARWATER/SLACK" prior to my deposition in this litigation held on April 23, 2008. I would interpret the message's statement that "[t]his serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable. The materials on these contracts are urgently needed. This includes extensions, cancellations, etc." as providing authority to perform or continue surveillance on the listed contracts. I would not interpret this message as providing me with authority to change the payee of a contract. I would not interpret this message as providing me with authority concerning payment, or to whom payment should be made.

I declare, under penalty of perjury that the foregoing is true and correct.

Executed on this 5th day of May 2008, in St. Petersburg, Florida.

Lynne T. Rahtes
Administrative Contracting Officer
Defense Contract Management
Agency St. Petersburg

# Fax

Please deliver immediately to: Ms. LuAnn Bosey18136925298

of: DSCC/PLLDBA1

Fax number: 16146925298

Voice number: 16146923234

Fax received from: Thelma S. Williams

of: Capital City Pipes, Inc.

Fax number: 850 574 0384

Voice number: 850 574 3717

Date: 11/9/99

Time: 4:00:25 PM

Number of Pages: 1

Subject: SP075099Q5778

# Message:

Hi, LuAnn, I spoke with JGB Enterprises, Inc and the price i quoted on this solicitation is the same
which is $147.96 Qty (248)
Also I am requesting a change of Payment Remittanence Address:

Capital City Pipes, Inc
Michael Kawa Esq
300 Crown Bldg
304 S. Franklin St
Syracuse, NY 13202
if you have any questions please call me
thank you

## ESCROW AGREEMENT

This Agreement made this 10th day of November, 1999, by and between **J.G.B. Enterprises, Inc.**, 115 Metropolitan Drive, Liverpool, New York 13088 ("J.G.B."), **Capital City Pipes, Inc.**, 1872 Mill Street, Building F, Tallahassee, Florida 32310 ("Capital City") and **Michael J. Kawa, Esq.**, 304 South Franklin Street, Syracuse, New York 13202 ("Escrow Agent").

## PREAMBLE

A. Capital City is a prime contractor of the United Stated Defense Supply Construction Center ("DSCC") for the manufacture and shipment of hose assemblies pursuant to various agreements between Capital City and DSCC.

B. Capital City has subcontracted with J.G.B. to, among other things, manufacture and ship such hose assemblies for and on behalf of Capital City and pursuant to Capital City's agreements with DSCC.

C. DSCC has, in the past, remitted payment directly to Capital City, pursuant to the agreements between Capital City and DSCC.

D. J.G.B. wants reasonable assurance that it will receive payment for its work performed pursuant to its subcontract with Capital City relating to the agreements between Capital City and DSCC.

E. The Escrow Agent is an attorney at law, duly admitted to practice as such in the State of New York, maintaining an office of 300 Crown Building, 304 South Franklin Street, Syracuse, New York.

NOW, THEREFORE, it is agreed as follows:

OPERATIVE PROVISIONS

1. Capital City and J.G.B. shall take all steps and execute all documents as may be required by DSCC to provide that future payments of the moneys due to Capital City from DSCC on the agreements for which J.G.B. is a subcontractor of Capital City, ("the Escrow Fund") shall be payable to Michael J. Kawa, Esq., as the Escrow Agent and remitted by DSCC to the Escrow Agent at his office address.

2. The Escrow Agent shall deposit the Escrow Fund into a non-interest bearing escrow account of his choosing, and he shall be the only party authorized to withdraw the Escrow Fund, or any part thereof, from that account.

3. Upon Escrow Agent's receipt of a signed statement from Capital City and J.G.B. mutually providing for a division of the Escrow Fund, or any part thereof, between Capital City and J.G.B., the Escrow Agent shall promptly release and pay over the Escrow Fund, or any part thereof, to Capital City and J.G.B. as so instructed.

4. J.G.B. and Capital City agree and acknowledge that the Escrow Agent assumes no liability in connection with this Agreement except for gross negligence or willful misconduct; that the Escrow Agent shall never be responsible for the validity, correctness or genuineness of any document or notice referred to, or paid by, the Escrow Agent under this Agreement; that the Escrow Agent may seek advice from his own counsel, and that the Escrow Agent shall be fully protected, indemnified and held

harmless in and against any action taken by him in good faith in accordance with the terms of this Escrow Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

J.G.B. Enterprises, Inc.

By: ______________________
Jay G. Bernhardt, President

Capital City Pipes, Inc.

By: ______________________
Lee Gilliam, President

______________________
Michael J. Kawa, Esq.

*Capital City Pipes, Inc.*

Office 850/574-3717 Fax 850/574-0384

November 10, 1999

LuAnn Bosey
DSCC/PLLDB1
Defense Supply Center Columbus

Ref: SP075099Q5778

LuAnn,

Hi, I am following up with you on fax I submitted to you on the above solicitation. My price will remain the same for the Qty (248) at $147.96 Everything remains the same. The only change is the one listed below.

I requested a change in the payment remittance address:

**Michael Kawa, Esq.**
**300 Crown Bldg.**
**304 S. Franklin St**
**Syracuse, NY 13202**

If you have nay questions please call me at 850-574-3717

Thank you

Thelma S. Williams
Government Sales

**1872 Mills Street Bldg. -F ** P.O. Box 12368 ** Tallahassee, Florida 32317-2368**

Nov 15 99 01:34p Th ma S. Williams 85 574 0384 p.1

| | | | |
|---|---|---|---|
| Attention: | LuAnn Bosey18136925298 | Date: | 11/15/99 |
| Company: | DSCC/PLLDBA1 | Number of Pages: | 1 |
| Fax Number: | 16146925298 | | |
| Voice Number: | 16146923234 | | |

| | |
|---|---|
| From: | Thelma S. Williams |
| Company: | Capital City Pipes, Inc. |
| Fax Number: | 850 574 0384 |
| Voice Number: | 850 574 3717 |

Subject: SP075099Q5778

Comments:

Good Morning, LuAnn, I apologize fot the confusion this may have caused.
We are requesting the payment address be changed to:

MICHAEL KAKA, ESQ.
300 CROWN BLDEG
304 S FRANKLIN STREET
SYRACUSE, NY 13202
If you have any questions please call me
THANK YOU

#41
WITNESS:_____
DATE:_____ Rptr._____
Higgins & Associates

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

Form Approved OMB No. 0704-0187 Expires Jun 30, 1997

PAGE 1 OF 7

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

*PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES. SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.*

1. CONTRACT/PURCH ORDER NO.: SP0750-00-M-4191
2. DELIVERY ORDER NO.:
3. DATE OF ORDER (YYMMDD): 1999 NOV 24
4. REQUISITION/PURCH REQUEST NO.: YPC99014000938
5. PRIORITY: DOA1

6. ISSUED BY — CODE SP0700
Defense Supply Center Columbus
3990 E.Broad St.
P.O. Box 16704
Columbus,OH 43216-5010
Local Administrator: LECC , (614)692-2423

7. ADMINISTERED BY (If other than 6) — CODE S1109A
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455
CRITICALITY: B

8. DELIVERY FOB: [X] DEST [ ] OTHER (See Schedule if other)

9. CONTRACTOR — CODE 0NSZ5 — FACILITY CODE
NAME AND ADDRESS:
CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

10. DELIVER TO FOB POINT BY (Date) (YYMMDD): 120 DAYS ADO
11. MARK IF BUSINESS IS: [ ] SMALL [X] SMALL DISADVANTAGED [ ] WOMEN-OWNED
12. DISCOUNT TERMS: NET 30 days
13. MAIL INVOICES TO: See Block 15

14. SHIP TO — CODE
See Schedule - Do Not Ship to Address in Block 6

15. PAYMENT WILL BE MADE BY — CODE S33181
S33181 DFAS COLUMBUS CENTER
ATTN DFAS-CO-LSCAA
P O BOX 182317
COLUMBUS OH 43218-2317

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

16. TYPE OF ORDER:
DELIVERY [ ] — This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract.
PURCHASE [X] — Reference your offer dated 1999 JUL 08, SP0750-99-Q-5778 and furnish the following on terms specified herein.
ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

NAME OF CONTRACTOR — SIGNATURE — TYPED NAME AND TITLE — DATE SIGNED (YYMMDD)

[ ] If this box is marked, supplier must sign Acceptance and return the following number of copies:

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
97X4930 5CC0 001 26.0 S33150

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICE | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | Remarks: ACCELERATED DELIVERY IS ACCEPTABLE AND DESIRED AT NO COST TO THE GOVERNMENT. | TOTAL: 306 | | | |

* If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity ordered and encircle.

24. UNITED STATES OF AMERICA
BY: [signature] 11-19-99
CONTRACTING OFFICER
CONTRACTING/ORDERING OFFICER

25. TOTAL: $ 45275.76
29. DIFFERENCES
30. INITIALS

26. QUANTITY IN COLUMN 20 HAS BEEN [ ] INSPECTED [ ] RECEIVED [ ] ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED

DATE — SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE

27. SHIP. NO. [ ] PARTIAL [ ] FINAL
28. D.O. VOUCHER NO.
31. PAYMENT [ ] COMPLETE [ ] PARTIAL [ ] FINAL
32. PAID BY
33. AMOUNT VERIFIED CORRECT FOR
34. CHECK NUMBER
35. BILL OF LADING NO.

36. I certify this account is correct and proper for payment.

DATE — SIGNATURE AND TITLE OF CERTIFYING OFFICER

37. RECEIVED AT — 38. RECEIVED BY (Print) — 39. DATE RECEIVED (YYMMDD) — 40. TOTAL CONTAINERS — 41. S/R ACCOUNT NUMBER — 42. S/R VOUCHER NO.

DD FORM 1155, JUN 94 (EG)

ID. [stamp] WITNESS: ______ Designee
DATE: ______ Rptr: ______
#16

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 2 | OF PAGES 7 |
|---|---|---|---|

FIRST ARTICLE TEST WAIVED BASED UPON JGB ENTERPRISES USING HOSE FOR FAT
PROVED SOURCE GOODYEAR TIRE AND RUBBER (73842).

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 4 | OF PAGES 7 |
|---|---|---|---|

SECTION B

4.7, CUSTOMER-SUPPLIED PRODUCT:
4.8, PRODUCT IDENTIFICATION & TRACEABILITY:
4.10, INSPECTION & TESTING:
4.11, INSPECTION, MEASURING & TEST EQUIPMENT:
4.12, INSPECTION AND TEST STATUS:
4.13, CONTROL OF NONCONFORMING PRODUCT:
4.14, CORRECTIVE AND PREVENTIVE ACTION:
PARAGRAPH 4.14.3 APPLY TO PRODUCT ONLY
4.16, QUALITY RECORDS:
FAR CLAUSE 52.246-11 APPLIES
POTENTIAL CONTRACTORS MUST IDENTIFY THE ACTUAL PLACE OF MANUFACTURE OF THE HOSE AT THE TIME OF SOLICITATION.

| ITEM | PR | PRLI | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|---|
| 0001 | YPC99014000938 | 0001 | 306 | EA | $147.96000 | $45275.76 |

QTY VARIANCE: PLUS 10% MINUS 10%
INSPECTION POINT: ORIGIN
ACCEPTANCE POINT: ORIGIN

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1C, 01 OCT 1996
QUP = 001: PRES MTHD = AE: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = 00: OPI = O:
PACK CODE = U:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129.
SPECIAL MARKING CODE: 00 - NO SPECIAL MARKING.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV B DATED 99238

DOD BAR CODE MARKING REQUIRED IN ACCORDANCE WITH MIL-STD-129 (LATEST REVISION) MARKING AND BAR CODING IN ACCORDANCE WITH AIM BC1.

DELIVER FOB: DESTINATION BY: 2000 MAR 23

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

CONTINUED ON NEXT PAGE

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 3 | OF PAGES 7 |
|---|---|---|---|

SECTION B

PR YPC99014000938
NSN 4720-00-978-8887

ITEM DESCRIPTION:

HOSE ASSEMBLY, NONMETALLIC, 4 IN. ID, 10 FT LG, ALUMINUM ALLOY QUICK DISCONNECT MALE AND FEMALE COUPLINGS, SPEC TITLE, HOSE AND HOSE ASSEMBLY, NONMETALLIC, SUCTION AND DISCHARGE. END ITEM, SUPPORT EQUIPMENT, B-52, F-111 AND C-135 AIRCRAFT.

IF AQLS ARE LISTED IN THE SPECIFICATION(S) OR DRAWING(S) THEY MAY BE USED TO ESTABLISH THE AUTHORIZED SAMPLE SIZE, HOWEVER, THE ACCEPTANCE NUMBER FOR THIS CONTRACT IS ZERO; I.E., THIS CONTRACT REQUIRES A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS AND REJECTS ON ONE OR MORE DEFECT(S).
I43 CONTRACTOR FIRST ARTICLE TEST IS REQUIRED.

'CLASS I OZONE DEPLETING CHEMICALS ARE NOT TO BE USED NOR INCORPORATED IN ANY ITEMS TO BE DELIVERED UNDER THIS CONTRACT. THIS PROHIBITION SUPERSEDES ALL SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT REQUIREMENTS. SUBSTITUTE CHEMICALS MUST BE SUBMITTED FOR APPROVAL UNLESS THEY ARE AUTHORIZED BY THE SPECIFICATION REQUIREMENTS.'

DLAD 52.246-9004, PRODUCT VERIFICATION TESTING, APPLIES. THIS CLAUSE IS A GOVERNMENT OPTION THAT CAN ONLY BE INVOKED UPON THE COGNIZANT CONTRACT ADMINISTRATION OFFICE NOTIFYING THE CONTRACTOR THAT PVT SAMPLES ARE TO BE SELECTED.

