No. 06-448C
(Judge George W. Miller)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA, ESQ.,

Plaintiff,

v.

UNITED STATES,

Defendant.

---

# PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

JOSEPH A. CAMARDO, JR.
CAMARDO LAW FIRM, P.C.
127 Genesee Street
Auburn, NY 13021
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorney for Plaintiff

# TABLE OF CONTENTS


TABLE OF CONTENTS i

TABLE OF AUTHORITIES iii

PLAINTIFF'S BRIEF 1

STATEMENT OF THE CASE 2

I. NATURE OF THE CASE 2

II. STATEMENT OF FACTS 2

ARGUMENT 13

I. NUMEROUS CRITICAL ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT 13

A. The Issue of Contracting Officer Bocsy's Knowledge is an Unresolved Question of Material Fact 14

B. There is a Material Question of Fact Regarding the Knowledge of Contracting Officer Moore 19

C. There Are Multiple Unresolved Question of Fact Regarding Delegation to DCMC Clearwater 19

D. There is a Material Question of Fact Regarding the Powers and Duties of the DCMC Office 25

II. MR. KAWA IS A THIRD PARTY BENEFICIARY 27

A. Under the Correct Facts, Mr. Kawa Is a Third Party Beneficiary, As His Identity Was Clear at the Time of Payment 27

B. Even Under The Facts As Stated By Defendant, Mr. Kawa is a Third Party Beneficiary 29

III. MR. KAWA IS AN ASSIGNEE 31

A. Contracting Officer Bocsy Waived the Anti-Assignment Act 31

B. The Assignment was Ratified by the Government 33

IV. EXPRESS AND IMPLIED CONTRACTS EXIST BETWEEN THE GOVERNMENT AND MR. KAWA 35

V. RES JUDICATA DOES NOT APPLY 37

VI. MR. KAWA IS ENTITLED TO CONTRACT DISPUTES ACT INTEREST 39

CONCLUSION 40

# TABLE OF AUTHORITIES

## CASES


Appeal of Floorpro, Inc.
04-1 BCA ¶ 32571, ASBCA No. 54143 (2004) 31

Banco Bilbao Vizcaya v. United States
48 Fed. Cl. 528 (2000) 32

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990) 35

Firestone Tire & Rubber Co. v. United States,
195 Ct.Cl. 21, 444 F.2d 547 (1971) 30

FloorPro, Inc.,
ASBCA 54143, 2008 WL 436927 (Feb 8, 2008) 39

Frank & Breslow, LLP v. United States,
43 Fed.Cl. 65 (1999) 30

Guardsman Elevator Co., Inc. v. U.S.
50 Fed.Cl. 577 (Fed. Cl. 2001) 28

Hol-Gar Mfg. Corp. v. United States
169 Ct.Cl. 384 (1965) 31

Humlen v. U.S.
49 Fed. Cl. 497 (2001) 34

In re Prudential Ins. Co. of Am. Sales Practices Litig.
169 F.R.D. 598 (D.N.J.1997) 25

ITT Arctic Servs., Inc. v. United States,
207 Ct.Cl. 743, 524 F.2d 680 (1975) 30

JET Inc., v. Sewage Aeration Systems,
223 F.3d 1566 (Fed. Cir. 1983) 37

JGB Enterprises v. United States
63 Fed. Cl. 319 (2004) passim

Kawa v. U.S.
77 Fed. Cl. 294 (2007) passim

Martin v. American Bancorporation Retirement Plan
407 F.3d 643 (4th Cir. 2005) 38

Martin v. United States,
30 Fed. Cl. 542 (1994) 37

Montana v. United States,
124 F.3d 1269 (Fed.Cir.1997) 28, 29

Riviera Finance of Texas, Inc. v. United States,
58 Fed. Cl. 528 (2003) 32

Stevenson v. Union Pacific R.R. Co.
354 F.3d 739 (8th Cir., 2004) 25

Sullivan v. U.S.
54 Fed. Cl. 214 (2002) 28

Summerfield Housing v. United States,
42 Fed.Cl. 160 (1998) 30, 31

Tuftco Corp. v. United States
222 Ct.Cl. 277 (1980) 32

United Medical Supply Co., Inc. v. U.S.
77 Fed. Cl. 257 (2007) 24, 25

US Ecology, Inc. v. U.S.
245 F.3d 1352 (Fed Cir. 2001) 13

West v. Goodyear Tire & Rubber Co.,
167 F.3d 776 (2nd Cir., 1999) 24

STATUTES

Contract Disputes Act, 41 U.S.C. § 601 2

Tucker Act, 28 U.S.C. § 1491(a)(1) 2

48 C.F.R. 2.101 27

OTHER AUTHORITIES

22 No. 4 Nash & Cibinic Rep ¶ 25,
POSTSCRIPT II: SUBCONTRACTORS AS THIRD-PARTY BENEFICIARIES 40

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | |
| THE UNITED STATES, | ) | (Judge George W. Miller) |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY <u>JUDGMENT</u>**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), plaintiff, Michael Kawa hereby responds to the defendant's motion for summary judgment. As will be explained below, there are numerous critical issues of disputed material fact, including the knowledge of the purchasing (pre-award) contracting officer at the time of issuing the purchase order, the scope of the delegation made by the post-award contracting officer to the administrative contracting officer's "team" at DCMC Clearwater, as well as the inherent authority of this DCMC "team" regarding payment of purchase orders and assignments.

It is undisputed that a key member of this DCMC Clearwater "team" knew exactly who Mr. Kawa was at the time that payment was made on Purchase Order 4191. It is thus plaintiff's contention that this knowledge by DCMC prior to payment cured any confusion or vagueness that may have existed regarding Mr. Kawa's identity at the time the purchase order was executed, and constituted a ratification by the Government. In any case, Contracting Officer Bocsy has testified that payment under P.O. 4191 was to be made to the "individual" Mr. Kawa, and has testified that she assumed that he was a bank, rather than a Capital City Pipes employee.

**STATEMENT OF THE CASE**

## I. NATURE OF THE CASE

On June 8, 2006, Mr. Kawa filed a complaint against the United States, alleging the existence of jurisdiction under the Contract Disputes Act, 41 U.S.C. § 601 et. seq. and the Tucker Act, 28 U.S.C. § 1491(a)(1), and asserting substantive rights flowing from express and implied contracts, an assignment, and third party beneficiary standing. This complaint was later amended to add an exhibit. The Government filed a motion to dismiss this complaint on September 18, 2006.

On November 17, 2006, Mr. Kawa filed the final version of his second amended complaint, asserting jurisdiction under the Contract Disputes Act, the Tucker Act, and adding allegations of jurisdiction under the Assignment of Claims Act, and 10 U.S.C. § 2785. Causes of action for assignment, third party beneficiary, express and implied contracts, and violation of 10 U.S.C. § 2785 were pled.

On December 19, 2006, the Government filed a supplemental motion to dismiss, again asserting that the Court lacks subject matter jurisdiction, and that Mr. Kawa lacks standing, has failed to state a claim, and is barred from bringing suit under res judicata. The Government's motion was denied by published decision dated June 28, 2007. In that decision, this Court found that Mr. Kawa had stated a cause of action as a third party beneficiary, under contracts, and as an assignee. This Court further found that Mr. Kawa's claims would not be barred by the doctrine of Res Judicata.

## II. STATEMENT OF FACTS

Capital City Pipes ("Capital Pipes") was, at all times relevant to this claim, a business located in Tallahassee, Florida, that was certified by the United States Small

Business Administration ("SBA") under the 8(a) program. Beginning in 1998, DSCC "set aside" its requirements for hose assemblies, previously supplied by JGB Enterprises ("JGB"), for Capital City. APFUF[1] 1

On or around April 30, 1999, Contracting Officer Bocsy forwarded a copy of solicitation number SP0750-99-Q-5778 to Capital City, requesting a quote for certain hose assemblies. APFUF 2. By letter dated June 23, 1999, Capital City advised Contracting Officer Bocsy that it was going to use JGB to assemble and supply the hose assemblies. APFUF 5.