THE INTERNATIONAL ORGANIZATION FOR STANDARDIZATION (ISO) 9002 OR A 'TAILORED' PROGRAM MEETING THE FOLLOWING ISO 9002 PARAGRAPHS APPLIES:
4.5, DOCUMENT CONTROL: LIMITED TO INSPECTION AND TESTING AS WELL AS APPLICABLE DRAWINGS, SPECIFICATIONS AND INSTRUCTIONS REQUIRED BY CONTRACT
4.6, PURCHASING: 4.6.1 AND LIMITED TO 4.6.2 A) AND 4.6.4.2, ALL OTHER PARTS OF PARAGRAPH ARE HEREBY DELETED

CONTINUED ON NEXT PAGE

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 5 | OF PAGES 7 |
|---|---|---|---|

SECTION B

FREIGHT SHIPPING ADDRESS:

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 12/31/1999 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REMIT PAYMENT TO:

MICHAEL KAWA, ESQ.
300 CROWN BLDG
304 S. FRANKLIN ST
SYRACUSE NY 13202

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED ON NEXT PAGE

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 6 | OF PAGES 7 |
|---|---|---|---|

All clauses and provisions listed within this individual solicitation are contained in the DSCC Master Solicitation (SSC/SSE) dated JUNE 1999. This document can be found at ( www.dscccols.com )'. Current changes to the aforementioned Master Solicitation are contained within this solicitation and [illegible] supersede any outdated information contained in the Master [illegible]itation. The clauses/provisions incorporated by reference [illegible] the same force and effect as if they were in full text; however, those having no bearing on the instant acquisition become self-deleting. In the event of an inconsistency between the Master Solicitation and the individual solicitation, the provision of the individual solicitation shall govern.

For Simplified Acquisitions (under $100,000) quoters may respond electronically via the DSCC Electronic Bid Board (EBB) at www.dscccols.com/programs/ebb or by facsimilie to the buyer's fax number.

SECTION B

B03 - DSCC WEB SITE

The DSCC Master Solicitation is available on the Internet via the DSCC Web Site at http://dibbs.dscccols.com/Refs/ProvClauses/ Also, the full text of FAR/DFARS/DLAD clauses incorporated by reference may be accessed electronically at http://www.procregs.hq.dla.mil/icps.htm

B04 - ALTERNATE DISPUTE RESOLUTION (ADR)

SECTION C

C - Y2K COMPLIANT NOTICE

SECTION D

D02a - PACKAGING AND MARKING REQUIREMENTS (DSCC 52.246-9C41) (AUG 1999)

Packaging and marking requirements for items being procured shall be accomplished as stated herein. (See Section B)

[illegible]ffice symbol for the Packaging Team is DSCC-VSP.

The following items shall be Preserved, Packaged, Packed and Marked in accordance with MIL-STD-2073-1C and Marked in accordance with MIL-STD-129N.

D03 - PACKING LIST/INVOICE/SHIPPING DOCUMENTS (AUG 1999) (DSCC 52.211-9C17)

(a) A packing list, invoice, or shipping documents shall accompany or be included in ALL shipments.
(b) The document(s) shall include the following:
Complete MARK FOR including requisition (TCN) number;
Order Number;
CLIN;
National Stock Number (NSN) or Part Number if NSN is not available; Noun Nomenclature;
Quantity;
Unit of Issue; and
Preparation for Delivery requirements such as MIL-STD-2073 Coded Packaging, QUP, and Packaging/Packing levels.
(c) In addition for all DIRECT SHIPMENTS to overseas AND domestic consignees, including shipments to Consolication and Containerization, the documentation with complete MARK FOR INFORMATION is to be placed in a water-resistant envelope securely attached to the outside of the shipping container/exterior pack. (This paragraph 'c' is not applicable to shipments to a Government Packing Facility)

D06 - PREPARATION FOR DELIVERY (JAN 1992) (DSCC 52.211-9C15)

D07 - LABELS (AUG 1999) (DSCC 52.211-9C18)

DD Form 1387, Military Shipment Labels, are required for all overseas shipments to water or air terminals and Consolidation and Containerization Points and must be used in accordance with MIL-STD-129N. (Labels are not required when forwarding to a Government Packing Facility or for Parcel Post shipments to any nation.)

D08 - SPECIAL HANDLING DATA/ACKNOWLEDGEMENT (AUG 1999) (DSCC 52.211-9C20)

Any item that contains dangerous material which by virtue of its properties is flammable, corrosive, combustible, explosive, toxic, radioactive, unduly magnetic, or which contains oxidizing agents or is otherwise hazardous shall not be offered for transportation by military air until properly packed and marked in accordance with joint military publication Preparation of Hazardous Materials for Military air shipment, AFJM 24-204/TM 38-250/NAVSUP PUB 505/MCO P4030.19G, DLAI 4145.3. Special Handling Data/Certification, DD Form 1387-2, shall be prepared and affixed to each package in accordance with MIL-STD-129N and the joint military publication cited above.

SECTION E

E01 - CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2) (FEB 1998)

E03 - INSPECTION AT ORIGIN (DSCC 52.246-9C01) (FEB 1993)

(c) Inspection Points:

SUPPLIES

CLIN(s)

ALL
( ) Same as Offeror
(X) Other (CAGE, Name, Street Address, City, State and Zip Code)
( ) JGB ENTERPRISES INC.
215 METROPOLITAN DR
LIVERPOOL NY 13088-0209
( )

PACKAGING

CLIN(s)

ALL
( ) Same as Offeror
(X) Same as above
( ) Other (CAGE, Name, Street Address, City, State and Zip Code)
( )

( )

E03A - INSPECTION/ACCEPTANCE AT ORIGIN WILL BE PERFORMED BY:

CLIN(s) SUPPLIES

ALL ( ) Office Administering Order/Contract

(X) Other

DCMC SYRACUSE
615 ERIE BLVD WEST
SYRACUSE NY 13204-2408

PACKAGING

( ) Office Administering Order/Contract

ALL (X) Same as for Supplies

( ) Other

CONTINUED ON NEXT PAGE

| CONTINUATION SHEET | Order Number: SP0750-00-M-4191 | PAGE 7 | OF PAGES 7 |
|---|---|---|---|

14 - ACCEPTANCE AT ORIGIN (DSCC 52.246-9C02) (NOV 1995)

16 - MATERIAL INSPECTION AND RECEIVING REPORT
DFARS 252.246-7000) (DEC 1991)

14a - HIGHER-LEVEL CONTRACT QUALITY REQUIREMENT (TAILORED ISO
9002) (FEB 1999) (DSCC 52.246-9C44) (SUBSTANTIALLY THE SAME AS
FAR 52.246-11)

18 - PRODUCT VERIFICATION TESTING (DLAD 52.246-9004) (AUG
1997)

23 - SUBSTITUTION OF ITEM AFTER AWARD (DSCC 52.246-9C13)
JAN 1999)

ECTION F

F01 - SOLICITATION CLAUSES INCORPORATED BY REFERENCE
FAR 52.252-2) (FEB 1998)

F04 - POINT OF CONTACT FOR TRANSPORTATION INSTRUCTIONS
(DSCC 52.247-9C04) (JUN 1999)

TION I

I01 - CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2)
(FEB 1998)

I43A - FIRST ARTICLE TESTING waived.

I46B - SECTION 8(a) DIRECT AWARD (DFARS 252.219-7009)
(JUN 1998)

(a) This contract is issued as a direct award between the contracting officer and the 8(a) Contractor pursuant to the Memorandum of Understanding dated May 6, 1998, between the Small Business Administration (SBA) and the Department of Defense. Accordingly, the SBA is not a part to this contract. SBA does retain responsibility for 8(a) certification, for 8(a) eligibility determination and related issues, and for providing counseling and assistance to the 8(a) Contractor under the 8(a) Program. The cognizant SBA district office is:
U.S. SMALL BUSINESS ADMINISTRATION
7825 BAYMEADOWS WAY SUITE 100B
JACKSONVILLE FL 32256-7504

(To be completed by the Contracting Officer at the time of award)

I83 - NOTIFICATION TO DELAY PERFORMANCE (DFARS 252.219-7011)
(JUN 1998)

PART VII MASTER SOLICITATION - PALLETIZATION NO. DC1636P001 -
96150 - APPLIES

# PART II – CONTRACT CLAUSES

## SECTION I - CONTRACT CLAUSES

I01 - CLAUSES INCORPORATED BY REFERENCE (FAR 52.252-2) (FEB 1998)

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. Also, the full text of a clause may be accessed electronically at

http://www.procregs.hq.dla.mil/icps.htm

NOTE: *If not applicable becomes self-deleting.*

a. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

52.202-1 - Definitions (Over $100,000)(OCT 1995)
Alternate I (APR 1984) (BASE CONTRACTS)
52.203-3 - Gratuities (Over $100,000)(APR 1984)
52.203-5 - Covenant Against Contingent Fees (Over $100,000) (N/A to Commercial) (APR 1984)
52.203-6 - Restriction on Subcontractor Sales to the Government (Over $100,000) (JUL 1995)
52.203-7 - Anti-Kickback Procedures (Over $100,000) (JUL 1995)
52.203-8 - Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity (Over $100,000) (JAN 1997)
52.203-10 - Price or Fee Adjustment for Illegal or Improper Activity (Over $100,000) (JAN 1997)
52.203-12 - Limitation on Payments to Influence Certain Federal Transactions (Over $100,000) (JUN 1997)
52.204-2 - Security Requirements (AUG 1996) (Applicable only when access to classified confirmation is required.)
52.204-4 - Printing/Copying Double-Sided on Recycled Paper (Over $100,000) (JUN 1996)
52.209-6 - Protecting the Governments Interest when Subcontracting with Contractors Debarred, Suspended, or Proposed for Debarment (Over $25,000) (JUL 1995)
52.211-5 - Material Requirements (OCT 1997) (N/A to Commercial)
52.211-15 - Defense Priority and Allocation Requirements (SEP 1990)
**The following FAR 52.214-XX clauses are applicable to IFB's only:**
52.214-26 - Audit and Records – Sealed Bidding (OCT 1997)
52.214-27 - Price Reduction for Defective Cost or Pricing Data – Modifications –Sealed Bidding (Over $500,000) (OCT 1997)
52.214-28 - Subcontractor Cost or Pricing Data – Modifications – Sealed Bidding (Over $500,000)(OCT 1997)
52.214-29 - Order of Precedence – Sealed Bidding (JAN 1986)
52.215-2 - Audit and Records—Negotiations (Over $100,000)(AUG 1996)
52.215-8 - Order of Precedence - Uniform Contract Format (Over $100,000)(OCT 1997)
52.215-10 - Price Reduction for Defective Cost or Pricing Data (Over $500,000) (OCT 1997)
52.215-11 - Price Reduction for Defective Cost or Pricing Data – Modifications (Over $500,000) (OCT 1997)
52.215-12 - Subcontractor Cost or Pricing Data (Over $500,000) (OCT 1997)
52.215-13 - Subcontractor Cost or Pricing Data – Modifications (Over $500,000)(OCT 1997)
52.215-14 - Integrity of Unit Prices (Over $100,000)(OCT 1997)
Alternate I (Over $100,000)(OCT 1997) (Applicable when there is inadequate price competition)
52.215-15 - Termination of Defined Benefit Pension Plans (Over $500,000) (DEC 1998)
52.215-17 - Waiver of Facilities Capital Cost of Money (Over $100,000)(OCT 1997)
52.215-18 - Reversion or Adjustment of Plans for Postretirement Benefits Other Than Pensions (PRB) (Over $500,000) (OCT 1997)
52.215-19 - Notification of Ownership Changes (Over $100,000)(OCT 1997)
52.216-5 - Price Redetermination-Prospective (BASE CONTRACTS and SERVICES) (OCT 1997)
52.216-6 - Price Redetermination-Retroactive (BASE CONTRACTS and SERVICES) (OCT 1997)
52.217-8 - Option to Extend Services (SERVICES) (AUG 1989)
52.219-8 - Utilization of Small Business Concerns (Over $100,000) (JUN 1999)
52.219-9 - Small Business Subcontracting Plan (Over $500,000) ($1,000,000 for Construction of any Public Facility) (JAN 1999)
Alternate I (Sealed Bidding) (JAN 1999)
52.219-16 - Liquidated Damages – Subcontracting Plan (JAN 1999)
52.222-1 - Notice to the Government of Labor Disputes (Over $2,000)(FEB 1997)
52.222-3 - Convict Labor (Over $2,500)(AUG 1996)
52.222-4 - Contract Work Hours and Safety Standards Act – Overtime Compensation (Over $100,000) (JUL 1995)
52.222-6 - Davis-Bacon Act (Over $2,000) (FEB 1995) (BASE CONTRACT)
52.222-7 - Withholding of Funds (Over $2,000) (FEB 1988) (BASE CONTRACT)
52.222-8 - Payrolls and Basic Records (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-9 - Apprentices and Trainees (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-10 - Compliance with Copeland Act Requirements (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-11 - Subcontracts (Labor Standards) (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-12 - Contract Termination – Debarment (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-13 - Compliance with Davis-Bacon and Related Act Regulations (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-14 - Disputes Concerning Labor Standards (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-15 - Certification of Eligibility (Over $2,000)(FEB 1988) (BASE CONTRACT)
52.222-20 - Walsh-Healey Public Contracts Act (Over $10,000) (DEC 1996)
52.222-21 - Prohibition of Nonsegregated Facilities (Over $10,000)(FEB 1999)
52.222-26 - Equal Opportunity (Over $10,000)(FEB 1999)
52.222-27 - Affirmative Action Compliance Requirements for Construction (Over $10,000) (FEB 1999) (BASE CONTRACTS)