On July 15, 1999 the Government Pre-award Monitor, pursuant to an inter-office memorandum, certified that the solicitation was an 8(a) set-aside and that Capital City was going to be a "dealer," with JGB supplying the hose assemblies. This memorandum stated that a certificate of competence for Capital City was not needed, since "inspection and acceptance must be at actual place of MFG. of hose Assy." Under the section of the memo pertaining to performance and quality history of Capital City, the memo states "ASAP," apparently meaning that the Government considered this an urgent order. APFUF 6.

By letter dated September 20, 1999, Capital City further advised Contracting Officer Bocsy that "[t]he assembly of this product will be done **by JGB** Enterprises, Inc. at their location, Liverpool, NY (61125)" (emphasis in original). APFUF 7. As part of ongoing negotiations, a letter from Capital City to Contracting Officer Bocsy, dated September 24, 1999, stated "JGB Enterprise, Inc will do the assembly and the pressure testing will be done at their plant in Liverpool, NY." APFUF 8.

[1] "APFUF" refers to Plaintiff's Additional Proposed Finding of Uncontroverted Fact.

Due to past non-payment by Capital City, JGB doubted that it would be properly paid by Capital City, and was reluctant to enter into a contract to supply the much needed hose assemblies. APFUF 9. JGB Enterprises, 63 Fed. Cl. at 323.

On October 27, 1999, Mr. Zywicki of JGB wrote Mr. Taylor (DSCC Small Business Specialist) and informed him that Capital City was delinquent on over $360,000 to JGB and that JGB had stopped production pending resolution of the matter. He asked Mr. Taylor to "[p]lease contact me immediately with a proposed solution" and sent a "cc" of his letter to both the Contracting Officer and legal counsel at DSCC, among others. APFUF 11.

During several conversations with Mr. Taylor over the next two weeks, Mr. Taylor suggested to Mr. Zywicki a proposed solution to the problem, where JGB and Capital City would enter into an escrow agreement, using Michael Kawa, Esq. as escrow agent. APFUF 12.

On November 9, 1999, Capital City advised Contracting Officer Bocsy that: Also, I am requesting a change of Payment Remittance Address to:

**Capital City Pipes, Inc.**
**Michael Kawa Esq.**
**300 Crown Bldg**
**304 S. Franklin Street**
**Syracuse, NY 13202**

APFUF 13.

Following receipt of the November 9, 1999 facsimile, Ms. Bocsy contacted Capital City, allegedly because the number of lines requested exceeded that which could be typed into the remittance address. Defendant's PFUF 13. However, Ms. Bocsy could have simply placed "Michael Kawa" and "Capital City Pipes" on the same line. APFUF 14.

In her January 8, 2008 deposition, Ms. Bocsy first claimed that Capital City Pipes told her "nothing" during this November 9, 2000 call, and when pressed, claimed to be unable to remember the substance of the call. APFUF 15.

On November 10, 1999, Capital City and JGB entered into an escrow agreement whereby Michael Kawa, Esq. was appointed as an escrow agent for receipt of payments under all DSCC-Capital City contracts under which JGB was the subcontractor. Under the escrow agreement, Capital City agreed to execute the necessary documents to ensure that all payments under the remaining Capital City prime contracts would be payable to Michael Kawa, Esq., who would then distribute the appropriate amounts to JGB and Capital City. APFUF 16. Mr. Kawa has been an attorney for approximately 35 years, practicing in the areas of business and real estate law. APFUF 17

It was JGB's, as well as Michael Kawa, Esq.'s, intention not to ship any hose assemblies to the Government unless it was paid. At the time of signing this agreement, Michael Kawa believed "[b]y entering into this agreement, I was facilitating and making possible the Government's receipt of urgently needed military materials." APFUF 18.

Capital City followed up with a letter to Contracting Officer Bocsy dated November 10, 1999, stating: "I requested a change in the payment remittance address:

> **Michael Kawa, Esq.**
> **300 Crown Bldg.**
> **304 S. Franklin Street**
> **Syracuse, NY 13202."**

APFUF 19.

The conflict between the November 9, 1999, letter and the November 10, 1999, letter apparently caused "confusion" and on November 15, 1999, Capital City sent a fax to Contracting Officer Bocsy. The fax stated: "Good Morning, Luann, I apologize fot

(sic) the confusion this may have caused. We are requesting the payment address be changed to:

> **MICHAEL KAKA (sic), ESQ.**
> **300 CROWN BLDEG (sic)**
> **304 S FRANKLIN STREET**
> **SYRACUSE, NY 13202**
>
> If you have any questions please call me
> THANK YOU."

APFUF 20.

The next day, on November 16, 1999, Contracting Officer Bocsy telephoned Capital City regarding an increase in quantity. APFUF 21.

DSCC ultimately awarded Purchase Order 4191 ("P.O. 4191") on November 24, 1999 to Capital City. JGB Enterprises, 63 Fed. Cl. at 325. APFUF 22.

At the time of signing P.O. 4191, Contracting Officer Bocsy assumed that payment would be made by physical check. JGB Enterprises, 63 Fed. Cl. at 325. APFUF 23.

P.O.4191 was in the amount of $45,275.76 for 306 hose assemblies, and was signed by Contracting Officer Bocsy on November 19, 1999. Contracting Officer Bocsy complied with Capital City's requests of November 10 and 15, 1999, and personally typed Michael Kawa, Esq.'s name and address into Purchase Order 4191. PA31. The language in the Purchase Order read: "REMIT PAYMENT TO:

MICHAEL KAWA, ESQ. 300 CROWN BLDG 304 S. FRANKLIN ST.

SYRACUSE NY 13202." APFUF 24.

Mr. Kawa felt that the language of P.O. 4191 bound the Government to make payment to him. APFUF 25.

In regards to this remittance address, Contracting Officer Bocsy testified that "remit payment to" means "payment should be remitted to that address," and confirmed that Mr. Kawa was an "individual," rather than just an address. APFUF 26. Kathryn Bader, a contracting specialist at DCMC Clearwater who was involved in administering P.O. 4191 also testified that: "Remittance address is where the funding is to be paid to." APFUF 27.

A "CCR" print out dated November 19, 1999 refers only to Capital City's physical address of: "CAPITAL CITY PIPES, INC.1872 MILLS ST BLDG F P.O. BOX 12368 TALLAHASSEE FL 32301 USA" APFUF 28. Contracting Bocsy testified that she printed this CCR entry out on the same day she issued P.O 4191. APFUF 29

The offer previously submitted by Capital City Pipes in response to solicitation SP0750-99-Q-5778 had given two addresses for Capital City Pipes, a street address and a post office box, both in Tallahassee, Florida. APFUF 30. Contracting Officer Boscy testified the she understood one of these addresses to be Capital City Pipe's actual address, and one to be a remittance address. APFUF 31.

At various times, Contracting Officer Bocsy has testified that she believed Mr. Kawa to work for a bank (PA12), that she did not give any thought as to whom Kawa was (PA44), and that she believed Mr. Kawa to be an employee of Capital City Pipes. This testimony is conflicting. APFUF 33.

No modification was ever entered into to remove Michael Kawa, Esq. as the payee, or to change the address for payment. JGB Enterprises, 63 Fed. Cl. 319. APFUF 34.

The P.O. 4191 provided that it was to be administered by DCMC Clearwater in St. Petersburg Florida. APFUF 37.

After signing the Purchase Order, pre-award Contracting Officer Bocsy was replaced by post-award Contracting Officer Moore. JGB Enterprises, 63 Fed. Cl. 325. APFUF 38.

Moore testified that she would ordinarily not take any action with regard to a contract unless a problem arose, and that the administration of the contract had been delegated to DCMC Clearwater. Contracting Officer Moore testified that the Federal Acquisition Regulations ("FAR") allowed certain functions to be delegated to DCMC Clearwater. Contracting Officer Moore specifically testified that DCMC Clearwater could be given authority to modify contracts. APFUF 39.

Michael Taylor, DSCC Small Business Specialist, discussed the possibility of using an escrow agreement to resolve the JGB non-payment problems with Contracting Officer Moore. APFUF 40. Contracting Officer Moore also kept Michael Taylor informed about discussions regarding establishment of a joint bank account for JGB and Capital City. APFUF 41.