52.222-29 - Notification of Visa Denial (FEN 1999)
52.222-35 - Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (Over $10,000) (APR 1989)
52.222-36 - Affirmative Action for Workers With Disabilities (Over $2,500) (JUN 1998)
52.222-37 - Employment Reports on Disabled Veterans and Veterans of the Vietnam Era(Over $10,000)(JAN 1999)(Applicable with FAR 52.222-35)
52.222-41 - Service Contract Act of 1965, as Amended (Over $2,500) (MAY 1989) (SERVICES)
52.222-43 - Fair Labor Standards Act and Service Contract Act – Price Adjustment (Multiple Year and Option Contracts) (Under $100,000) (SERVICES)(MAY 1989)
52.222-44 - Fair Labor Standards Act and Service Contract Act – Price Adjustment (MAY 1989) (SERVICES)
52.222-48 - Exemption from Application of Service Contract Act Provisions (SERVICES) (AUG 1996)
52.223-2 - Clean Air and Water (Over $100,000) (APR 1984)
52.223-5 - Pollution Prevention and Right-to-Know Information (APR 1998) (BASE CONTRACTS AND SERVICES)
52.223-14 - Toxic Chemical Release Reporting (Competitive over $100,000) (OCT 1996)(Applicable with FAR 52.223-13)
52.225-10 - Duty-Free Entry (APR 1984)
52.225-11 - Restrictions on Certain Foreign Purchases (OCT 1996)
52.225-14 - Inconsistency Between English Version and Translation of Contract (AUG 1989)
52.225-18 - European Union Sanction for End Products (Under $186,000) (JAN 1996)
52.226-1 - Utilization of Indian Organizations and Indian-Owned Economic Enterprises (Over $500,000 or $1,000,000 for BASE CONTRACTS) (MAY 1999)
52.227-1 - Authorization and Consent (JUL 1995)
52.227-2 - Notice and Assistance Regarding Patent and Copyright Infringement (Over $100,000 except when delivery and performance are outside the U.S. and it's possessions and Puerto Rico) (AUG 1996)
52.227-3 - Patent Indemnity (Over $100,000) (APR 1984)
52.227-4 - Patent Indemnity – Construction Contracts (Over $100,000)(APR 1984) (BASE CONTRACT)
52.228-2 - Additional Bond Security (OCT 1997)(BASE CONTRACTS)
52.228-5 - Insurance – Work on a Government Installation (Over $100,000) (JAN 1997) (BASE CONTRACTS and SERVICES)
52.228-11 - Pledges of Assets (Use when Bid Guarantees and Performance and Payment Bonds are required.) (FEB 1992) (BASE CONTRACTS)
52.228-12 - Prospective Subcontractor Requests for Bonds (Over $100,000)(OCT 1995) (BASE CONTRACTS)
52.228-14 - Irrevocable Letter of Credit (OCT 1997) (BASE CONTRACTS)
52.228-15 - Performance and Payment Bonds - Construction (Over $100,000)(SEP 1996)(BASE CONTRACTS)
52.229-3 - Federal, State, and Local Taxes (Over $100,000) (JAN 1991)
52.229-5 - Taxes – Contracts Performed in U.S. Possessions or Puerto Rico (Over $100,000)(APR 1984) (Use with FAR 52.229-3)
52.229-6 - Taxes – Foreign Fixed-Price Contracts (Over $100,000) (JAN 1991)
52.230-2 – Cost Accounting Standards (Over $500,000) (APR 1998)
52.230-3 – Disclosure and Consistency of Cost Accounting Practices (Over $100,000) (APR 1998)
52.230-4 – Consistency in Cost Accounting Practices (Over $500,000) (AUG 1992)
52.230-6 – Administration of Cost Accounting Standards (Over $500,000) (APR 1996)
52.232-1 - Payments (APR 1984)
52.232-5 - Payments under Fixed-Price Construction Contracts (MAY 1997) (Over $100,000)(BASE CONTRACTS)
52.232-8 - Discounts for Prompt Payment (MAY 1997)
52.232-9 - Limitations on Withholding of Payments (Over $100,000) (APR 1984) (SERVICES)
52.232-11 - Extras (APR 1984)
52.232-17 - Interest (Over $100,000) (JUN 1996)
52.232-18 - Availability of Funds (APR 1984) (BASE CONTRACTS and SERVICES)
52.232-23 - Assignment of Claims (Over $2,500) (MAY 1997)
52.232-25 - Prompt Payment (JUN 1997)
52.232-27 - Prompt Payment for Construction Contracts (JUN 1997) (BASE CONTRACTS)
52.232-33 - Mandatory Information for Electronic Funds Transfer Payment (MAY 1999)
52.233-1 - Disputes (DEC 1998), Alternate I (DEC 1991)
52.233-3 - Protest After Award (AUG 1996)
52.236-2 - Differing Site Conditions (APR 1984) (BASE CONTRACTS)
52.236-3 - Site Investigation and Condition Affecting the Work (APR 1984) (BASE CONTRACTS)
52.236-5 - Material and Workmanship (APR 1984) (BASE CONTRACTS)
52.236-6 - Superintendence by the Contractor (APR 1984) (BASE CONTRACTS)
52.236-7 - Permits and Responsibilities (NOV 1991) (BASE CONTRACTS)
52.236-8 - Other Contracts(APR 1984) (BASE CONTRACTS)
52.236-9 - Protection of Existing Vegetation, Structure, Equipment, Utilities, and Improvements (APR 1984) (BASE CONTRACTS)
52.236-10 - Operations and Storage Areas (APR 1984) (BASE CONTRACTS)
52.236-11 - Use and Possessions Prior to Completion (APR 1984) (BASE CONTRACTS)
52.236-12 - Cleaning Up (APR 1984) (BASE CONTRACTS)
52.236-13 - Accident Prevention (NOV 1991) (BASE CONTRACTS)
52.236-14 - Availability and Use of Utility Services (APR 1984) (BASE CONTRACTS)
52.236-21 - Specifications and Drawings for Construction (FEB 1997) (BASE CONTRACTS), Alternate I (APR 1984), Alternate II (APR 1984)
52.237-2 - Protection of Government Buildings, Equipment, and Vegetation (APR 1984) (SERVICES)
52.237-3 - Continuity of Services (JAN 1991) (SERVICES)
52.242-12 - Report of Shipment (RESHIP) (JUL 1995)
52.242-13 - Bankruptcy (Over $100,000) (JUL 1995)
52.242-14 - Suspension of Work (APR 1984) (BASE CONTRACTS)
52.243-1 - Changes – Fixed Price (AUG 1987), Alternate I (APR 1984) (SERVICES), Alternate II (AUG 1987) )SERVICES), Alternate III (APR 1984) (SERVICES), Alternate IV (Under $100,000) (APR 1984)
52.243-4 - Changes (AUG 1987) (BASE CONTRACTS)
52.243-5 - Changes and Changed Conditions (APR 1984) (BASE CONTRACTS)

52.244-2 – Subcontracts (AUG 1998) (SERVICES over $100,000)
52.244-5 - Competition in Subcontracting (DEC 1996)
52.245-1 - Property Records (APR 1984)
52.245-3 - Identification of Government-Furnished Property (APR 1984) (BASE CONTRACTS)
52.246-18 - Warranty of Supplies of a Complex Nature (Over $100,000) (APR 1984), Alternate IV (APR 1984)
52.246-19 - Warranty of Systems and Equipment under Performance Specifications or Design Criteria (Over $100,000) (DEC 1989) Alternate III (APR 1984)
52.246-23 - Limitation of Liability (Over $100,000)(FEB 1997)
52.247-1 – Commercial Bill of Lading Notations (APR 1984) (Applicable to F.O.B Orders/Contracts)
52.247-63 – Preference for U.S. – Flag Air Carriers (Over $100,000) (Jan 1997)
52.248-1 - Value Engineering (Over $100,000) (MAR 1989)
52.249-1 - Termination for Convenience of the Government (Fixed-Price)(Short Form) (APR 1984)
52.249-2 - Termination for Convenience of the Government (Fixed-Price) (Over $100,000) (SEP 1996) Alternate I (SEP 1996) (BASE CONTRACTS), Alternate II (Over $100,000) (SEP 1996), Alternate III (SEP 1996) (BASE CONTRACTS)
52.249-4 - Termination for Convenience of the Government (Short Form) (APR 1984) (SERVICES)
52.249-8 - Default (APR 1984), Alternate I (Under $100,000) (APR 1984)
52.249-10 - Default (APR 1984) (BASE CONTRACTS), Alternate I (APR 1984) Alternate II (Under $100,000) (APR 1984) (BASE CONTRACTS), Alternate III (Under $100,000) (APR 1984)
52.253-1 - Computer Generated Forms (JAN 1991)

b. DEPARTMENT OF DEFENSE FAR SUPPLEMENT (48 CFR CHAPTER 2) CLAUSES

252.203-7001 - Special Prohibition on Employment (Over $100,000) (N/A to Commercial) (MAR 1999)
252.203-7002 - Display of DoD Hotline Poster (Over $5 Million) (DEC 1991)
252.204-7002 - Payment for Subline Items Not Separately Priced (DEC 1991)
252.204-7003 - Control of Government Personnel Work Products (APR 1992)
252.204-7004 - Required Central Contractor Registration (MAR 1998)
252.205-7000 - Provision of Information to Cooperative Agreement Holders (Over $500,000) (DEC 1991)
252.209-7000 - Acquisition from Subcontractors Subject to On-Site Inspection Under the Intermediate Range Nuclear Forces (INF) Treaty) (Over $100,000) (N/A to Commercial) (NOV 1995)
252.209-7004 - Subcontracting with Firms That Are Owned or Controlled by the Government of a Terrorist Country (Over $100,000) (MAR 1998)
252.215-7000 - Pricing Adjustments (Over $500,000) (DEC 1991)
252.215-7002 - Cost Estimating System Requirements (Over $500,000) (OCT 1998)
252.219-7003 - Small, Small Disadvantaged and Women-Owned Small Business Subcontracting Plan and Small Disadvantaged Business Subcontracting Plan (DoD Contracts). (Over $500,000) (APR 1996)
252.223-7002 - Safety Precautions for Ammunition and Explosives (MAY 1994)
252.223-7003 - Change in Place of Performance - Ammunition and Explosives (DEC 1991)
252.223-7004 - Drug-Free Work Force (SEP 1988) (N/A to Commercial)
252.223-7006 - Prohibition on Storage and Disposal of Toxic and Hazardous Materials (APR 1993) (BASE CONTRACTS and SERVICES)
252.225-7001 - Buy American Act and Balance of Payments Program (MAR 1998)
252.225-7002 - Qualifying Country Sources as Subcontractors (DEC 1991)
252.225-7005 - Identification of Expenditures in the United States (Negotiated over $25,000) (DEC 1991)
252.225-7007 - Trade Agreements (Over $186,000) (MAR 1998)
252.225-7009 - Duty-Free Entry – Qualifying Country Supplies (End Products and Components) (MAR 1998)
252.225-7010 - Duty-Free Entry – Additional Provisions (Use with 52.225-10) (MAR 1998)
252.225-7012 - Preference for Certain Domestic Commodities (Over $100,000) (MAY 1999)
252.225-7014 - Preference for Domestic Specialty Metals (Over $100,000) (MAR 1998)
252.225-7016 - Restriction on Acquisition of Ball and Roller Bearings (AUG 1998)
252.225-7025 - Foreign Source Restrictions (Over $100,000) (JUN 1997)
252.225-7026 - Reporting of Contract Performance Outside the United States (Over $500,000) (MAR 1998)
252.225-7029 - Preference for United States or Canadian Air Circuit Breakers (Over $100,000) (AUG 1998)
252.225-7031 - Secondary Arab Boycott of Israel (Over $100,000) (JUN 1992)
252.225-7032 - Waiver of United Kingdom Levies (OCT 1992)
252.225-7036 - Buy American Act-North American Free Trade Agreement (Over $53,150) (MAR 1998)
252.225-7036 - Buy American Act-North American Free Trade Agreement with Alternate I ($25,000 - $53,150) (MAR 1998)
252.225-7037 - Duty-Free Entry – NAFTA Country End Products and Supplies (When 52.225-10 is not used and 225.403-70 applies) (MAR 1998)
252.225-7041 - Correspondence in English Language (JUN 1997)
252.225-7042 - Authorization to Perform (JUN 1997)
252.231-7000 - Supplemental Cost Principles (Over $100,000) (DEC 1991)
252.232-7008 - Assignment of Claims (Overseas) (JUN 1997)
252.233-7001 - Choice of Law (Overseas) (JUN 1997)
252.236-7000 - Modification Proposals - Price Breakdown (DEC 1991)(BASE CONTRACTS)
252.242-7000 - Post Award Conference (DEC 1991)
252.242-7003 - Application for U.S. Government Shipping Documentation/Instructions (Use with FAR 52.242-10) (DEC 1991)
252.242-7004 - Material Management and Accounting System (Over $100,000 – N/A to Commercial) (SEP 1996)
252.243-7001 - Pricing of Contract Modification (DEC 1991)
252.248-7000 – Preparation of Value Engineering Change Proposal (Over $100,000) (May 1994)

52.232-33 - Payment by Electronic Funds Transfer--Central Contractor Registration.

As prescribed in 32.1110(a)(1), insert the following clause:

Payment by Electronic Funds Transfer--Central Contractor Registration (May. 1999)

(a) *Method of payment.*

(1) All payments by the Government under this contract, shall be made by electronic funds transfer (EFT), except as provided in paragraph (a)(2) of this clause. As used in this clause, the term "EFT" refers to the funds transfer and may also include the payment information transfer.

(2) In the event the Government is unable to release one or more payments by EFT, the Contractor agrees to either--

(i) Accept payment by check or some other mutually agreeable method of payment; or

(ii) Request the Government to extend the payment due date until such time as the Government can make payment by EFT (but see paragraph (d) of this clause).