Based on the Purchase Order citing Mr. Kawa as the payee, JGB shipped the items for P.O. 4191 directly to the Government on February 8, 2000. APFUF 42. The Government accepted this delivery made under P.O. 4191, which named Michael Kawa, Esq. as the remittance address.

On March 24, 2000, DSCC Contracting Officer Phyllis Moore sent an E-mail message to the Administrative Contracting Officer ("ACO") at DCMC Clearwater with an attached list of all contracts and purchase orders awarded to Capital City, including

P.O. 4191. In this message, Moore delegated authority to the ACO to "TO TAKE WHATEVER CONTRACTUAL ACTIONS NECESSARY TO KEEP THESE ORDERS VIABLE." APFUF 46.

Moore sent the March 24, 2000 message because of delayed deliveries, and Moore understood the reason for this delay was JGB's allegation that it had never been paid for past deliveries. APFUF 45.

At the time this March 24, 2000 message was sent, Lynne Rahtes was the ACO at Clearwater assigned to P.O. 4191. She was on a "team" with contracting Specialist Kathryn Bader, who was also assigned to P.O. 4191. APFUF 47. At the time of this March 24, 2008 ALERT message, the Government had not yet made payment for the shipments under P.O. 4191. JGB Enterprises, 63 Fed. Cl. 326, 327. APFUF 49.

DSCC Contracting Officer Moore confirmed that an ACO such as Lynne Rathes was: "a person who does pretty much the same thing as the PCO [purchasing contracting officer], except for they don't buy. . . " and stated that "They're heading their own agency, a lot of them. . ." APFUF 48. Contracting Officer Moore testified that an ACO is not subsidiary to or less senior that a post-award contracting officer. APFUF 51. Contracting Officer Moore also confirmed that in regards to an existing contract, an ACO can "do most of what a PCO does." APFUF 52. According to Contracting Officer Moore, it would have been DCMC Clearwater, not herself, who would have told the paying office to release payment on P.O. 4191. APFUF 53.

ACO Rahtes testified that the contract administrators under her supervision processed notices of assignment pursuant to administering contracts, and testified that her

contract administrators would "probably" speak to her before processing a notice of assignment. APFUF 54.

A document dated April 4, 2000 contains a handwritten note on a DCMC Fax transmittal sheet to Contracting Specialist Bader at DCMC Clearwater, indicating: "Mike says there is an escrow acct between JGB and Cap. City and Mr. Kawa is the attorney who controls it." APFUF 55. Ms. Bader thus knew of Mr. Kawa's role as an escrow agent at least as early as April 4, 2000. Defendant's PFUF 69.

On April 5, 2000, Capital City contacted Ms. Bader, at DCMC St. Petersburg, Florida, regarding Contract 2508 (another DSCC contract with Capital City as prime contractor and JGB as subcontractor), responding to "questions" asked by Contracting Officer Bader in a letter dated March 30, 2000. Capital City informed Ms. Bader that: "Mr. Michael Kawa, Esq. is an attorney and Capital City Pipes President and CEO Mr. Lee Gilliam and JGB Enterprises, Inc President/ CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, ESQ as a go-between on this contract." APFUF 56.

Ms. Bader was unable to recall one way or another whether she had spoken with the "PCO" [Purchasing Contracting Officer] or anyone else with regards to this April 5, 2008 correspondence. She did state that she "could have" discussed this correspondence with others. APFUF 57. Ms. Bader did state that she would have placed the April 5, 2000 letter in the DCMC files. APFUF 58. ACO Rahtes had full access to the DCMC files. APFUF 59. Contracting Officer Moore also had access to the DCMC files. APFUF 60.

ACO Rahtes was unable to recall if she had personally reviewed the documents stating that Mr. Kawa was an escrow agent or "go between," but Ms. Rahtes did indicate that documents clearly stating this fact would have ordinarily been placed in files which she had access. APFUF 61. ACO Rahtes also was unable to remember one way or another if her team had ever made any reports to Contracting Officer Moore regarding P.O. 4191, as had been requested by Contracting Officer Moore's March 24, 2000 E-mail message. APFUF 62.

Kathryn Bader has testified that her team at DCMC Clearwater had a large role in the payment of contracts, and actually made "sure they got shipped and paid correctly, and then were closed correctly." APFUF 63, 64. Ms. Bader testified that she definitely looked at the contracts which she was assigned, including P.O. 4191. APFUF 65.

On April 12, 2000, in a hand-written memorandum of a telephone call, Contracting Officer Moore stated, in regards to Contract 2508, "Since this material is urgently needed, I will entertain on a one time basis of this award, changing the remittance address to a bank or whatever is agreeable." APFUF 66. At the time Contracting Officer Moore made this memorandum, payment had not yet been made on P.O. 4191, and she was responsible for administering P.O. 4191. APFUF 67.

Lynne Rahtes confirmed that her team at DCMC Clearwater knew who Mr. Kawa was prior to payment being made on P.O. 4191. APFUF 68. Ms. Bader testified that "I did nothing to ensure that Michael Kawa got paid." APFUF 69.

On April 24, 2000, without informing Mr. Kawa, the Government directly paid, by EFT, the amounts due under the Purchase Order to Capital City. APFUF 70. Capital City did not pay JGB for the items shipped under P.O. 4191. APFUF 71.

If Michael Kawa "had known that the Government would not honor its written obligations, I never would have agreed to serve as escrow agent for PO 4191, and the Government would not have received the urgently needed hose assemblies." APFUF 72.

According to the Affidavit of Lavern Reising, retired Disbursing Officer, the Government's failure to pay Kawa was contrary to proper procedures. APFUF 73.

On May 31, 2000, JGB sent a letter to DCMC Clearwater and DSCC clearly demanding payment on Contract 2508 and P.O. 4191, among other contracts. APFUF 74. This notification came approximate 37 days after final payment on Purchase Order 4191. APFUF 75. DSCC Contracting Officer Phyllis Moore confirmed that this letter was in fact received by Defense Supply Center Columbus. APFUF 76.

The fax confirmation sheet following the May 31, 2000 letter shows that it was sent to the Commander of DCMC Clearwater at fax number 727-579-3106. ACO Rathes confirmed that the number 727-579-3106 was the correct fax number for the Commander of DCMC Clearwater. APFUF 77. ACO Rahtes, who was responsible for administering P.O. 4191 and Contract 2508, could recall <u>no action</u> whatsoever that was taken to preserve files after this notification. APFUF 78.

On August 14, 2000, Contracting Officer Moore sent an E-Mail to DCMC Clearwater, stating, in regards to P.O. 4191 and Contract 2508, "THE CONTRACTING OFFICER HAS RECEIVED A REQUEST FOR EQUITABLE ADJUSTMENT FROM THE CONTRACTOR'S SUB CONTRACTOR FOR THE ABOVE AWARDS." APFUF 79.

Ms. Moore confirmed that after sending this message to DCMC Clearwater she took action to preserve the files within her immediate control at DSCC, and she would

not have expected DCMC to destroy any contract files after having received such a message from her. APFUF 80.

ACO Rahtes could not recall any action that was taken by DCMC Clearwater to preserve files after this second notification. APFUF 81. During the deposition of ACO Rahtes, it was revealed that that "anyone" could add or remove documents from the files. APFUF 82.

Since payment was made on Purchase Order 4191 on April 24, 2000, the earliest that the documents could have been destroyed pursuant to DCMC policy would have been October 24, 2000. Thus the Purchase Order 4191 documents were destroyed after both the notification from JGB in May of 2000, and after the notification by Contracting Officer Moore in August of 2000. APFUF 83.

## ARGUMENT

## I. NUMEROUS CRITICAL ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT

As held by the Federal Circuit in US Ecology, Inc. v. U.S. 245 F.3d 1352 (Fed Cir. 2001), summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Fed.R.Civ.P. 56(c). Thus, summary judgment is proper only when no "reasonable jury could return a verdict for the nonmoving party.' Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)." As will be seen below, there are multiple critical issues of fact that prevent defendant from meeting this standard.