(b) *Contractor's EFT information.* The Government shall make payment to the Contractor using the EFT information contained in the Central Contractor Registration (CCR) database. In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database.

(c) *Mechanisms for EFT payment.* The Government may make payment by EFT through either the Automated Clearing House (ACH) network, subject to the rules of the National Automated Clearing House Association, or the Fedwire Transfer System. The rules governing Federal payments through the ACH are contained in 31 CFR part 210.

(d) *Suspension of payment.* If the Contractor's EFT information in the CCR database is incorrect, then the Government need not make payment to the Contractor under this contract until correct EFT information is entered into the

9 / 2

CCR database; and any invoice or contract financing request shall be deemed not to be a proper invoice for the purpose of prompt payment under this contract. The prompt payment terms of the contract regarding notice of an improper invoice and delays in accrual of interest penalties apply.

(e) *Contractor EFT arrangements.* If the Contractor has identified multiple payment receiving points (i.e., more than one remittance address and/or EFT information set) in the CCR database, and the Contractor has not notified the Government of the payment receiving point applicable to this contract, the Government shall make payment to the first payment receiving point (EFT information set or remittance address as applicable) listed in the CCR database.

(f) *Liability for uncompleted or erroneous transfers.*

(1) If an uncompleted or erroneous transfer occurs because the Government used the Contractor's EFT information incorrectly, the Government remains responsible for--

(i) Making a correct payment;

(ii) Paying any prompt payment penalty due; and

(iii) Recovering any erroneously directed funds.

(2) If an uncompleted or erroneous transfer occurs because the Contractor's EFT information was incorrect, or was revised within 30 days of Government release of the EFT payment transaction instruction to the Federal Reserve System, and--

(i) If the funds are no longer under the control of the payment office, the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds; or

(ii) If the funds remain under the control of the payment office, the Government shall not make payment, and the provisions of paragraph (d) of this clause shall apply.

(g) *EFT and prompt payment.* A payment shall be deemed to have been made in a timely manner in accordance with the prompt payment terms of this contract if,

9 / 3

in the EFT payment transaction instruction released to the Federal Reserve System, the date specified for settlement of the payment is on or before the prompt payment due date, provided the specified payment date is a valid date under the rules of the Federal Reserve System.

(h) *EFT and assignment of claims.* If the Contractor assigns the proceeds of this contract as provided for in the assignment of claims terms of this contract, the Contractor shall require as a condition of any such assignment, that the assignee shall register in the CCR database and shall be paid by EFT in accordance with the terms of this clause. In all respects, the requirements of this clause shall apply to the assignee as if it were the Contractor. EFT information that shows the ultimate recipient of the transfer to be other than the Contractor, in the absence of a proper assignment of claims acceptable to the Government, is incorrect EFT information within the meaning of paragraph (d) of this clause.

(i) *Liability for change of EFT information by financial agent.* The Government is not liable for errors resulting from changes to EFT information made by the Contractor's financial agent.

(j) *Payment information.* The payment or disbursing office shall forward to the Contractor available payment information that is suitable for transmission as of the date of release of the EFT instruction to the Federal Reserve System. The Government may request the Contractor to designate a desired format and method(s) for delivery of payment information from a list of formats and methods the payment office is capable of executing. However, the Government does not guarantee that any particular format or method of delivery is available at any particular payment office and retains the latitude to use the format and delivery method most convenient to the Government. If the Government makes payment by check in accordance with paragraph (a) of this clause, the Government shall mail the payment information to the remittance address contained in the CCR database.

(End of Clause)

9 / 4

DEFENSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OHIO 43216-5000

IN REPLY REFER TO DSCC SP0750-00-C-3001 CAPITAL CITY PIPES INC. CAGE 0NSZ5 10 MAR 2000

ALERT

PHONE 614-692-3716 FAX 614-693-1574 EMAIL PHYLLIS_MOORE@DSCC.DLA.MIL
REFERENCE SUBJECT CONTRACTOR.
THIS IS A REQUEST FOR YOUR OFFICE TO REPORT ON ALL NIB/NISH OR 8A CONTRACTOR'S PROGRESS, ISSUED BY THIS CENTER WITH YOUR ~~ADMINISTRATION ASSIGNMENT. IT IS REQUESTED THAT THE REPORTS BE~~ GIVEN MONTHLY AND THEY MAY BE THROUGH THE ALERTS OR CPSS PROGRAM. THANKS FOR YOUR SUPPORT. IF THERE ARE ANY QUESTIONS PLEASE FEEL FREE TO CALL OR E-MAIL.
THIS CONTRACTOR IS A 8A CONTRACTOR.

SIGNED//

PHYLLIS E. MOORE
CONTRACTING OFFICER

#22
WITNESS:________
DATE:____ Rptr:____
Higgins & Associates

**Moore, Phyllis E**

From: Moore, Phyllis E
Sent: Friday, March 24, 2000 3:14 PM
To: 'DCMC CLEARWATER/SLACK'
Subject: FW: CAPITAL CITY PIPES(8A) CAGE 0NSZ5

Importance: Low

*PHYLLIS E. MOORE*
***PHYLLIS E. MOORE***
***CONTRACTING OFFICER***
***PHONE 614-692-3716 FAX 614-693-1574***

-----Original Message-----
From: Moore, Phyllis E
Sent: Friday, March 24, 2000 3:04 PM
To: 'DCMC CLEARWATER/SLACK'
Subject: CAPITAL CITY PIPES(8A) CAGE 0NSZ5
Importance: High

ENCLOSED IS A LISTING OF ORDERS WHICH HAVE BEEN IDENTIFIED AS AWARDED TO CAPITAL CITY PIPES. AS STATED IN ALERT SENT TO YOUR ACTIVITY 10 MAR 2000, YOU ARE HEREBY REQUESTED TO MAINTAIN A SURVEILLANCE OF THESE CONTRACTS AND REPORT TO THIS OFFICE ON A 30 DAY INTERVALS [illegible] ON THE AMOUNT OF REPORTING, YOU MAY REFER ALL QUESTIONING PARTIES FROM DSCC [illegible] MOORE (AC)614-692-3716 TO GET INFORMATION YOU HAVE FURNISHED.

THIS SERVES AS AUTHORIZATION FOR THE ACO TO TAKE WHATEVER CONTRACTUAL ACTIONS NECESSARY TO KEEP THESE ORDERS VIABLE. THE MATERIAL ON THESE CONTRACTS ARE URGENTLY NEEDED. THIS INCLUDES EXTENSIONS, CANCELLATIONS, ETC..

0nsz5(8a).xls 0nsz5(8a).xls

THIS IS THE CORRECTED SPREAD SHEET. THANKS

*PHYLLIS E. MOORE*
***PHYLLIS E. MOORE***
***CONTRACTING OFFICER***
***PHONE 614-692-3716 FAX 614-693-1574***

#23
WITNESS:
DATE: Rptr:
Higgins & Associates

CAPITAL CITY PIPES

0NSZ5(8A)

STATUS

| | A | B | C | E | F | G | H | I | J | K | O | S | T | Z | AK | BB | BH | BI | BN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CAGE | min_ | Admin | PIIN | CLIN | Qty | CDD | Ship_Qt | Ship_Date | ays_De | NSN | Recvd_Qt | cvd_D | wd_Dat | ri_Cod | PS_C | ORC | MC | STATUS |
| 2 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0001 | 416 | 00099 | 416 | 00060 | 0 | 4720010666447 | 416 | 00064 | 99180 | | 05F | AA | 1 | SHIPPED |
| 3 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0002 | 198 | 00099 | 198 | 00060 | 0 | 4720010666447 | 198 | 00069 | 99180 | | 05F | AA | 1 | SHIPPED |
| 4 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0003 | 178 | 00099 | 178 | 00067 | 0 | 4720010666447 | 178 | 00075 | 99180 | | 05F | AA | 1 | SHIPPED |
| 5 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0004 | 343 | 00099 | 343 | 00074 | 0 | 4720010666447 | 272 | 00076 | 99180 | | 05F | AA | 1 | SHIPPED DISCREPANCY |
| 6 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0005 | 169 | 00099 | 169 | 00074 | 0 | 4720010666447 | 0 | 00000 | 99180 | | 05F | AA | 1 | SHIPPED |
| 7 | 0NSZ5 | 306 | LECCG | SP075000C3001 | 0001 | 38 | 00003 | 0 | 00000 | 79 | 4720011945160 | 0 | 00000 | 99288 | | | GQ | 9 | KR DOES NOT HAVE CY |
| 8 | 0NSZ5 | 306 | LECCG | SP075000C3001 | 0002 | 35 | 00003 | 0 | 00000 | 79 | 4720011945160 | 0 | 00000 | 99288 | | | GQ | 9 | KR DOES NOT HAVE CY |
| 9 | 0NSZ5 | 306 | LECCG | SP075000M4191 | 0001 | 306 | 00082 | 306 | 00069 | 0 | 4720009788887 | 306 | 00080 | 99328 | | 86F | FW | 3 | SHIPPED |
| 10 | 0NSZ5 | 306 | LECCG | SP075000M4333 | 0001 | 300 | 00113 | 0 | 00000 | 0 | 4720005852282 | 300 | 00046 | 99358 | | ABF | FP | 3 | SHIPPED |
| 11 | 0NSZ5 | 306 | LECCG | SP075000M4333 | 0002 | 650 | 00113 | 0 | 00000 | 0 | 4720005852282 | 650 | 00042 | 99358 | | ABF | FP | 3 | SHIPPED NEEDS INV |
| 12 | 0NSZ5 | 306 | LECCG | SP075099C2506 | 0001 | 986 | 99308 | 986 | 99287 | 0 | 4720000830044 | 986 | 00059 | 99188 | | KGM | HA | 3 | SHIPPED |
| 13 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 0003 | 480 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |
| 14 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 5001AA | 100 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |
| 15 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 5001AB | 59 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |

PHYLLIS E. MOORE
DSCC-LDAC
692-3716

Page 1 of 1

CAPITAL CITY PIPES

0NSZ5(8A)

STATUS

| | A | B | C | E | F | G | H | I | J | K | O | S | T | Z | AK | BB | BH | BI | BN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | CAGE | mln_ | Admln | PIIN | CLIN | Qty | CDD | Ship_Qt | Ship_Date | ays_De | NSN | Recvd_Qt | cvd_D | wd_Da | Prl_Cod | PS_C | ORC | MC | STATUS |
| 2 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0001 | 416 | 00099 | 416 | 00060 | 0 | 4720010666447 | 416 | 00064 | 99180 | | 05F | AA | 1 | SHIPPED |
| 3 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0002 | 198 | 00099 | 198 | 00060 | 0 | 4720010666447 | 198 | 00069 | 99180 | | 05F | AA | 1 | SHIPPED |
| 4 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0003 | 178 | 00099 | 178 | 00067 | 0 | 4720010666447 | 178 | 00075 | 99180 | | 05F | AA | 1 | SHIPPED |
| 5 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0004 | 343 | 00099 | 343 | 00074 | 0 | 4720010666447 | 272 | 00076 | 99180 | | 05F | AA | 1 | SHIPPED DISCREPANCY |
| 6 | 0NSZ5 | 306 | AEAAL | SP074099C1004 | 0005 | 169 | 00099 | 169 | 00074 | 0 | 4720010666447 | 0 | 00000 | 99180 | | 05F | AA | 1 | SHIPPED |
| 7 | 0NSZ5 | 306 | LECCG | SP075000C3001 | 0001 | 38 | 00003 | 0 | 00000 | 79 | 4720011945160 | 0 | 00000 | 99288 | | | GQ | 9 | DCMC SURVEILLANCE |
| 8 | 0NSZ5 | 306 | LECCG | SP075000C3001 | 0002 | 35 | 00003 | 0 | 00000 | 79 | 4720011945160 | 0 | 00000 | 99288 | | | GQ | 9 | DCMC SURVEILLANCE |
| 9 | 0NSZ5 | 306 | LECCG | SP075000M4191 | 0001 | 306 | 00082 | 306 | 00069 | 0 | 4720009788887 | 306 | 00080 | 99328 | | 86F | FW | 3 | SHIPPED |
| 10 | 0NSZ5 | 306 | LECCG | SP075000M4333 | 0001 | 300 | 00113 | 0 | 00000 | 0 | 4720005852282 | 300 | 00046 | 99358 | | ABF | FP | 3 | SHIPPED |
| 11 | 0NSZ5 | 306 | LECCG | SP075000M4333 | 0002 | 650 | 00113 | 0 | 00000 | 0 | 4720005852282 | 650 | 00042 | 99358 | | ABF | FP | 3 | SHIPPED NEEDS INV |
| 12 | 0NSZ5 | 306 | LECCG | SP075099C2506 | 0001 | 986 | 99308 | 986 | 99287 | 0 | 4720000830044 | 986 | 00059 | 99188 | | KGM | HA | 3 | SHIPPED |
| 13 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 0003 | 480 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |
| 14 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 5001AA | 100 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |
| 15 | 0NSZ5 | 306 | LECCG | SP075099C2508 | 5001AB | 59 | 99286 | 0 | 00000 | 161 | 4720007059542 | 0 | 00000 | 99211 | | KFM | HA | 3 | DCMC SURVEILLANCE |



# FAX TRANSMITTAL

TO: Mr. Mike Taylor, DSCC Small Business
PHONE: 614 / 692-2777 FAX: 614 / 692-4920

FROM: Kathryn M. Bader @ DCMC ST. PETERSBURG
Telephone #: 727 / 579-3023 FAX #: 727 / 579-3107
DSN #: 697 – 3023 email: kbader@dcmde.dla.mil

# of Pages: 1

DATE: 30 March 2000

SUBJECT: SP0750-99-C-2508/Notice of Assignment paperwork

In response to your voice message, I am forwarding for your review a copy of the fax I sent to Ms. Williams at Capital City Pipes outlining issues found by our legal division.