### A. The Issue of Contracting Officer Bocsy's Knowledge is an Unresolved Question of Material Fact

The lynch pin of defendant's entire argument in this matter is the claim that: "Ms. Bocsy did not know that Mr. Kawa was an attorney for JGB or that he had been designated as an escrow agent, but rather believed that Mr. Kawa was an employee of Capital City." (emphasis added). PFUF 21. Defendant attempts to establish this point by citation to the declaration of Ms. Bocsy, as well as portions of her deposition testimony. It must be clearly emphasized that this proposed finding of fact is not a "carry over" from the JGB case, but rather represents a new fact defendant seeks to establish. In JGB, this Court found only that "CO Bocsy testified that she did not know that Michael Kawa was affiliated in any way with JGB." JGB Enterprises, 63 Fed. Cl at 334. This finding states only that Contracting Officer Bocsy did not know Kawa to be affiliated with JGB, not that she knew him to be affiliated with Capital City Pipes. According to this finding, Contracting Officer Bocsy could have believed Mr. Kawa to be a banker, or could have simply not known any details other than that payment was to be sent to his name and address.

The actual testimony of Ms. Bocsy on her knowledge is extremely confused and contradictory. At various times, Contracting Officer Bocsy has testified that she believed Mr. Kawa to work for a bank, that she did not give any thought as to whom Kawa was, and that she believed Mr. Kawa to be an employee of Capital City Pipes. Ms. Bocsy's knowledge at this time is an open issue of material fact. In her deposition of January 8, 2008, Ms. Bocsy testified that:

> Q. Did you believe Michael Kawa was affiliated with a bank of some kind?
> A. It was an assumption.
> Q. Why did you make that assumption?

A. Because I've never dealt with - - When dealing with Capital City, there was only one person I ever dealt with.
Q. Who was that?
A. Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me.

APFUF 32.

In her more recent deposition on January 8, 2008, Mr. Bocsy was confronted with the conflicts in her testimony, and was unable to give any convincing explanation as to the obvious conflicts in her testimony:

Q. And you thought that Michael Kawa was some sort of banker?
A. I really didn't give any thought to who Michael Kawa was.
Q. Didn't give any thought to who Michael Kawa was.
A. I mean, I didn't dwell on the thought of who Michael Kawa was. I assumed that he was a person related to Capital City Pipes; he could have worked in their offices, could have worked in their shipping, billing section
Q. Did you assume that Michael Kawa was affiliated with a bank?
A. I assumed Michael was affiliated with Capital City Pipes.
Q. Would you answer my question?
A. No.
Q. You did not assume that he was affiliated with a bank?
A. No.
Q. You did not assume that he was affiliated with a bank?
A. No.
Q. I'm going to direct your attention to tab 1, page 44. Could you go to page 44 on the bottom? Do you see that page?
A. Yes.
Q. The question was asked of you by Mr. Hornyak at line 2, "Question: Did you believe Michael Kawa was affiliated with a bank of some kind?
"Answer: It was an assumption."
Was that your testimony at the time?
A. Apparently. I'm going to say as it's typed here - -
Q. Let me finish my question, please. "Question: why did you make that assumption?"
"Answer: Because I've . . . dealt with - - when dealing with Capital City, there was only one person I ever dealt with."
"Question" - - well, let me just ask you, you answered the question that way, correct?
A. Correct
Q. "Question: who was that?"
"Answer: Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me."

That's the way you answered the question, correct?
A. Correct.

PA[2] 44-46, APFUF 33.

Defendant's claims regarding Ms. Bocsy's knowledge are further undermined by the course of dealing leading up to the issuance of P.O. 4191. Whether or not these dealings linked Mr. Kawa to JGB, they certainly showed that Mr. Kawa was not synonymous with Capital City Pipes. First of all, Contracting Office Bocsy had information from several sources that both Capital City Pipe's physical and remittance addresses were in Florida. APFUF 30. A CCR print out available to the plaintiff dated November 19, 1999 refers only to Capital City's physical address of "CAPITAL CITY PIPES, INC.1872 MILLS ST BLDG F P.O. BOX 12368 TALLAHASSEE FL 32301 USA." Contracting Bocsy testified that she printed this CCR entry out on the same day she issued P.O 4191. APFUF 28, 29

The offer previously submitted by Capital City Pipes in response to solicitation SP0750-99-Q-5778 had given two addresses for Capital City Pipes: "Capital City Pipes, Inc. P.O. Box 12368 Tallahassee FL 32310" and "Capital City Pipes, Inc.1872 Mills St. Bldg F Tallahassee FL 32310." APFUF 30.

Contracting Officer Boscy testified the she understood one of these addresses to be Capital City Pipe's actual address, and one to be a remittance address. APFUF 31. Thus she knew that the regular remittance address for Capital City Pipes was a P.O. Box in Florida, not Mr. Kawa' address in Syracuse. Neither the CCR print out nor the offer gave any indication that Capital City Pipes employed a Mr. Kawa, nor that it had a presence in Syracuse, New York.

[2] "PA" refers to Plaintiff's Appendix, which accompanies this motion.

Furthermore, prior to issuing the purchase order, Contracting Officer Bocsy received a Fax clearing up "confusion" and changing the remittance address from "Capital City Pipes, Inc. Michael Kawa Esq" to only "Michael Kawa, Esq." APFUF 20. After receiving the first Fax from Capital City Pipes, Ms. Bocsy called specifically about the remittance address, but she alternately claims that "nothing" was discussed, or claims an inability to remember:

Q. Lets slow down for a minute. You called her right after you got this fax on 11/9/99?
A. I am going to say yes, to the best of my recollection.
Q. Okay. And then what did she tell you over the phone?
A. Nothing. If she had told me something on the phone, there would be a conversation record.
Q. Well, is there a conversation record documenting it?
A. I'm not sure. . .
Q. Well, I'm not asking about procedures. I'm asking if you can remember your conversation with her.
A. No.
Q. No, you can't remember it?
A. No, I can't.

APFUF 15.

Ms. Bocsy also claimed that she made the call to Capital City Pipes because the address in the November 9, 2000 correspondence contained five lines, and she could only type four lines in to the remittance address. However, when questioned, Ms. Bocsy testified:

Q. Four lines of information. Why couldn't you put Michael Kawa, Esquire and Capital City Pipe on the same line?
A. I could have. I didn't.

APFUF 14.

All this must be seen in the context of Ms. Bocsy's admission that payment would be made by check, and that the Remittance Address of P.O. 4191 called for payment to an "individual":

Q -- where you have "Remit Payment To: Michael Kawa, Esquire, " you typed that in?
A. Yes.
Q. And "remit payment to" meant what to you? What does that mean? Pay Kawa?
A. Payment should be remitted to that address.
Q. All right. Well, it was more than an address there, it's an individual, isn't it?
A. In this case.

APFUF 26.

As is shown by all of the above, Ms. Bocsy was only accustomed to dealing with one specific person at Capital City Pipes, suggesting that Capital City did not have many employees. She knew Capital City was a small business based in Florida. When instructed to remit payment to a totally new name and address in Syracuse New York, Ms. Boscy quite logically assumed that this was a separate entity dealing in some way with the handling and transfer of moneys, ie a "bank." In fact, this supposition was not far off the mark, as the service being provided by Mr. Kawa was not unlike that provided by some banks.

Considering the convoluted nature of Ms. Bocsy's testimony, plaintiff realizes that the final determination of this question is left to the finder of fact. However, of all her statements, it is submitted that the above quoted statement regarding the "bank" is the most credible and logical. At the very least, the conflicting statements of Ms. Bocsy would suggest that she did not form any firm "belief" as to who Mr. Kawa was, and placed him into the purchase order knowing he was an individual to whom payment would be made.

**B. There is a Material Question of Fact Regarding the Knowledge of Contracting Officer Moore**

Defendant claims that "Ms. Moore did not have any discussions with Mr. Taylor about JGB's problems with Capital City until after payment had been made on PO 4191" PFUF 49. Defendant further states that "Ms. Moore does not recall ever knowing what the remittance address was on PO 4191 until after JGB filed its request for equitable adjustment." PFUF 68. By proposing these allegedly uncontroversial facts, defendant is clearly trying to establish that Moore, who had unquestioned authority, did not know that payment was to be made to Kawa.