To date Ms. Williams has not responded to my request for information &/or revised pages.

After your review, please give me a call or email at the numbers listed above and we'll talk about what either agency can do to assist this contractor.

Thanks

4/4/00 TW Mike. HE ALREADY HAS A COPY OF MY 3/30 FAX TO THELMA. AFTER OUR DISCUSSION, HE PLANS TO APPROACH MS. MATTHEWS ABOUT MOD'G CONTRACT TO MR. KAWA'S ADDRESS. MIKE SAYS THERE IS AN ESCROW ACCT BETWEEN JGB + CAP. CITY AND MR. KAWA IS THE ATTORNEY WHO CONTROLS IT. HOWEVER, MR. KAWA DOESN'T MEET REQMTS AS A FINANCIAL INSTITUTION. MIKE WILL TELL ME WHAT CAROLYN SAYS



12Apr00 : Capital City P. i.e. SP0750-94-C-2E41
Ms. Williams asked for my help. She said there had been numerous conversations pertaining to Assignment of CLAIMS. I repeatedly told everyone involved that all we want to do is to have monies go to the vendor. Material is Complete, this is not a loan." (initialed, 21 Apr 00)

After careful review of the previous action, I suggested if this is not an assignment, their company & the vendor's Company must set up an account where monies will be directly sent or set aside for the vendor. If they can agree, there's no need for Government intervention. An Assignment is a transfer of the Contractor's rights to be paid by the Government, to another Contractor to secure a loan. In this case I do not believe we are talking about transferring your rights to be Paid.
How you pay your vendors, should be your decision.

#26

WITNESS:
DATE: Rptr:
Higgins & Associates

However, I see a problem in your remittance address if it's not to a bank. DFAS does not want to make paper checks.

If an agreement cannot be made, please explain to the vendor the order will be terminated and that there is no guarantee that there would an award to them. They will lose out all the way around.

Since this material is urgently needed, I will entertain on a one time basis for this award, changing the remittance address to a bank or whatever is agreeable.

PHYLLIS E. MOORE
DS C-LECC(F)
692-3716

Moore, Phyllis E

| | |
|---|---|
| ..om: | KOVER, PHILIP [PHILIP.KOVER@DFAS.MIL] |
| Sent: | Thursday, June 15, 2000 1:41 PM |
| To: | 'Ann Wong'; 'Phyllis Moore'; 'Karen Spradlin' |
| Subject: | Capital City Pipes |

Please do not make any remit to address changes for Capital City Pipes, Cage Code 0NSZ5 until further notice. Also please inform me if anyone requests changes to the address. Currently it is an EFT address remitting payment to Capital City Bank.

Thank you for your assistance.

Phil Kover
Chief, Construction Team
DFAS-CO/LSCAA
Phone: (614)693-0537
Fax: (614) 693-9631
email: Philip.Kover@dfas.mil

IN THE UNITED STATE COURT OF FEDERAL CLAIMS

- - -

J.G.B. Enterprises, Inc., :

Plaintiff, :

vs. : Case No. 01-680C

The United States of America, :

:

Defendant.

- - -

V O L U M E I

- - -

July 16, 2003

Deposition of

Lu Ann Bocsy,

a witness herein, called by the Plaintiff for cross-examination under the applicable Rules of Federal Court Procedure, taken before me, Laura E. Thornsberry, a Registered Professional Reporter and Notary Public in and for the State of Ohio, taken pursuant to notice, at the offices of DSCC, 3990 East Broad Street, Columbus, Ohio, on Wednesday, July 16, 2003, commencing at approximately 2:18 p.m.

- - -

have gone back to Capital City and questioned it?

A. Yes.

Q. Why?

A. Because I know for a fact J.G.B. Enterprises is a separate entity than Capital City Pipes.

Q. Is Michael Kawa a separate entity than Capital City Pipes?

A. I don't know.

Q. Did you assume Michael Kawa was part of Capital City Pipes?

A. Yes.

Q. Now, Michael Kawa's address was Syracuse, New York, correct?

A. Correct.

Q. It was your understanding that Capital City was based in Florida?

A. Correct.

MR. HORNYAK: Off the record.

(Discussion off the record.)

BY MR. HORNYAK:

Q. At or about the time you awarded the 4191 contract, which I'll represent to you was in November of 1999, did you -- it was DSCC's practice

IN THE UNITED STATE COURT OF FEDERAL CLAIMS

- - -

J.G.B. Enterprises, Inc.,:
Plaintiff, :
vs. : Case No. 01-680C
The United States of America, :
:
Defendant.

- - -

V O L U M E I

- - -

July 16, 2003

Deposition of

Phyllis E. Moore,

a witness herein, called by the Plaintiff for cross-examination under the applicable Rules of Federal Court Procedure, taken before me, Laura E. Thornsberry, a Registered Professional Reporter and Notary Public in and for the State of Ohio, taken pursuant to notice, at the offices of DSCC, 3990 East Broad Street, Columbus, Ohio, on Wednesday, July 16, 2003, commencing at approximately 3:34 p.m.

- - -

Q. Are you familiar with Carolyn Mathews?
A. Yes.
Q. Did you ever have any discussions with Carolyn Mathews concerning Capital City Pipes?
A. No.
Q. Do you recall her handing you a file for Capital City Pipes for one or more contracts?
A. No.
Q. Do you recall her causing to be delivered to you the file on one or more contracts with Capital City Pipes?
A. Pardon me?
Q. Did she somehow arrange for the contract file to be delivered to you?
A. No.
Q. Do you know Lu Ann Bocsy?
A. Yes.
Q. Have you ever spoken to Lu Ann Bocsy about Capital City Pipes?
A. Yes.
Q. When did you first speak to Ms. Bocsy concerning Capital City Pipes?
A. Sometime well after the claim.
Q. Claim by J.G.B. Enterprises?

the contract -- and you find that the contractor is due $10, we can authorize the DC -- DFAS to make payment off-line.

Q. Is it the ultimately the contracting officer's responsibilities to ensure that the payments are made pursuant to the contractor?

A. No.

Q. Whose responsibility is it?

A. I believe it's DFAS.

Q. Were you ever asked to search your files for documents in connection with this litigation?

A. Yes.

Q. Did you, in fact, search your files?

A. Yes.

Q. Did you turn documents over to counsel?

A. Yes.

Q. What files did you look it?

A. Every file that's associated with this contract -- with J.G.B.'s client.

Q. There's an official contract file for each of the two contractors that are the subjects of this litigation. Is that correct?

A. I guess there's an official file. I don't know which one.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

J.G.B. Enterprises, Inc.,:
Plaintiff, :
vs. : Case No. 01-680C
The United States of :
America,
:
Defendant.

- - -

V O L U M E I I

- - -

July 17, 2003

Continued Deposition of

Phyllis E. Moore,

a witness herein, called by the Plaintiff for cross-examination under the applicable Rules of Federal Court Procedure, taken before me, Laura E. Thornsberry, a Registered Professional Reporter and Notary Public in and for the State of Ohio, taken pursuant to notice, at the offices of DSCC, 3990 East Broad Street, Columbus, Ohio, on Thursday, July 17, 2003, commencing at approximately 8:25 a.m.

- - -

Q. Do you recall receiving phone messages at or about this time?
A. No.
Q. Do you recall who left the phone messages that you were referring to in this sentence?
A. No.
Q. Do you think it probably would have been Phil Kover?
A. I can't recall.
Q. A few moments ago, we looked at, I think it was, Exhibit 30, we looked at some documents that reflect an inquiry into the SAMMS database. And those all related to the 2508 contract, correct?
A. Yes.
Q. Did you ever make an inquiry into this SAMMS to find out the remittance address on the 4191 contract?
A. I can't recall.
Q. Do you ever -- Do you recall ever learning the identity of the remittance address on the 4191 contract?
A. I really don't remember.
Q. Sitting here today, do you remember who the remittance address on the 4191 contract was?

A. No.

\- - -

Thereupon, a one-page document was marked for purposes of identification as Deposition Exhibit No. 33 by the reporter.

\- - -

BY MR. HORNYAK:

Q. Before I ask you about this document, do you recall whether J.G.B. Enterprises, in fact, delivered all the hose assemblies required under the 2508 contract?

A. I really don't remember.

Q. Sitting here today, do you have any reason to think J.G.B. Enterprises did not deliver the hose assemblies required under the 2508 contract?

A. I don't.

Q. You don't know one way or the other?

A. No.

Q. When a contractor delivers product under a contract for which you are the post-award contracting officer, there is some mechanism for you to learn of that fact, correct?

A. Yes.

Q. Is that mechanism a copy of the DD-250

Q. Okay. With that assumption, do you see where Mr. Zywicki states that the remittance address was stated as Michael Kawa?
A. Yes.
Q. Did you go back and look at the 4191 contract to see if Mr. Zywicki was the remittance address on the 4191 contract?
A. I can't remember if I took any action at all.
Q. Did you ever go back to look at the remittance address on the 4191 contract to see --
A. At some point.
Q. Do you recall when?
A. No. I can't recall.
Q. Do you believe it was after J.G.B. submitted its certified claim?
A. Yes.
Q. Was that the first time you had occasion to look at the remittance address on the 4191 contract?
A. I really can't recall.
Q. You don't recall looking at the remittance address on the 4191 contract before J.G.B. submitted its claim?

A. No.
Q. Do you know whether payment under the 4191 contract was remitted to Michael Kawa?
A. I don't remember.
Q. Is it your belief that payment may have been made to Michael Kawa under that contract?
A. I believe that it may be.
Q. Would I be here today if it was?
A. I don't know.
Q. Sitting here today, you don't know one way or the other whether Mr. Kawa was paid?
A. No.
Q. If I represent to you that Mr. Kawa was not paid under the 4191 contract -- Actually, let me back up.
You have since looked at the remittance address on the 4191 contract and confirmed that Michael Kawa is identified as the remittance address, correct?
A. I can't remember. But if I reviewed the file --
Q. I'd be happy to show you the 4191 contract, but accept my representation he is listed as the --

Certified Copy

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

J.G.B. ENTERPRISES, INC., )
Plaintiff, )
vs. ) Volume I
) Civil Action No. 01-680C
THE UNITED STATES, )
Defendant. )

PROCEEDINGS

Before the Honorable George W. Miller, taken before Linda G. Sturm, RDR/CRR, a Notary Public in and for the State of Ohio, at the Joseph P. Kinneary United States Federal Courthouse, 85 Marconi Drive, Columbus, Ohio, on May 10, 2004, at 9:53 a.m.

-=0=-

Professional Reporters, Inc.
(614) 460-5000 or (800) 229-0675

Q. How did you first become familiar with Capital City Pipes?

A. I believe the first introduction I had to them was at a small business conference.

Q. Did you assist Capital City Pipes in getting contracts at -- prime contracts at DSCC?

A. Yes.

Q. And did you work with preaward contracting officers to help get those contracts awarded?

A. Yes.

Q. Was one of those preaward contracting officer a woman by the name of Lu Ann Bocsy?

A. Yes.

Q. And I take it another one was Jennifer DeWitt?

A. Yes.

Q. Do you recall sometime in about October of 1999 J.G.B. Enterprises informing you that they were having a problem -- that they were a subcontractor to Capital City

Pipes and that they were having a problem getting paid by Capital City Pipes?
A. Yes.
Q. And you looked into the matter?
A. Yes, I did.
Q. And you -- and you believed at that time that J.G.B. had a legitimate gripe against Capital City Pipes?
A. Yes.
Q. Do you recall how this issue was first brought to your attention?
A. I believe I received a phone call from J.G.B. and was informed that Capital City Pipe was delinquent in their payment.
Q. And did that phone call come from Mr. Zywicki, Robert Zywicki?
A. I believe so.
Q. Did you also receive a letter from Mr. Zywicki regarding the issue of nonpayment by Capital City Pipes?
A. Yes.
Q. Excuse me, could you please turn to Exhibit 6 in the binder in front of you.
THE COURT: Mr. Taylor, you might

A. I wouldn't say a number of discussions.

Q. You had some discussions with him?

A. I believe I spoke to him maybe one or two times.

Q. Do you recall that it was J.G.B.'s position that it would not ship any further product unless it was assured of being paid?

A. Yes.

Q. Now, in your -- in your discussions with Ms. Williams of Capital City Pipes, do you recall having some discussions with her about the possibility of using an escrow agreement, and it was an escrow agreement between Capital City Pipes and J.G.B., to somehow provide the assurance J.G.B. was looking for?

A. I believe that was with the owner of Capital City Pipe that I had the discussion with.

Q. That would be Mr. Gilliam?

A. Yes.

Q. Lee Gilliam?

A. Yes.

Q. And was it you who represented to Mr. Gilliam -- was it you who brought up the idea of using an escrow agreement to assure J.G.B. of payment?

A. Not -- I'm -- I don't remember whether I brought it up or whether he brought it up. But I remember a discussion.

Q. Now, what was your understanding of how the escrow agreement solution, if you will, would -- would work? How would it assure J.G.B. -- give J.G.B. the assurances it was looking for so that it could start shipping again?

A. Well, typically that works, basically, when a -- two companies put together a joint account, or the government would send the money directly to that account, and it would require both signatures in order to release funds.

Q. When you say both signatures, you mean the signature of both the prime and the subcontractor?

A. Correct.

Q. And that ensures that the prime

Q. And that is your handwriting and signature on Exhibit 42?

A. Yes.

Q. Does that refresh your memory about whether you had a conversation with Thelma Williams of Capital City Pipes on November 16?