However, Michael Taylor, DSCC Small Business Specialist, discussed the possibility of using an escrow agreement to resolve the JGB non-payment problems with Contracting Officer Moore. Contracting Officer Moore also kept Michael Taylor informed about discussions regarding establishment of a joint bank account for JGB and Capital City. APFUF 40, 41. This Court expressly found that: "While the Court believed some of Ms. Moore's testimony, her claims of ignorance regarding JGB's allegations of non-payment and the attempts to remedy the situation were not credible." JGB Enterprises, 63 Fed. Cl. at 327.

**C. There Are Multiple Unresolved Question of Fact Regarding Delegation to DCMC Clearwater**

The defendant admits that DCMC Contracting Specialist Kathryn Bader knew that Mr. Kawa was serving as an escrow agent prior to payment being made on P.O. 4191. However, the defendant claims that this is irrelevant since "Ms. Bader did not have authority to bind the Government" Defendant's Brief at 18, PFUF 43, 48-60, 63. Defendant further claims that "Ms. Bader was not responsible for remittance addresses,

or for where or to whom payment was sent." PFUF 44. Defendant claims that DCMC ACO Rathes "would not have interpreted the March 24, ALERT message as authorization to change the payee of the contract or to determine to whom payment should be made." PFUF 62. The Government further asserts that ACO Rahtes "does not specifically recall anything about PO 4191, Contract 2508, JGB, or Mr. Kawa." PFUF 71."

As will be explained below, plaintiff strongly disagrees that the knowledge of Ms. Bader is irrelevant, disagrees that Ms. Bader did not have power to bind the Government, disagrees that Ms. Bader was not responsible for payment, disagrees that the March 24, 2000 message was not a full delegation of contracting authority, and avers that Ms. Bader's knowledge must be imputed to ACO Rahtes.

Ms. Bader was a contracting specialist on a DCMC Clearwater "team" with ACO Lynne Rahtes. This entire team was vested with full contractual authority by Contracting Officer Moore. On March 24, 2000, Contracting Officer Moore sent a message to DCMC Clearwater, stating in part:

> THIS SERVES AS AUTHORIZATION FOR THE ACO TO TAKE WHATEVER CONTRACTUAL ACTIONS NECESSARY TO KEEP THESE ORDERS VIABLE. THE MATERIAL ON THESE CONTRACTS ARE [sic] URGENTLY NEEDED.

APFUF 46.

Ms. Rahtes interpreted this as a delegation to her entire "team" which included Ms. Bader:

> A. I was the ACO for this contract.
> Q. So you were administering the contract?
> A. Yes, along with my team.

PA 81

Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify a contract?
A. It's a delegation to the contract administration team. . .
Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
A. That's what is says.

PA 95-96, APFUF 48.

Ms. Bader specifically testified that she played a role in insuring that contracts were properly paid. Ms. Bader clearly stated: "I ensured that the shipping documents were accurate, that they were submitted to DFAS for remittance, that DFAS processed them through their system in a timely fashion, and that DFAS issued a check." APFUF 63. Ms. Bader also testified that "I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly." APFUF 64

While it is plaintiff's position that the knowledge of Ms. Bader prior to payment is sufficient to support its causes of action, it must also be inferred that Ms. Rahtes, the ACO at DCMC Clearwater was also aware of Mr. Kawa's identity at the time of payment. The ACO was the direct recipient of a full delegation from Ms. Moore, and thus her knowledge must be considered as equivalent to that of Ms. Moore herself.

Ms. Bader was unable to recall one way or another whether she had spoken with the "PCO" [Purchasing Contracting Officer] or anyone else with regards to the correspondence revealing Mr. Kawa's identity. She did state that she "could have" discussed this correspondence with others. APFUF 57. Ms. Bader did state that she would have placed the April 5, 2008 letter in the DCMC files. APFUF 58. ACO Rahtes had full access to the DCMC files. APFUF 59. Contracting Officer Moore also had access to the DCMC files. APFUF 60.

Ms. Rahtes was unable to recall if she had personally reviewed the documents stating that Mr. Kawa was an escrow agent or "go between," but Mr. Rahtes did indicate that documents clearly stating this fact would have ordinarily been placed in files which she had access:

Q. All right. And would you please read the first numbered paragraph.

A. "Mr. Michael Kawa, Esquire is an attorney and Capital City Pipes president and CEO, Mr. Lee Gilliam and JGB Enterprises, Incorporated, president/CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, Esquire as a go-between on this contract. If you require a copy of the agreement in order for this contract to be fulfilled, please let me know."

Q. All right. Thank you. And you can take a moment to look at this correspondence. But is this the type of correspondence that would normally be placed in the file?

A. Yes.

APFUF 61.

ACO Rahtes was also unable to remember one way or another if her team had ever made any reports to contracting Officer Moore regarding Purchase Order 4191, as had been requested by Contracting Officer Moore's March 24, 2000 E-mail message. APFUF 61.

Ordinarily, this lack of memory caused by the passage of time could be remedied by looking to the DCMC Purchase Order 4191 contract files, which would perhaps contain a memo from Ms. Bader to ACO Rahtes, a conversation record, or some similar memorandum. Unfortunately, these files were improperly destroyed by DCMC Clearwater after receiving not one but two notifications of a claim. On May 31, 2000, JGB sent a letter to DCMC Clearwater and DSCC clearly demanding payment on Contract 2508 and Purchase Order 4191, among other contracts. APFUF 74. This notification came approximate 37 days after final payment on Purchase Order 4191. The fax confirmation sheet following the letter shows that it was sent to the Commander of DCMC Clearwater at fax number 727-579-3106. ACO Rathes confirmed that the number 727-579-3106 was the correct fax number for the Commander of DCMC Clearwater. APFUF 77. ACO Rahtes could recall no action whatsoever that was taken to preserve files after this notification. APFUF 78.

On August 14, 2000, Contracting Officer Moore sent an E-Mail to DCMC Clearwater, stating, in regards to Purchase Order 4191 and Contract 2508, "THE CONTRACTING OFFICER HAS RECEIVED A REQUEST FOR EQUITABLE ADJUSTMENT FROM THE CONTRACTOR'S SUB CONTRACTOR FOR THE ABOVE AWARDS." APFUF 79. Ms. Moore confirmed that after sending this message to DCMC Clearwater she took action to preserve the files within her immediate control at DSCC, and she would not have expected DCMC to destroy any contract files after having received such a message from her. APFUF 80. ACO Rahtes again could not recall any action that was taken by DCMC Clearwater to preserve files after this second notification. APFUF 81.

ACO Rahtes testified that since payment was made on Purchase Order 4191 on April 24, 2000, the earliest that the documents could have been destroyed pursuant to DCMC policy would have been October 24, 2000. Thus the Purchase Order 4191 documents were destroyed after both the notification from JGB in May of 2000, and after the notification by Contracting Officer Moore in August of 2000. APFUF 83.

As has been clearly stated by this Court: "[i]t has long been the rule that spoliators should not benefit from their wrongdoing, as illustrated by 'that favourite maxim of the law, *omnia presumuntur contra spoliatorem,'* 1 Sir T. Willes Chitty, et al., *Smith's Leading Cases,* 404 (13th ed.1929). Spoliation may result in a variety of sanctions, with 'the oldest and most venerable remedy' being an 'adverse inference,' under which the finder of fact may infer that the destroyed evidence would have been favorable to the opposing side." United Medical Supply Co., Inc. v. U.S. 77 Fed.Cl. 257, 263 (2007).