A. Yes, I did.

Q. And during that conversation you did not ask her why she wanted the remittance address changed to Michael Kawa?

A. No, I didn't.

Q. You didn't even discuss with her her request to change the remittance address to Michael Kawa?

A. No, I didn't.

Q. By the way, looking back at Exhibit 58, where it says Michael Kawa, Esquire, you see that?

A. Yes.

Q. You understand the term "esquire" to be an attorney; correct?

A. I do now.

Q. So you didn't discuss it with

Ms. Williams, I take it you made no other effort to find out why Capital City Pipes wanted the remittance address changed?

A. No, I didn't.

Q. Didn't ask the industrial specialist?

A. No.

Q. Didn't ask Mr. Taylor?

A. No.

Q. Didn't ask any of the postaward contracting officers?

A. No.

Q. And at the time -- well, let me -- we've seen two letters here. You complied with the request of Capital City Pipes to change the remittance address on Purchase Order 4191?

A. Yes.

Q. To Michael Kawa?

A. Yes.

Q. And prior to that request, their proposal had said make the payment address Capital City Pipes in Tallahassee, Florida?

A. I'm not sure.

is required to be performed by DCMC in Syracuse, New York?

A. Correct.

Q. Now, regardless of what you thought at the time, sitting here today, wouldn't you agree with me that it's a fair assumption that the remit-to -- remit payment address to Michael Kawa in Syracuse, New York, listed on Page 5 of 7, has something to do with J.G.B. Enterprises?

A. Sitting here today, after what I've been through, yes.

Q. Reading the document?

A. No.

Q. That's not a fair assumption?

A. That's not a fair assumption.

Q. Your assumption was that Capital City Pipes, based in Tallahassee, Florida, wanted their payments to go to an attorney in Syracuse, New York?

A. At the time I made this award, I was not aware that Michael Kawa was an attorney. I was aware that he was located in Syracuse, New York.

Q. Well, I guess my question is, your assumption was that Capital City Pipes in Tallahassee, Florida, wanted their payments to be sent by check to a person named Michael Kawa in Syracuse, New York?

A. I assumed that Capital City wanted their payment made by whichever mode of payment they were having it made to this address in Syracuse, New York.

Q. And in your view that was just a coincidence that Syracuse, New York, was nearby where J.G.B. Enterprises was located?

A. I didn't even register it as a coincidence.

Q. Didn't think about it one way or the other?

A. No, sir.

Q. Are you familiar with the term "central contractor registration"?

A. Yes.

Q. That is a government database?

A. Yes.

Q. Where prime contractors are required to enter certain information about

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| JGB ENTERPRISES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No.: 01-680C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

Room 220
United States District Court
Southern District of Ohio
Eastern Division
85 Maruri Boulevard
Columbus, Ohio

Tuesday,
May 11, 2004

The parties met, pursuant to notice of the Court, at 9:00 a.m.

BEFORE: HONORABLE GEORGE W. MILLER
Judge

APPEARANCES:

For the Plaintiff:

JOSEPH P. HORNYAK, Esquire
Sonnenschein, Nath & Rosenthal, LLP
1301 K Street, N.W., Suite 600, East Tower
Washington, D.C. 20005
(202) 408-6400

A Twenty-six years.

Q And in the year 2000, you were a contracting officer with the Defense Supply Center, Columbus.

A Yes.

Q At that time, DSCC divided its contracting officers into pre-award and post-award contracting officers.

A Yes.

Q And you were a post-award contracting officer.

A Yes.

Q Are you familiar with a company called Capital City Pipes?

A Yes.

Q You were the post-award contracting officer for more than one Capital City Pipes contract.

A Yes.

Q Do you recall how many?

A At that time, there might have been seven.

Q Are you familiar with a contracting officer named Carolyn Matthews?

A Yes.

Q At the time you were post-award contracting officer for Capital City Pipes, you never had any discussions with Ms. Matthews concerning Capital City

Pipes.

A No, sir.

Q Just so the record is clear, you did not have any conversations with her. Correct?

A No, I did not.

Q DSCC has an Office of Small Business Utilization. Correct?

A Yes.

Q And that office has some responsibility to interact with 8(a) or small, disadvantaged business contractors.

A Yes.

Q And you had some interaction with the people in that office concerning Capital City Pipes.

A Yes.

Q And you're familiar with a gentleman named Michael Taylor --

A Yes.

Q -- and another gentleman named Tony Griffin.

A Yes.

Q Mr. Taylor and Mr. Griffin are employees within the small business office.

A Yes.

Q Just so the record is clear, when I say "small business office," I'm referring to the Office

responsibility to make sure that payments are made in accordance with the contract's payment terms, --

A Yes.

Q -- or is it the contracting officer's ultimate responsibility to make sure that those payments are made in accordance with the contract?

A Well, you're asking two different things.

Q I guess the question is, whose responsibility is it to make sure that the payments are made pursuant to --

A Both.

Q Both?

A Yes.

Q Just so I'm clear, when I use the term "contracting officer," I'm referring to the post-award contracting officer. Correct?

A Yes.

Q In other words, the pre-award contracting officer wouldn't be responsible for making sure that payments are made in accordance with the contract.

A No. A contracting officer is responsible for putting the terms and conditions into the contract, and we, as contracting officers, we use those avenues to make sure that the contractors will be paid.

still have JGB's allegations.

Q At the time you succeeded Ms. Matthews as the post-award contracting officer on this 2508 contract, you didn't read the contract file.

A I can't say whether I had the contract file.

Q If you can't say whether you had the file, you can't say whether you remember reading it.

A Right, at that point.

Q So if you had no idea why the 2508 contract was delayed 161 days -- I'll withdraw the question.

Could you please turn to Exhibit 8 in your binder? Your colleague, Ms. Matthews, has testified that this is a letter she signed out and sent to Capital City Pipes on or about November 2, 1999. At the time you were post-award contract on the 2508 contract, you had never seen this document. Correct?

A No, I hadn't.

Q In fact, you had never seen it before I showed it to you at your deposition last year. Correct?

A You're correct.

Q And, in fact, you really didn't make any effort at all to find out what Ms. Matthews had done on the 2508 contract before you succeeded her as contracting officer.

Q Are you familiar with a woman named Thelma Williams?

A Yes.

Q Who is Thelma Williams?

A An employee of Capital City Pipes.

Q You had a number of conversations with Ms. Williams while you were post-award contracting officer for Capital City Pipes.

A A few.

Q That would have been sometime in 2000.

A Yes.

Q Do you recall having a phone conversation with Ms. Williams on April 12, 2000?

A I don't know. Was it April 12th? I remember having a conversation with her.

Q Could you please turn to Exhibit -- I believe it's 26? Do you recognize the document in Exhibit 26?

A Yes.

Q And these are your handwritten notes of a conversation with Miss Williams of Capital City Pipes on April 12, 2000.

A Yes.

Q And the subject of that conversation was a vendor-payment issue.

vendor.

A Yes.

Q Then Ms. Williams and you also discussed the idea of changing the remittance address on the 2508 contract.

A Yes. We discussed changing the remittance address.

Q And that remittance address would be changed to this account that you and she had discussed, where monies would be sent or set aside directly for the vendor.

A Yes.

Q By the way, would you agree with me that Capital City Pipes was not a sophisticated government contractor?

A I couldn't agree. I wouldn't know.

Q Well, in your conversations with Ms. Williams, did you get a sense that she had a firm understanding of government contracting?

A For a small contractor, I think she understood the basics.

Q Could you clarify what you mean by "for a small contractor"?

A They were a company that was set up through the 8(a) program. They needed a lot of help, prodding

and so forth. They would ask for a lot of help, like, from the small business offices on how to handle the day-to-day business.

Q That's appropriate?

A For that type of a company, yes.

Q Now, you mentioned the small business office. You had discussions with Mr. Taylor of the small business office about the vendor-payment problem that is referenced in the phone conversation.

A No. I did not have conversations with Mr. Taylor.

Q Was it your understanding that Mr. Taylor was working with Capital City Pipes to resolve the vendor-payment problem that is the subject of your April 12th conversation?

A Yes. I had asked.

Q You asked Mr. Taylor to assist them?

A Well, afterwards. At this point, no, I had not talked with small business.

Q You had not spoken to Mr. Taylor about Capital City Pipes --

A No.

Q -- prior to this call.

A No.

Q But after the call, you did speak to him.

THE COURT: In the beginning of the second paragraph, you say, "After careful review of the previous actions."

THE WITNESS: Yes.

THE COURT: What does that refer to?

THE WITNESS: Our conversations about FAR. I had pulled out FAR, and we had went through almost everything in Part 33. That was the contractor and myself, Thelma Williams, and I had also given examples of how other contractors had set up remittance addresses. We had a pretty extensive search and conversation.

THE COURT: Was that during this conversation that took place on April 12, or were you referring to a conversation or conversations that had taken place earlier?

THE WITNESS: No. During April 12th. That was the only time that we talked up to that point.

THE COURT: About how long was the conversation from beginning to end?

THE WITNESS: It might have been a couple of hours.

THE COURT: Okay. Counsel?

BY MR. HORNYAK:

Q During this conversation with Ms. Williams,

that you were looking through FAR Part 33.

A Uh-huh.

Q Do you believe that you actually were looking at FAR Part 32?

A Oh. Well, I thought it was 33.

Q You were looking at the FAR section that deals with payments to contractors.

A Yes.

Q Did you happen to notice the FAR section entitled "Subcontractor Assertions of Nonpayment"?

A We went all through -- you're saying it's 32 -- through the FAR part concerning the financial payments and so forth, yes. I don't know whether we discussed that because I didn't know that that would have been an issue.

Q But you were not aware that you, upon an assertion by a subcontractor that he has not been paid, that you had the right to make a determination as to whether or not the subcontractor had been paid in accordance with his subcontract.

A No. At that time, no.

MR. HORNYAK: Your Honor, if I could just have a moment.

THE COURT: Uh-huh.

(Pause.)

BY MR. HORNYAK:

Q Before, you described some sort of remittance clause approach used by AM General. Could you elaborate on how AM General directs the government to write remittance clauses in its contracts?

A Well, it just depends on what type of -- they are a large business, and it depends on how they set up the contract. They may come in, and if it's going to be a credit card contract, then they have a remittance address set up just for that. I mean, is that what you're asking?

Q They use different remittance clauses on different contracts?

A Yes. So you can have more than one.

Q I see. So they ask you to put different remittance clauses on their contracts.

A Yes, at the time of negotiation.

Q And it's your job to make sure the payment gets to those different remittance clauses.

A Pardon me?

Q Well, it's your job, as post-award contracting officer, to make sure that payments for each of those contracts is made to the entity that's set forth in the remittance clause.

A See, really, as a post-award person, that's something very rarely that we would even have to get into unless we have a problem. It's nothing that we would actually maintain surveillance on because most of your payments are electronic. If it's in the contract, and there should be a problem that we must address, then we would do so.

MR. HORNYAK: Your Honor, can I have a moment to confer?

THE COURT: Certainly.

(Discussion off the record.)

BY MR. HORNYAK:

Q Turning back to this AM General situation, since you brought it up, if I understand you correctly, AM General has multiple remittance addresses in its various different contracts at DSCC.

A Yes.

Q But the Central Contractor Registration Data Base is only set up for on specific account.

A No.

Q You can have different -- and that's the way AM General does it?

A I guess, yeah. They would have to be registered in the CCR, and their remittance addresses would be in the CCR.

NISH, and then the general population of the 15 states helping administer for the other four administrators.

THE COURT: Could we just elucidate from the witness the meaning of NIB NISH? I think that may be difficult for those who are not quite as in the know as we are.

MS. BOSQUE: Thank you, Your Honor, yes.

BY MS. BOSQUE:

Q Can you spell the acronym, "NIB NISH"?

A Okay. It's N-I-B-N-I-S-H, and it's National Industry for the Blind.

Q Do you know what "NISH" stands for?

A No. (Laughter.) It's the national something, but they are all together. Generally, they would have some type of severe handicap issues, and the federal government has set aside certain monies and certain -- how can I say? -- they have put people out in the field to help these companies be successful in business.

THE COURT: Thank you.

THE WITNESS: Uh-huh.

BY MS. BOSQUE:

Q Thank you. Do you recall roughly when you took over administration of Contract 2508?

A In the March-April time frame of 2000.

Q And what was the nature of those communications?

A Well, this communication was to Michael Taylor. I was info'd on it, and it was advising us of monies that were due JGB by Capital City.

Q What, if any, contact did you have with Mr. Taylor regarding this letter?

A None because it was sent to him.

Q At some point, did you have any communications with Mr. Taylor?

A Yes.

Q And what were those regarding?

A It was regarding -- well, I wanted Mr. Taylor to go out and see what the problems were. I remember, but like I said, the time frame, I'm lost.

Q What, if any, communications had you had with Mr. Zywicki before this May 31st letter?

A None that I can recall.

Q Had you had any communications with anyone from JGB?

A No.

Q Once you received a letter from -- the copy of the letter that was sent to Mr. Taylor, what do you do?

A I don't know whether that's when I asked Mr.

2000. Do you have that in front of you?

THE WITNESS: Yes.

THE COURT: You say, "I did receive several phone messages."

THE WITNESS: Yes.

THE COURT: Can you tell us from whom you received those phone messages?

THE WITNESS: They could have been from Phil Kover, the DFAS person, and I might have received conversation with the DCMA office at that time.

THE COURT: And who would that have been?

THE WITNESS: That would have been either Mr. Slack -- I can't remember whether it was a Mr. or Ms. Slack -- or any one of the employees there at DCMA.

THE COURT: Was Ms. Rhates in that office?

THE WITNESS: Yes, I believe, but I've never spoken to her.

THE COURT: Okay. You go on to say, "This was an oversight because I did not know their name had to be a part of the remittance address." How did you find out that that was a requirement?

THE WITNESS: Through Phil Kover of the DFAS office, yes.

THE COURT: He told you that in substance.