Under the facts as properly understood, the Government has committed spoliation of evidence. "Spoliation is the destruction or significant alteration of evidence, or failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2nd Cir., 1999). As seen above, the Government did indeed destroy and fail to preserve evidence. At the time this destruction was committed, the Government had been informed of JGB's claims, and DSCC had actually sent an internal notification to DCMC regarding the Request for Equitable Adjustment filed by JGB. The litigation was certainly reasonably foreseeable. It is irrelevant whether the destruction was done in bad faith or was merely a result of carelessness and negligence: "an injured party need not demonstrate bad faith in order for the court to impose, under its inherent authority, spoliation sanctions." United

Medical Supply Co., Inc. v. U.S. 77 Fed.Cl. 257, 268 (2007). Likewise, any alleged document retention policy does not justify the actions of the Government: "courts have repeatedly rejected claims that a party should not be subject to spoliation sanctions because it destroyed documents pursuant to a document retention/destruction policy." Id. at note 30, *citing* Stevenson v. Union Pacific R.R. Co., 354 F.3d 739, 750 (8th Cir., 2004); In re Prudential Ins. Co. of Am. Sales Practices Litig., 169 F.R.D. 598, 615 (D.N.J.1997).

### D. There is a Material Question of Fact Regarding the Powers and Duties of the DCMC Office

As explained above, there was clearly a delegation of full contractual authority to the "team" at DCMC Clearwater. However, in a sense this entire issue is a "red herring" propounded by defendant. At PFUF 39, defendant states, as a proposed fact, that "The ACO has no authority to substantively modify contracts without authorization from the DSCC contracting officer," suggesting that without a special delegation, the knowledge of DCMC Clearwater was not relevant. The actual testimony suggests that DCMC Clearwater routinely had cognizance over payment matters, and thus knowledge by the ACO or her "team" at Clearwater would be sufficient to bind the Government.

Moore testified that she would ordinarily not take any action with regard to a contract unless a problem arose, and that the administration of the contract had been delegated to DCMC Clearwater. Contracting Officer Moore testified that the Federal Acquisition regulations allowed certain functions to be delegated to DCMC Clearwater. Contracting Officer Moore testified:

Q. Would the DCMC verify that the product was delivered, for example?
A. Yes, they would.
Q. All. right. And - -

A. Or could.
Q. They could. And would they ever be allowed to make contract modifications?
A. Yes.

APFUF 39.

Contracting Officer Moore also emphasized that the powers of an ACO with regards to an existing contract were substantially similar to those of a post award contracting officer. Contracting Officer Moore confirmed that an ACO such as Lynne Rathes was: "a person who does pretty much the same thing as the PCO [purchasing contracting officer], except for they don't buy. . . " and stated that "They're heading their own agency, a lot of them. . ." APFUF 50. Contracting Officer Moore testified that an ACO is not subsidiary to or less senior than a post-award contracting officer. APFUF 51. Contracting Officer Moore also confirmed that in regards to an existing contract, an ACO can "do most of what a PCO does." APFUF 52.

Contracting Officer Moore's testimony is harmonious with Ms. Bader's broad description of her own job duties. She stated: "I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly." APFUF 64.

The authority of DCMC is further established by the fact that DCMC would apparently process assignments, which effectively change the payee on contracts, without the involvement of the post-award contracting officer. ACO Rahtes testified:

Q. Now, as we said, this is a Notice of Assignment. Would processing assignments be the sort of thing your office would do pursuant to administering a contract?
A. Yes.

Q. All right. Would you personally process Notices of Assignment as a general procedure?
A. Personally, no. . .
Q. Would you contract administrators, as a general rule, speak to you before processing a Notice of Assignment"
A. Probably.

APFUF 54, PA 90-91.

Due to all of the above, the level of authority enjoyed by DCMC Clearwater cannot be considered as an un-controverted fact.

## II. MR. KAWA IS A THIRD PARTY BENEFICIARY

### A. Under the Correct Facts, Mr. Kawa Is a Third Party Beneficiary, As His Identity Was Clear at the Time of Payment

As explained above, by the time of payment on Purchase Order 4191, the "team" at DCMC Clearwater knew who Mr. Kawa was. In the case of Contracting Specialist Bader, this knowledge is actual and admitted, and this knowledge must be imputed to ACO Rahtes. The entire "team" at DCMC Clearwater had previously received a written delegation of full contractual authority to take "any contractual actions necessary" by Contracting Officer Moore, and was authorized to process assignments as a routine matter. This formal and specific delegation allows DCMC Clearwater to bind the Government, and the knowledge of DCMC Clearwater thus becomes tantamount to that of the Contracting Officer. In fact, the definition of a "Contracting Officer" expressly includes the recipients of such delegated authority. 48 C.F.R. 2.101 reads: "Contracting officer means a person with the authority to enter into, administer, and/or terminate contracts and make related determinations and findings. The term includes certain authorized representatives of the contracting officer acting within the limits of their authority as delegated by the contracting officer."

It is settled law in this Court that when the identity of a third party beneficiary is revealed prior to the time performance is due (ie payment), this is sufficient. In Sullivan v. U.S. 54 Fed. Cl. 214 (2002) a private person entered into a contract with the United States Postal Service to transport mail. This government contract required the carrier to possess vehicle insurance. A person injured due to the negligence of the contractor sued the United States Government as a third party beneficiary of the provision requiring insurance. In denying the Government's Motion to Dismiss, the Sullivan Court stated: "According to the Federal Circuit, 'the intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to benefited thereby.' Montana v. United States, 124 F.3d 1269, 1273 (Fed.Cir.1997). Determining if the plaintiff is an intended beneficiary requires the court to ask 'whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him.'" Id. at 216.

Guardsman Elevator Co., Inc. v. U.S. 50 Fed.Cl. 577, 581 (Fed.Cl., 2001) also stated the "The intended beneficiary need not be specifically identified in the contract. State of Mont., 124 F.3d at 1273." Turning directly to Montana v. United States, 33 Fed. Cl. 82, 87 (1997), it can be seen that a beneficiary need not be "specifically or individually identified in the contract," provided that "the beneficiary be identified before he has an enforceable right, i.e., 'at the time performance is due.' 4 Arthur L. Corbin, Corbin on Contracts § 781, at 70 (1951)."

In the current case, any ambiguity regarding Mr. Kawa's identity was cured before the time that payment was due, via written notification to the DCMC team, who had been delegated full authority to take any contractual actions necessary, and were

authorized to process assignments of payment. Thus, the beneficiary was "identified before he has an enforceable right, i.e., 'at the time performance is due.'"

Also, based upon the testimony of Contracting Officer Bocsy, it appears that at the time of issuing P.O. 4191, she may believed Mr. Kawa to be affiliated with a bank, and thus understood him to be an individual separate and distinct from Capital City Pipes. The intent to send payment to a certain individual is an intent to benefit, and thus supports third party beneficiary standing. Montana v. United States, 124 F.3d 1269, 1273 (Fed.Cir.1997).

### B. Even Under The Facts As Stated By Defendant, Mr. Kawa is a Third Party Beneficiary

Even accepting, *arguendo*, that Contracting Officer Bocsy believed Mr. Kawa to be an employee of Capital City Pipes, accepting that only Kathryn Bader knew of his identity prior to payment, and further accepting the dubious proposition that Ms. Bader's knowledge was irrelevant, Mr. Kawa is still a third party beneficiary.

It is undisputed that, after receiving a letter removing "Capital City Pipes" from the address line of the remittance address, Contracting Officer Bocsy placed Mr. Kawa's name and address into the "remit to" clause of Purchase Order 4191, assuming that payment would be sent to that individual's address by physical check. She testified as follows:

Q - - where you have "Remit Payment To: Michael Kawa, Esquire, " you typed that in?
A. Yes.
Q. And "remit payment to" meant what to you? What does that mean? Pay Kawa?
A. Payment should be remitted to that address.
Q. All right. Well, it was more than an address there, it's an individual, isn't it?
A. In this case.

APFUF 26.

However the Government argues that this action was insufficient to establish an intent to benefit, since Contracting Officer Bocsy mistakenly thought that Mr. Kawa worked for Capital City Pipes, rather than being an escrow agent for both Capital City Pipes and JGB. While this alleged mistake could be relevant if JGB were the plaintiff in this suit, it is not at all relevant to Mr. Kawa's own rights.

Again, Contracting Officer Bocsy knew Mr. Kawa's name, and his office address in Syracuse New York. Is anymore detail needed to sustain third party beneficiary status? Defendant is implicitly arguing here that when a contracting officer knows a person's correct name and address, but happens to be mistaken regarding the person's employer, this mistake will bar recovery by the named beneficiary. This novel assertion by the defendant is not supported by case law.