RECEIVED

JAN 13 2006

DSCC - G

**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

IN REPLY REFER TO DSCC-FLBB (Lu Ann Bocsy (614)692-3234)

13 January 2006

Michael J. Kawa, Esq.
300 Crown Building
304 South Franklin Street
Syracuse, New York 13202

Re: Claim under Purchase Order SP0750-00-M-4191

Dear Mr. Kawa:

This is in response to your claim dated November 18, 2005 for $43,987.50 under Purchase Order SP0750-00-M-4191. By letter dated November 22, 2005, you amended your claim to $45,275.76. The basis of your claim is that you were an assignee of funds under this purchase order; you were a third party beneficiary to this purchase order; and you had an implied-in-fact contract with the government under this purchase order. For the reasons stated below, your claim is denied.

You were neither an assignee of funds nor a third party beneficiary under this purchase order, and you did not have an implied-in fact-contract with the government. The government awarded the purchase order to Capital City Pipes. When Capital City Pipes asked me to change the remittance address, I did not know nor have any reason to know about your relationship to JGB. I did not intend to assign payments to you, to establish a third-party beneficiary relationship with you, or to contract with you. As the Court of Federal Claims previously held in the case filed by JGB, it is irrelevant what Mr. Taylor knew because he cannot bind the government.

This is the final decision of the contracting officer. Although you have also addressed your claim to Carolyn Mathews, Ms. Mathews was not the contracting officer for this purchase order. This is the final decision of the contracting officer. You may appeal this decision to the Armed Services Board of Contract Appeals (ASBCA). If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the ASBCA and provide a copy to me. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract or purchase order by number. With regard to appeals to the ASBCA, you may, solely at your election, proceed under the Board's small claims procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the ASBCA, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Sincerely,

LuAnn Bocsy
Contracting Officer

Federal Recycling Program Printed on Recycled Paper

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL KAWA,

Plaintiff,

-against-

No. 06-448C

(Judge George W. Miller)

THE UNITED STATES,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMINATION BEFORE TRIAL of MICHAEL J. KAWA, held on December 7, 2007, at the offices of MICHAEL J. KAWA, Attorney at Law, 304 South Franklin Street, Syracuse, New York, commencing at 10:00 AM, before Brenda K. Boyce, Registered Professional Reporter and Notary Public in and for the State of New York.

direct the witness not to -- the witness to answer general -- I'm going -- anything specific, I'm going to object and direct him not to answer.

**Q. Will you please answer in terms of general knowledge of JGB?**

A. I think I was introduced to Jay Bernhardt, who is the owner, by another client of mine. That was 20 years ago.

**Q. What is your current relationship with JGB?**

MR. CAMARDO: Objection again. Attorney-client. Any specific information I direct you not to answer it about a relationship.

**Q. Can you please answer generally in terms of what your relationship is with JGB without revealing client privileges?**

A. I do some legal work for JGB.

**Q. How long have you been doing legal work for them?**

A. I'd say probably 20 years.

**Q. What types of matters have you represented them in?**

MR. CAMARDO: Once again,

objection. There is no -- it's a matter -- if it's a matter of public record, fine. But anything else, direct him not to answer.

A. I represented JGB in some civil matters that are on record in various clerk's offices.

**Q. What types of civil matters?**

A. Generally speaking, I would classify them as contract matters. Not government contract, but basic contract matters.

**Q. You said that you came to know of JGB by meeting Mr. Bernhardt, the president.**

A. Yes.

**Q. Do you have a personal relationship with Mr. Bernhardt other than him being your client or other than JGB being your client?**

MR. CAMARDO: Once again, objection. It's hard to distinguish between a personal relationship and a legal relationship when you are representing a client.

So I would direct you not to answer the question.

**Q. Will you answer the question?**

A. On the advice of my attorney, I decline to answer.

Q. Are you familiar with a woman named LuAnn Bocsy?

A. Again, based upon my review of documents here. I've never had any firsthand contact with Ms. Bocsy.

Q. You said you have no firsthand contact with Ms. Bocsy?

A. I've never talked to her or had any communications with her. I did get a letter from her rejecting the claim that I filed, which apparently was the underlying basis of this lawsuit. But other than that, I've never had any contact with her.

I know that she signed 4191 on behalf of the government.

Q. Do you know what her role was with respect to 4191?

A. No.

Q. Have you ever had any contact with Mr. Taylor?

A. No.

Q. Do you know of a woman named Phyllis Moore?

A. Again, only by review of documents to prepare for today.

Q. Have you ever had any personal contact with Ms. Moore?

A. No.

Q. Okay. What were the terms of the agreement?

MR. CAMARDO: Objection. The document speaks for itself.

If you want to give him the document and ask him about it, that's fine. But it speaks for itself.

Q. Please answer the question.

A. Yeah. To me it was a very simple deal. It was JGB had some concerns about working with Capital City in terms of eventually getting paid. And Mr. Bernhardt, I guess as a result of a conversation with Mr. Taylor, had suggested an escrow agreement.

And the escrow agreement basically was once the contract was completed, the government was to send me a check. And I was going to hold that check pending mutual further instructions from JGB and Capital City as to how the money was to be divided up. And I never got any payment.

Q. Other than your responsibility to hold the check and then divide it up between JGB and Capital City, did you have any other role or responsibility pursuant to the agreement?

A. No.

MR. CAMARDO: Objection. Again,

the agreement speaks for itself.

**Q. What did you understand your personal liability to be pursuant to the agreement?**

A. None. Other than gross negligence, which an escrow agent would be responsible for.

**Q. Did the government's failure to send payment to you constitute gross negligence on your part?**

MR. CAMARDO: Objection. Calls for a legal conclusion.

A. On my part? No. It was no negligence on my part.

**Q. Did the government's failure to pay constitute willful misconduct on your part?**

A. No.

**Q. So were you personally liable for the money to either JGB or Capital City due to the fact that the government did not send the payment to you?**

A. No. I had no personal responsibility unless and until I received the check from the government.

**Q. Did the agreement permit you to keep payments after receiving any release signed by Capital City and JGB?**

A. No, the agreement provided that once I received the money from the government and once I received

mutual instructions agreed to by Capital City and JGB, I was to disburse the money according to those mutual instructions.

So I wasn't -- I wasn't going to keep any money after instructions from Capital City and JGB.

**Q. So once you received the payment from the government, received instructions from JGB and Capital City as to the disbursement, you had no right to keep any of the payment. Is that correct?**

A. That's correct.

**Q. Did you receive any payment from either JGB or Capital City for your participation in the agreement?**

A. No.

MR. CAMARDO: Objection.

A. Well, no.

MR. CAMARDO: What he does with JGB is part of attorney-client again.

**Q. Did you have any direct contact with anyone in the government regarding the escrow agreement?**

MR. CAMARDO: I'm going to object to the term direct contact. Again, that's a very broad term.

**Q. Did you have any communications, letters, faxes, e-mails, telephone conversations, in-person**

Kawa's name in it.

Q. Not in the contract. In the solicitation.

A. I don't know anything about the solicitation.

Q. Are you aware that at some point during either the solicitation process or during the contract 4191 that a request was made for the address to be your address?

A. Yes. Again, reviewing the paperwork that I reviewed, I noticed that there was a change which eventually was incorporated into 4191 that indicated remit payment to me at my address.

Q. Outside of the paperwork that you reviewed, did you have any knowledge of that request?

A. No.

Q. Did you have any contact with anyone in the government regarding the change in address?

A. No.

Q. Do you know if JGB had contact with anyone in the government regarding the change of address for 4191?

A. I don't know.

Q. Do you know if Capital City had contact with anyone in the government regarding the change in address on 4191?

MR. CAMARDO: I'm going to object. I think it's asked and answered. He's already

Q. **Were you an agent for Capital City?**

A. I was an escrow agent under an agreement between Capital City and JGB.

Q. **Were you an employee of Capital City?**

A. No.

Q. **Is there anything on this fax that tells Ms. Bocsy that you were not an employee of Capital City?**

A. Other than the office address is not Capital City Pipes. I believe it was in Florida.

Q. **Other than that.**

A. No, there isn't anything on here that says I'm not an employee.

Q. **Does this fax contain the word assign or assignment anywhere?**

A. No.

(Exhibit 4 was marked for identification.)

BY MS. COHEN:

Q. **Do you recognize Exhibit 4?**

A. As a result of reviewing -- I believe this was attached to the Response for Production of Documents.

Q. **Had you seen this document prior to reviewing the Response?**

A. No.

**Q. Can you please read the paragraph that starts with I requested a change?**

A. I requested a change in the payment remittance address. Michael Kawa, Esquire, 300 Crown Building, 304 South Franklin Street, Syracuse, New York, 13202.

**Q. Is this remittance address different than the one in the fax labeled as Exhibit 3?**

A. Well, other than the fact that Exhibit 3 refers to Capital City Pipes, Inc. And Exhibit 4 does not have any reference to Capital City Pipes, Inc.

**Q. Does the letter, Exhibit 4, contain any explanation for why the address was changed?**

MR. CAMARDO: Objection. Whose address are we speaking of?

A. Your question was, does it explain why the change was made?

**Q. Yes.**

A. Well, no. I can't interpret there as being any explanation for the change in this letter, Exhibit 4.

**Q. Does it state that the change was made because you are not an employee of Capital City?**

A. There is nothing like that in this letter, no.

**Q. Is there anything saying that the reason was because Capital City was assigning a payment to you?**

A. Nothing like that in Exhibit 4, no.

**Q. Outside of this letter, were there any communications with Ms. Bocsy in which the reason for the change was explained?**

A. I never had any communications with Ms. Bocsy about a change. So I can't -- I can't answer whether there were any explanations given to her or not.

**Q. Does this letter contain the word assignment or assign anywhere?**

A. No.

**Q. Is there any other indication that Capital City wished to assign payment to you?**

A. Well, yeah. I mean --

MR. CAMARDO: I'm going to object. It calls for a legal conclusion.

A. I would interpret it as meaning the money should go to me. Because they removed their own name from Exhibit 3, and the only reference to payment remittance is mine. My name and address. No reference to Capital City Pipes. Which again was my understanding of the way the escrow agreement was to work.

The government was going to pay me, send me a check payable to me, which I was going to hold as the escrow agent. I would interpret Exhibit 4 as being that

direction from Capital City Pipes to the government to send me a check payable to me.

(Exhibit 5 was marked for identification.)

BY MS. COHEN:

Q. **Have you seen Exhibit 5 before?**

A. Not other than reviewing the Response to Production for Documents the other day.

Q. **What is this exhibit?**

A. 5.

Q. **Yes. What is the document?**

A. What is it? Well, it looks like it's --

MR. CAMARDO: Objection. Only if you know, Mike.

A. Well, I don't know what it is. I mean I can -- it appears to me like to be a fax cover sheet from Thelma S. Williams of Capital City Pipes to LuAnn Bocsy.

And it says, good morning, LuAnn. I apologize for the confusion this may have caused.

This is dated November 15th, '99.

We are requesting the payment address be changed to -- they spelled my name wrong. But it says Michael K-A-K-A, Esquire, 300 Crown Building, 304 South Franklin Street, Syracuse, New York, 13202.

Q. Is this address different than the address listed in Exhibit 3?

A. Yes. Because Capital City Pipes isn't included in Exhibit 5.

Q. In Exhibit 5 is there any explanation for the change of address?

A. There is no explanation, but apparently somebody must have been confused.

Q. Is there an indication that the reason for the change is because you are not an employee of Capital City?

A. There is no reference to that in Exhibit 5, no.

Q. Does Exhibit 5 anywhere use the word assign or assignment?

A. No.

Q. Other than these three communications in Exhibits 3, 4 and 5, are you aware of any other communications requesting a change in the remittance address?

A. No.

Q. Are you aware of any other communications explaining to Ms. Bocsy or anyone else in the government the reason for the change in 4191?

A. No. Again, other than the fact that under the

**Q. You stated that Capital City's payments -- any payment that you would receive would have to go to Capital City's trustee in bankruptcy. Is that correct?**

A. Well, yeah. Once JGB and Capital City agreed on a division of those moneys, the 45,000, you know -- I mean subsequent to this whole thing I was -- understood that Capital City filed bankruptcy.

So again, I'm not a bankruptcy attorney, but my understanding, any money coming to Capital City would had to have been paid to their trustee in bankruptcy.

**Q. So if you were to receive payment, the entire amount would have to be split between JGB and Capital City's trustee in bankruptcy. Is that right?**

A. Yes. In some manner that they agreed to between themselves.

**Q. I understand. Turn to page five of Exhibit 2, please.**

A. (Witness complies). Okay.

**Q. In paragraph 18.**

A. Yes.

**Q. The very last sentence states, it was JGB's, as well as Michael Kawa, Esquire's, intention not to ship any hose assemblies to the Government unless it was paid.**

**Is that what that sentence states?**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MICHAEL KAWA,

Plaintiff,

vs. INDEX No.: 06-448C

THE UNITED STATES,

Defendant.

Deposition of KATHRYN BADER, held on January 8, 2008, in the General Counsel's Library at the Defense Contracts Management Agency, 6350 Walker Lane, Alexandria, Virginia, commencing at 10:00 a.m., before Neal R. Gross, Court Reporter and Notary Public in and for the State of Virginia.

Q. Okay. And that you would report to whom, say in the year 2000?
A. The administrative contracting officer, Ms. Lynne Rahtes.
Q. Okay. Do you know who Ms. Rahtes would report to, only if you know, say in the year 2000?
A. We had several team leaders at that time. I'm not sure which one was in charge of the team at that time.
Q. Team leaders? Could you give me any names?
A. The last that I worked for in 2004 was William Anderson. I believe --
Q. How about 2000?
A. No, I don't remember.
Q. Okay. Do you recall who the commander would've been in the year 2000?
A. No.
Q. I want you to go in to your packet of information there at Exhibit-5 and I want you to find a document bates stamped on the right-hand corner 0240.
A. I have it.