A robust body of case law supports Mr. Kawa's claim that he was an intended third party beneficiary, base upon the objective meaning of Purchase Order 4191, and his reasonable reliance thereon. As he testified, he was an experienced attorney, and had no doubt that his naming in the Purchase Order would bind the Government. APFUF 25. Frank & Breslow, LLP v. United States, 43 Fed.Cl. 65, 67 (1999) stated: "The test for a third party beneficiary relationship . . . is one of reasonable reliance." Despite the Government's many arguments to the contrary, this is an objective test. See Firestone Tire & Rubber Co. v. United States, 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971); ITT Arctic Servs., Inc. v. United States, 207 Ct.Cl. 743, 524 F.2d 680, 684 (1975). Summerfield Housing v. United States, 42 Fed.Cl. 160, 166 (1998) stated: "The language of a contract must be given that meaning that would be derived from the contract by a reasonable

intelligent person acquainted with the contemporaneous circumstances" *citing* Hol-Gar Mfg. Corp. v. United States, 169 Ct.Cl. 384 (1965).

Despite this, the Government states that Mr. Kawa's reliance upon the plain and unambiguous language of the contract was not reasonable, due to "FAR 52.232-33, which was incorporated into the contract by reference and stated that payment would be made to the EFT information contained in the CCR system. . ." First of all, the CCR System for Capital City Pipes did not actually contain "EFT information," but rather contained a physical address. APFUF 28. Second, the Contracting Officer herself assumed that payment would be made by physical check. APFUF 23. Third, the remittance clause referred to a physical address, not "EFT information."

Furthermore, the Armed Services Board of Contract Appeals, a body with extensive experience and expertise in such matters, has held that such FAR clauses do not render reliance unreasonable. In Appeal of Floorpro, Inc. 04-1 BCA ¶ 32571, ASBCA No. 54143 (2004), in a nearly exact parallel to the current matter, the Board found Floorpro stated a claim as a third party beneficiary, holding that "there was nothing in that clause [FAR 52.232-33] that would prevent jurisdiction in this direct subcontract appeal based on the third-party beneficiary exception to the privity rule."

## III. MR. KAWA IS AN ASSIGNEE

### A. Contracting Officer Bocsy Waived the Anti-Assignment Act

As the Defendant recognizes, the Government may waive the technical requirements of the Anti-Assignment Act, and such waivers are determined by a totality of the circumstances test, including whether: "(1) the assignor and/or the assignee sent notice of assignment to the Government; (2) the contracting officer signed the notice of

assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the Government sent payments to the assignee pursuant to the assignment." Riviera Finance of Texas, Inc. v. United States, 58 Fed. Cl. 528, 530 (2003). It is important to note that the Rivera factors are merely examples, and Rivera quoted Tuftco Corp. v. United States, 222 Ct.Cl. 277 (1980) for the proposition that : "It is unnecessary to identify any one particular act as constituting recognition of the assignments by the Government. It is enough to say that the totality of the circumstances presented to the court establishes the Government's recognition of the assignments by its knowledge, assent, and action consistent with the terms of the assignments." Id. at 530.

The particular circumstances of this case are a powerful case for assignment. At the time Kawa was written in to the purchase order's remittance address, the Contracting Officer had received a series of three letters changing the address from "Capital City Pipes Michael Kawa Esq" to "Michael Kawa Esq." alone, assumed that payment would be made by physical check, and knew that payment due to Capital City Pipes would be sent to the "individual" Mr. Kawa in Syracuse, rather than to the Florida remittance address contained in Capital City Pipe's offer, and believed Mr. Kawa to be a bank.

In plaintiff's view, this alone is sufficient. The "meeting of the minds" as called for by Banco Bilbao Vizcaya v. United States, 48 Fed. Cl. 528, 580 (2000) occurred with regards to the essential elements of the assignment. Mr. Kawa and Capital City Pipes wanted a physical check to be forwarded to Mr. Kawa at his physical address. Capital City accordingly requested that payment be made to Mr. Kawa. Contracting Officer Boscy took steps to which she assumed would lead to the exact outcome desired by Mr. Kawa and Capital City, namely receipt of a physical check for payment at Mr. Kawa's

Syracuse address. Bocsy has admitted that P.O. 4191 called for payment to an "individual." APFUF 26. What more is required?

In the face of this, the Government constantly invokes the alleged fact that Contracting Officer Moore believed Mr. Kawa to be an employee of Capital City, rather than an escrow agent with responsibilities to both Capital City Pipes and JGB. The Government is essentially arguing that even though the contracting officer knew the payment was to go to Mr. Kawa, Mr. Kawa may not recover if the contracting officer did not know precisely what Mr. Kawa was going to do with the money. As far as Kawa's personal right to recover under Purchase Order 4191, it should make no difference at all whether he was bound to give all the money over to Capital City Pipes, or was bound to divide the money pursuant to an escrow agreement.

**B. The Assignment was Ratified By the Government**

It is plaintiff's position that the initial placement of Mr. Kawa into the purchase order was sufficient for a valid assignment. However, Mr. Kawa's status as an assignee is further cemented by the fact that the Government personnel who had been delegated full authority over the purchase order became aware of exactly who he was prior to payment being made. Further, as explained above, the government personnel who became aware of Mr. Kawa's role and identity were empowered to process assignments as part of their normal duties, and were authorized to see that payment was properly made on the Purchase Order. APFUF 54.

In fact, prior to payment on P.O. 4191 during the spring of 2000, the DCMC Clearwater office was actually engaged in processing notices of assignment in an attempt to make Mr. Kawa the assignee on another contract involving Capital City Pipes and

JGB. In this context, Contracting Specialist Bader received a letter from Capital City Pipes stating that:

> 1. Mr. Michael Kawa, Esq. is an attorney and Capital City Pipes President and CEO Mr. Lee Gilliam and JGB Enterprises, Inc President/ CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, ESQ as a go-between on this contract.
>
> 2. This Notice of Assignment is not for a loan. The purpose is for the disbursement of the funds related to the above-mentioned contract.

APFUF 56.

As has been explained in detail above, Ms. Bader was part of a team with ACO Lynne Rahtes responsible for administering Purchase Order 4191, and would have placed this correspondence in the DCMC files. Ms. Bader's team had been delegated authority to take any contractual actions necessary with regards to Purchase Order 4191.

Ms. Bader, who had actual knowledge of Mr. Kawa's identity, would have personally reviewed Purchase Order 4191, pursuant to her testimony that she would read the contracts that she administered. APFUF 65. Ms. Rahtes testified that the DCMC contracting specialists would "probably" speak to her before processing a notice of assignment. APFUF 54. Thus the assignment to Kawa came to the actual knowledge of a government employee (Ms. Bader) authorized to process assignments, prior to payment. Ms. Bader "probably" who have spoken to ACO Rahtes regarding the May 5, 200 "notice of assignment" on Contract 2508, bringing the identity of Kawa to Ms. Rahtes' attention.

Since dealing with assignments was part of Ms. Baders' and Ms. Rahtes' duties in administering a contract, at the very least they had Implied Actual Authority to bind the government in this regard. According to Humlen v. U.S. 49 Fed. Cl. 497, 503 (2001),

"Implied actual authority, like express actual authority, also can bind the Government for the acts of its agents. See H. Landau & Co., 886 F.2d at 324. Authority is 'generally implied when such authority is considered to be an integral part of the duties assigned to that Government employee.' Thomas v. INS, 35 F.3d 1332, 1340 (9th Cir.1994); H. Landau & Co., 886 F.2d at 324 (quoting J. Cibinic & R. Nash, Formation of Government Contracts 43 (1982))."