Q. And didn't this contract say that Michael Kawa had to get paid?

A. The contract states that he is the remit payment address.

Q. And my question is how did you ensure that Michael Kawa got paid?

MS. COHEN: Asked and answered.

MR. CAMARDO: I still haven't heard an answer to it, but --

THE WITNESS: I ensured that payment was made. Where DFAS sent the payment was not my -- part of my job.

BY-MR.CAMARDO:

Q. I'm not asking that. I'm asking how did you, Ms. Bader, ensure that Michael Kawa got paid? If you didn't do that, that's fine.

MS. COHEN: Objection; asked and answered and argumentative.

MR. CAMARDO: I don't think I'm being argumentative at all. I'd just like to get an answer to my question.

Q. What did you do to ensure that Michael Kawa got paid?

administration through electronic or hard copy are reviewed for me for accuracy, then they're filed, and I monitor them to ensure that they meet their delivery schedules. When deliveries are made, I track the payment documents to make sure they process through the payment systems and go -- and get paid in a timely fashion.

Q. Does your responsibility for administration include anything about remittance addresses?

A. No.

Q. You also said earlier that Capital City was not an important contractor. What did you mean by that?

A. An A8 contract --

MR. CAMARDO: I'm sorry. I didn't hear the question.

Q. You said that Capital City was not an important contractor. What did you mean by that?

A. A small A8 contractor who worked in Tallahassee, most of their contracts were low-dollar value. We did not monitor them

COPY OF TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MICHAEL KAWA,

Plaintiff,

vs. INDEX No.: 06-448C

THE UNITED STATES OF AMERICA,

Defendant.

/

Deposition of **LU ANN BOCSY**, held on January 8, 2008, at the Defense Supply Center Columbus, 3990 East Broad Street, Columbus, Ohio, commencing at 12:05 p.m., before Maria DiPaolo Jones, Court Reporter and Notary Public in and for the State of Ohio.

ACR ACCURATE COURT REPORTING, INC.
"One Call Truly Does It All"
Nationwide Depositions, Hearings & Trials • Conference Facilities • Video Conferencing
Legal Video Services • Exhibit Scanning • Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (Fax)
info@acrdepos.com • scheduling@acrdepos.com • www.acrdepos.com

myself concerning the pricing and the remittance address.

Q. And with respect to the remittance address, it's fair to say that she was requesting a change in a payment remittance address, correct?

A. Correct.

Q. And that would be a change from the Capital Cities Pipe, Inc., PO Box 12368, Tallahassee, Florida, that's listed on block g of 206?

A. Correct.

Q. And she's requesting that the remit to address or the remittance address be Capital Cities Pipes, Inc. and Michael Kawa, Esquire only, correct?

A. Correct.

Q. Did you have any discussions with her regarding both of those addresses?

A. To the best of my memory, I did question her because the number of lines provided exceeded that which I could type into the remittance address. This shows five lines, and you can only type four, so I did

ACR ACCURATE COURT REPORTING, INC.
"One Call Truly Does It All"
Nationwide Depositions, Hearings & Trials • Conference Facilities • Video Conferencing
Legal Video Services • Exhibit Scanning • Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (Fax)
info@acrdepos.com • scheduling@acrdepos.com • www.acrdepos.com

ask -- to the best of my memory I did ask for clarification as to what that was supposed to be.

Q. What did she tell you?

A. She sent another fax.

Q. You said you asked her. Did you have a telephone conversation with her?

A. Yeah, I just asked her to clarify it. Everything has to be provided --

Q. Let's slow down for a minute. You called her right after you got this fax on 11/9/99?

A. I am going to say yes, to the best of my recollection.

Q. Okay. And then what did she tell you over the phone?

A. Nothing. If she had told me something on the phone, there would be a conversation record documenting that.

Q. Well, is there a conversation record documenting it?

A. I'm not sure.

Q. Well, you just alluded, and correct me if I'm wrong, that you wrote down what

ACR ACCURATE COURT REPORTING, INC.
"One Call Truly Does It All"
Nationwide Depositions, Hearings & Trials • Conference Facilities • Video Conferencing
Legal Video Services • Exhibit Scanning • Transcript / Video Synchronization • 24-7 Online Repository
1.888.ACR.3335 • 1.800.862.4206 (Fax)
info@acrdepos.com • scheduling@acrdepos.com • www.acrdepos.com

A. In this case.

Q. And you thought that Michael Kawa was some sort of banker?

A. I really didn't give a thought to who Michael Kawa was.

Q. Didn't give any thought to who Michael Kawa was.

A. I mean, I didn't dwell on the thought of who Michael Kawa was. I assumed that he was a person related to Capital City Pipes; he could have worked in their offices, could have worked in their shipping, billing section.

Q. Did you assume that Michael Kawa was affiliated with a bank?

A. I assumed Michael was affiliated with Capital City Pipes.

Q. Would you answer my question?

A. No.

Q. You did not assume that he was affiliated with a bank.

A. No.

Q. I'm going to direct your attention to tab 1, page 44. Could you go to page

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA,

Plaintiff,

vs. Index No. 06-448C

THE UNITED STATES,

Defendant.
_______________________________/

Deposition of PHYLLIS E. MOORE, held on April 23, 2008, at the Offices of DSCC, Office of Counsel, 3990 East Broad Street, Columbus, Ohio, commencing at 10:00 a.m., before Sandra D. Kin, Court Reporter and Notary Public in and for the State of Ohio.

responsibility for this contract begin, would it begin after a signature?

A. For --

MS. COHEN: Objection, vague. What contract are you referring to?

MR. VAN BUSKIRK: I'm speaking generally of the duties of the position.

MS. COHEN: You can answer, Ms. Moore.

A. Yes, after the award.

BY-MR.VANBUSKIRK:

Q. All right. And when a contract is assigned to you after the award, what would be the first action you would take to administer this contract?

A. The first action would be nothing if there's no problem.

Q. All right. So you would only take action if a problem came to your attention?

A. In most instances.

Q. All right. When would you take action without a problem coming to your attention?

A. Probably never.

Q. Well, you said that you would only take -- you would wait until it was brought to your attention in most instances. When would you take action of your own accord?
A. With the volume of contracts that we have, I would probably never look at anything unless there were -- there was a problem.
Q. All right. And would you say that you have the responsibility to see that the product was delivered under the contract.
A. Well, I guess -- yes.
Q. All right. And would you generally have responsibility to see that payment was made under the contract?
A. No.
Q. All right. Who would have that responsibility?
A. Our DEFAS office.
Q. All right. So you're saying that DEFAS would release payment under a contract?
A. Yes, sir.
Q. And would they only release payment after the product is delivered?
A. There are situations where there's

A. Well, it looks like something I might have sent.
Q. All right. Is that a document you sent down to the ACO at DCMC Clearwater?
A. Yeah -- well, this is an alert.
Q. Yeah.
A. So it did go to the ACO.
Q. And in the e-mail we were just looking at it made a reference to an alert on March 10th, 2000, right, in Tab 7? Look back, if you'd like.
A. Let me go back and look.
Q. The second line of your e-mail of Tab 7.
A. Yes. Yes.
Q. Okay. And turning to Tab 8 page 6, is this alert dated March 10th, 2000 regarding contract 4191, is that the alert you're referring to?
A. Yes.
Q. Okay. Now, why did you send this alert?
A. Well, I probably sent it on all open awards.

Q. All right. Did you send this on all the Capital City Pipes contracts?
A. Yes.
Q. All right. And why particularly did you send Alerts on Capital City Pipes?
A. Because they were an 8A contractor and as part of my responsibilities all 8A contractors are assigned the DCMC office and they -- you know, we ask them to put special emphasis on that contractor in all their shipments and so forth.
Q. All right. And if you look down in that alert it states, "It is requested the reports be given monthly and they may be through the Alerts or CPSS program." Now, I know you stated earlier you didn't recall whether they made the reports or not. But what type of report were you looking for by making this report? What did you want them to make?
A. Well, I wanted them to make sure that the contractor, if there were any problems, that they would be taken care of, you know, any clarifications needed. If

Q. All right. And as far as you know that's accurate, right?
A. Yes.
Q. All right. Do you know who payment was made to on purchase order 4191?
A. No.
Q. If you'd continue looking at that page 3 under Tab 2, you'll see it says disbursed to?
A. Yes, sir.
Q. It says EFT Capital City Bank, correct?
A. Yes.
Q. So as far as this document goes, payment was made to Capital City Bank, correct?
A. Yes, sir.
Q. All right. If you'd please look over to page 17 under Tab 2, where we were previously.
A. Okay. I'm there.
Q. All right. And as we were mentioning earlier that's purchase order 4191, correct?

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA,

Plaintiff,

vs. Index No. 06-448C

THE UNITED STATES,

Defendant.

_________________________________/

Deposition of LYNNE RAHTES, held on April 23, 2008, at DCMA St. Petersburg, 9549 Koger Street, St. Petersburg, Florida, commencing at 12:00 p.m., before Cindy R. French, Registered Professional Reporter and Notary Public in and for the State of Florida.

2000?

A. The same.

Q. All right. And what was your position in the year 2000?

A. I was an administrative contracting officer.

Q. All right. Now, what does an administrative contracting officer do generally.

A. Contracts that are awarded by various defense department agencies are delegated to DCMA offices who are within the geographic region of the contractor. And we do the various functions -- FAR Part 42 has a list of all the various administrative functions that DCMA handles.

Q. All right. Are you familiar with a Purchase Order SP0750-00-M-4191?

A. I mean, I've seen it now, but I don't recall it.

Q. Okay. If you go to tab 1 of the binder we've been speaking of, you'll see some materials prepared by your attorney in the beginning, but then there will be a

sequence of documents with the page stamp numbers at the bottom middle. If you can go to page 17 under tab 1, I would appreciate it. Are you there?

A. Some of the numbers are kind of obliterated here. All right.

Q. It will state at the top "Order for Supplies or Services."

A. Correct.

Q. Okay. And then in box 1 you see the contract purchase order number with the last four digits being 4191, correct?

A. Yes.

Q. All right. Now, looking to box 6, we see that that was issued by the Defense Supply Center Columbus, correct?

A. Yes.

Q. Looking to box 7, it was administered by DCMC Clearwater, correct?

A. Yes.

Q. All right. And as of November 1999, you were employed as an ACO at Clearwater, correct?

A. Well, Clearwater used to be our

name. Now it's St. Petersburg. It's the same office.

Q. It's the same office, but it's changed names, is that --

A. Correct.

Q. But you were employed by what was essentially the same office, right?

A. Yes.

Q. All right. And how many administrative contracting officers were there in that office in 1999, approximately?

A. I couldn't say. Probably six, maybe.

Q. All right. So when a contract was written, as you mentioned earlier, by another agency within the Government, it would be administered by DCMC Clearwater, correct?

MS. COHEN: Objection, mischaracterization of testimony.

You can answer, Ms. Rahtes.

THE WITNESS: I'm sorry. Can you repeat the question?

BY-MR.VANBUSKIRK:

Q. All right. So we are looking at

weeks.
Q. All right. And how would you meet? Would you meet in person?
A. We would meet, yes, here in the office. We had people located in Tallahassee and in Perry, Florida, who would either come down or participate telephonically, or other times some members of the team, we would travel up there.
Q. All right. Did you supervise the performance of Ms. Bader?
A. No. I was not her supervisor.
Q. Did you supervise the administration of Purchase Order 4191?
A. I would be the contracting officer for the administration of those contracts.
Q. All right. So you had overall responsibility for the administration of this Purchase Order 4191, correct?
A. Yes, along with several hundred other contracts.
Q. All right. And as you stated, that Ms. Bader also, as we just discussed from your interrogatory responses, Ms. Bader also

A. Yes.
Q. Do you recall this e-mail being given to you?
A. No.
Q. In the normal course of events, would correspondence relating to one of your contracts have been given to you?
A. This e-mail was not addressed to me.
Q. I'm aware it was not addressed to you. I'm asking, in normal course of events, would an e-mail related to one of your contracts have been given to you?
A. Not usually if it was addressed to someone else.
Q. You stated you had oversight over the Capital City Pipes contract, correct?
A. Yes.
Q. Is that correct?
A. I answered yes.
Q. Yes. And this is an e-mail stating, further down in the second paragraph, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable."

Do you see that?
A. Yes.
Q. Okay. And you were the ACO for Purchase Order 4191, correct?
A. Yes.
Q. So this e-mail is authorizing you to take whatever contractual actions necessary to keep the orders viable, correct?
A. The way that would be interpreted is that the administrative -- the contract administration team responsible for those contracts was being given authorization from the buying activity to continue or perform surveillance. This e-mail was sent to our industrial specialist who was responsible for monitoring deliveries of the contract.
Q. All right. So you're saying that Slack there in the "To" line, he was an industrial specialist?
A. Yes.
Q. All right. What was his first name?
A. Warren.
Q. All right. And you just mentioned that some of the duties of an industrial

specialist are to monitor -- did you say delivery?
A. They monitor performance and delivery of the product on the contract.
Q. Okay. And how was Mr. Slack monitoring these things?
A. Various ways, through the MOCAS System, through telephonic communication to the company, through communication to the QAR responsible for acceptance of product.
Q. All right. So after Mr. Slack would verify that material had been delivered, what actions would he take regarding payment?
A. None.
Q. How would payment be released?
A. The contractor invoices DFAS for their payments. And if the delivery has been accepted and posted into MOCAS and matches up to the payment request, the payment is sent.
Q. You state that delivery has been posted. Who would post delivery?
A. Those go into the MOCAS System, which is -- resides and is the responsibility