## IV. EXPRESS AND IMPLIED CONTRACTS EXIST BETWEEN THE GOVERNMENT AND MR. KAWA

At page 14 of its brief, the Government claims that no contract could have been formed, since "Ms. Bocsy did not know that Mr. Kawa was an attorney for JGB or that he had been designated as an escrow agent, but rather believed that Mr. Kawa was an employee of Capital City." As has been explained before, Ms. Bocsy's testimony on the subject of her knowledge is contradictory and conflicting, giving rise to a material issue of fact. In any case, whether or not Contracting Officer Bocsy knew of the link between JGB and Mr. Kawa is utterly irrelevant to Mr. Kawa's independent claim asserted in this action.

As stated by the Government at page 14 of its Brief, the elements of an implied in fact contract are "1) mutuality of intent to contract; 2) consideration; and 3) lack of ambiguity in offer and acceptance." Quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990). Mr. Kawa intended to contract with the Government, entering into an escrow agreement suggested by the Government, expecting that the Government would place his name in future purchase orders. The Government accepted this offer by placing Michael Kawa in Purchase Order 4191 as payee, assuming that a physical check for payment would be sent to his address. Prior to payment, the DCMC office

administering the Purchase Order was informed exactly who Mr. Kawa was, via the April 5, 2008 letter from Capital City Pipes and via the April 4, 2008 communication from Michael Taylor. As consideration for his services, the Government promised to forward Mr. Kawa $45,275.76. This formed a contract.

On page 18 of its motion for summary judgment, the Government makes an argument against ratification of an implied in fact contract that is simply irrational. Stating that in order to show ratification, Mr. Kawa must prove "(1) that the government received a benefit from plaintiff's activities and (2) government officials who had authority to contract had knowledge of the contract and accepted plaintiffs offer," the Government argues that "the Government did not receive any benefits from Mr. Kawa," since "the Government was entitled to delivery of the hose assemblies." While the Government may have regarded itself as entitled to the hoses, it would not have gotten the hoses unless Mr. Kawa served as an escrow agent. Employees of JGB clearly communicated to the Government that they would not ship any material unless they were assured of payment. The services of Mr. Kawa, in an <u>escrow agreement suggested by the Government</u> allowed the Government to receive the hose assemblies. As detailed in this Brief, by the time the Government accepted and paid for these goods, "government officials who had authority to contract" knew of the arrangement with Mr. Kawa, since DCMC Clearwater had been delegated full authority and had been informed in writing who Mr. Kawa was. Receipt of a benefit and knowledge by the Government are established here. This is a clear case of ratification.

## V. RES JUDICATA DOES NOT APPLY

In its motion for summary judgment, the Government is asserting that "claim preclusion" bars Mr. Kawa's claim in its entirety, due the alleged identity between Mr. Kawa's claims and the claim of JGB in the previously decided case of JGB Enterprises, 63 Fed. Cl. 319. First of all, the Government unsuccessfully made a similar argument in its Motion to Dismiss in this Case, which was rejected by this Court in Kawa v. U.S. 77 Fed.Cl. 294 (2007). Accordingly, plaintiff submits that the law of the case should bar defendant from again arguing this point.

In its motion for summary judgment, the Government has simply re-advanced its same argument under the new banner of "concurrent" or "successive" relationship between JGB and Kawa, apparently abandoning the previously advanced concept of "virtual representation." As will be explained, claim preclusion is not warranted under any theory. The Government states that res judicata applies when: "(1) there is identity of parties (or their privies); (2) there has been and earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *citing* JET Inc., v. Sewage Aeration Systems, 223 F.3d 1566, 1572 (Fed. Cir. 1983). According to the Government, "all three elements are met here." Reviewing the three factors in turn, it is clear that none are met.

First, the Government asserts that Mr. Kawa is "a privy of JGB," citing Martin v. United States, 30 Fed. Cl. 542, 550 (1994) for the proposition that "Privity requires, at a minimum, a substantial identity between the issues in controversy and showing the parties in the two actions are really and substantially in interest the same." It should be noted that Martin v. United States was actually a case of issue preclusion. In any case,

Martin does not support a finding of privity, since there is no "substantial identity between the issues in controversy." The legally significant facts in this case are sharply different than in JGB Enterprises, 63 Fed. Cl. 319. Mr. Kawa's name and address were on the face of P.O. 4191, while JGB was behind the scenes. JGB's lack of visibility was what led to the failure of its claim on Purchase Order 4191. This difference in rights eliminates the privity needed for res judicata: "[t]o be in privity with a party to a former litigation, the non-party must be 'so identified in interest with a party to former litigation that he represents **precisely the same legal right** in respect to the subject matter involved." (emphasis added) Martin v. American Bancorporation Retirement Plan 407 F.3d 643, 651 (4th Cir. 2005). Mr. Kawa's claim can be further differentiated from JGB's in that the express naming of Mr. Kawa has allowed him to credibly state causes of action for Assignment and under Contract that would have been much more difficult for the "invisible" JGB.

Moving to the second factor from JET Inc., the Government asserts that "there has been a final judgment upon JGB's PO 4191 claim." This is true; there has been a judgment upon JGB's claim. What there has not been is a judgment on Mr. Kawa's claim, which is substantially different, due to his being expressly named in Purchase Order 4191, and also due to the fact that DCMC Clearwater was informed of Mr. Kawa's role and identity prior to payment. Also, as clearly explained in the complaint, Mr. Kawa served as an escrow agent for both Capital City Pipes and JGB, with an obligation to turn money over to both parties. When Mr. Kawa collects the payment due under PO 4191 from the Government, he will be bound turn a portion over to Capital City's trustee in bankruptcy.

The third factor from JET Inc., "the second claim is based on the same set of transactional facts as the first" can also be dealt with for the reasons explained at length above. To put the matter in the simplest possible way, the contracting officer allegedly did not know that her actions with regard to Purchase Order 4191 would result in payment being sent to JGB. However, the Contracting Officer did know that her actions would result in a check for payment being sent to Mr. Kawa at his Syracuse, New York address. To say the least, this is a major distinction. The new facts regarding the DCMC office are yet another major legal and factual distinction between the cases.

## VI. MR. KAWA IS ENTITLED TO CONTRACT DISPUTES ACT INTEREST

Defendant argues that this Court does not have jurisdiction under the Contract Disputes Act, and thus Mr. Kawa is not entitled to interest. However, this argument regarding Contract Disputes Act jurisdiction has already been unsuccessfully advanced by defendant in its motion to dismiss. Should plaintiff succeed with the merits of its contract claims, it would indeed be a "contractor" and would be entitled to recover CDA interest. See Kawa v. U.S. 77 Fed.Cl. 294, 305 (2007). Thus, the question of interest in inexorably linked to the final resolution of this case, and is not suitable for decision at his time.

Also, defendant cites to JGB Enterprises, 63 Fed. Cl. at 331, implying that Mr. Kawa is not a "contractor" and is thus ineligible for interest, even if he should succeed on any of his causes of action. Plaintiff here will respectfully note that the law on this question has fallen into a state of considerable controversy, due to the decision of the Armed Services Board of Contract Appeals in FloorPro, Inc., ASBCA 54143, 2008 WL 436927 (Feb 8, 2008), which is in direct opposition to the decision of this court in JGB.

As was noted by professors Nash and Cibinic, "This jurisdictional disagreement will have to be resolved by the Federal Circuit." Nash and Cibinic further noted that "The sooner this jurisdictional disagreement is resolved, the better. The Government procurement process is not well served by this kind of issue which forces parties to make litigation decisions not knowing the extent of their rights." 22 No. 4 Nash & Cibinic Rep ¶ 25, POSTSCRIPT II : SUBCONTRACTORS AS THIRD-PARTY BENEFICIARIES.

## CONCLUSION

As has been explained in detail above, numerous issues of material fact preclude the granting of summary judgment at this time. Before the legal issues can be reached, a finder of fact must determine the exact state of Ms. Bocsy's knowledge or lack of the same with regarding to Mr. Kawa, as well as several issues regarding delegation and authority with regards to DCMC Clearwater.

Plaintiff submits that a finder of fact may well find in its favor on all these issues, and further submits that with the correct facts in place, Mr. Kawa is legally entitled to receive payment on Purchase Order 4191. Thus, this the motion for summary judgment must fail.

Dated: July 21, 2008

s/Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
127 Genesee Street
Auburn, New York 10321
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorney for Plaintiff