IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | |
| THE UNITED STATES, | ) | (Judge George W. Miller) |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), plaintiff, Michael Kawa, respectfully responds to defendant's proposed findings of uncontroverted fact, submitted by defendant in support of its motion for summary judgment. Defendant's proposed findings will be set out below verbatim, followed by a response

*1. Michael Kawa, Esq., is an attorney for JGB Enterprises, Inc. ("JGB"). JGB Enterprises, 63 Fed. Cl. at 325; Defendant's Appendix ("DA") 74-75.*

PLAINTIFF'S RESPONSE:

Plaintiff will not disagree that Mr. Kawa is an attorney who as represented JGB, but will clarify that in the context of the escrow agreement mentioned below, Mr. Kawa also had duties towards Capital City Pipes in his capacity as a escrow agent. PA 123-125[1].

*2. Pursuant to an escrow agreement between prime contractor Capital City Pipes, Inc. ("Capital City") and subcontractor JGB, Mr. Kawa served as an escrow agent for receipt of payments due to Capital City for manufacture and delivery of hose*

[1] "PA" refers to Plaintiff's Appendix.

*assemblies pursuant to several contracts between the United States and Capital City. Second Am. Compl. ¶ 18; DA 13.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

3. *In 1999, the Defense Supply Center Columbus ("DSCC"), which is part of the Defense Logistics Agency ("DLA"), issued several sole-source contracts and purchase orders to Capital City for hose assemblies, including SP0750-00-M-4191 ("PO 4191"). JGB Enterprises, Inc. v. United States, 63 Fed. Cl. 319, 323 (2004). Capital City subcontracted the work to JGB, who manufactured and delivered the hose assemblies to the Government. Id.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

4. *By late October 1999, Capital City was indebted to JGB, and JGB became concerned that Capital City would not be able to satisfy its debts. Id. 2*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

5. *JGB expressed its concerns about getting paid by Capital City to DSCC Small Business Specialist Michael Taylor. DA 49-50. Mr. Taylor contacted Capital City and discussed the possibility of an escrow agreement with Capital City's president, Lee Gilliam. DA 51-52. Mr. Taylor understood an escrow agreement to be an agreement by which the two companies would set up a joint account, the Government would send payments to that account, and it would require the signatures of both companies to release the funds. DA 52.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*6. On November 10, 1999, JGB entered into an escrow agreement with Capital City. Second Am. Compl. ¶ 7; DA 12-14.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*7. Under the escrow agreement, Capital City and JGB agreed to "take all steps and execute all documents as may be required to provide that future payments of money due to Capital City from DSCC . . . shall be payable to Michael E. Kawa, Esq., as the Escrow Agent . . .." DA 13.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*8. Under the escrow agreement, Mr. Kawa was not liable to JGB or Capital City for failure to receive the payment, unless that failure was the result of his gross negligence, which Mr. Kawa admits it was not. DA 13, 78.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*9. Under the escrow agreement, Mr. Kawa was required to deposit the monies into an escrow account and distribute payment to Capital City and JGB only upon a joint statement signed by both Capital City and JGB. DA 13, 77-79.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*10. Under the escrow agreement, Mr Kawa had no right to retain the Government's payment following release by JGB and Capital City; he would have had to split the entire payment between JGB and Capital City's trustee in bankruptcy. DA 78, 86.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*11. DSCC was not a party to the escrow agreement. DA 12-14.*

PLAINTIFF'S RESPONSE:

No DSCC personnel signed the agreement, however, DSCC employee Michael Taylor was aware of and suggested the agreement so that the Government could get the parts it needed, which were manufactured by JGB. PA6-7. JGB disagrees with defendant's legal conclusion that "DSCC was not a party to the escrow agreement."

*12. On November 9, 1999, Capital City sent a facsimile to the pre-award contracting officer for PO 4191, Lu Ann Bocsy, confirming Capital City's prior offer to provide hose assemblies and requesting that the payment remittance address be changed to:*

*Capital City Pipes, Inc*
*Michael Kawa Esq*
*300 Crown Building*
*304 S. Franklin Street*
*Syracuse, NY 13202*

*Second Am. Compl. ¶ 17; DA 11.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*13. Following receipt of the November 9, 1999 facsimile, Ms. Bocsy contacted Capital City because the number of lines requested exceeded that which could be typed into the remittance address. DA 3, Declaration of LuAnn Bocsy ("Bocsy Decl.") ¶ 4; see also DA 92-93.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees the Ms. Bocsy contacted Capital City. Plaintiff does not agree with Ms. Bocsy's stated reasons for this call, as the alleged issue with the number of lines is not credible or reasonable. In her January 8, 2008 deposition, Ms. Bocsy testified:

> Q. Four lines of information. Why couldn't you put Michael Kawa, Esquire and Capital City Pipe on the same line?
> A. I could have. I didn't.

PA 36.

*14. On November 10, 1999, Capital City sent a letter to Ms. Bocsy, following up on the November 9 facsimile, confirming Capital City's prior offer to provide hose assemblies, and requesting that the payment remittance address be changed to:*

> *Michael Kawa, Esq.*
> *300 Crown Building*
> *304 S. Franklin Street*
> *Syracuse, NY 13202*

*Second Am. Compl. ¶ 19; DA 15.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*15. On November 15, 1999, Capital City again sent Ms. Bocsy another facsimile, apologizing for any confusion, and requesting that the payment address be changed to:*

> *Michael Kaka. Esq.*
> *300 Crown Bldeg*
> *304 S Franklin Street*

*Syracuse, NY 13202*

*Second Am. Compl. ¶ 20; DA 16.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

*16. None of these letters or facsimiles gave any explanation for the requested change, did not inform Ms. Bocsy of the escrow agreement, and did not identify Mr. Kawa's relationship with JGB. JGB Enterprises, 63 Fed. Cl. at 325-26; see also DA 11, 15, 16, 81-85.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. The first letter stated "Capital City Pipes, Inc Michael Kawa Esq." In the second two letters, the name of "Capital City Pipes, Inc." has been removed from the address, leaving only the name of "Michael Kawa, Esq." Plaintiff submits that considering the course of dealings, any reasonable person would understand that the removal of "Capital City Pipes, Inc." from the address line "indicated" that Mr. Kawa was not an employee of Capital City Pipes.

*17. None of these letters or facsimiles indicated that Mr. Kawa was not an employee of Capital City. DA 11, 15, 16, 81-85.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. The first letter stated "Capital City Pipes, Inc Michael Kawa Esq." In the second two letters, the name of "Capital City Pipes, Inc." has been removed from the address, leaving only the name of "Michael Kawa, Esq." Plaintiff submits that considering the course of dealings, any reasonable person would understand that the removal of "Capital City Pipes, Inc." from the address line "indicated" that Mr. Kawa was not an employee of Capital City Pipes.

*18. None of these letters or facsimiles said anything about an assignment. DA 11, 15, 16, 81-85.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. The letters indicated that the payment due to Capital City Pipes was to be sent to a "Michael Kawa, Esq." in Syracuse, New York. While the work "assignment" was not used, these letters were essentially requests for an assignment of funds to Michael Kawa.

*19. Ms. Bocsy did not ask who Mr. Kawa was or why Capital City wanted the remittance address changed. DA 4, Bocsy Decl. ¶ 5; see also DA 53-54 ; JGB Enterprises, 63 Fed. Cl. at 326.*

PLAINTIFF'S RESPONSE:

Plaintiff finds this testimony to be non-credible. Defendant admits that Ms. Bocsy called Capital City Pipes specifically about these remittance address changes, which had apparently caused confusion. It strains belief that nothing was discussed regarding the purpose of this remittance address change. In fact, Ms. Bocsy claims to be unable to recall the substance of this conversation, and thus cannot certify what she did or did not ask during this call. At page 22 of her deposition, Bocsy testified:

Q. Lets slow down for a minute. You called her right after you got this fax on 11/9/99?
A. I am going to say yes, to the best of my recollection.
Q. Okay. And then what did she tell you over the phone?
A. Nothing. If she had told me something on the phone, there would be a conversation record.
Q. Well, is there a conversation record documenting it?
A. I'm not sure. . .
Q. Well, I'm not asking about procedures. I'm asking if you can remember your conversation with her.

A. No.
Q. No, you can't remember it?
A. No, I can't.

PA 32-36

*20. Ms. Bocsy never had any communications with Mr. Kawa. DA 76.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement, in so far as it refers to oral conversations.

*21. Ms. Bocsy did not know that Mr. Kawa was an attorney for JGB or that he had been designated as an escrow agent, but rather believed that Mr. Kawa was an employee of Capital City. DA 4, Bocsy Decl.¶ 6; DA 39, 55-56, 94.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. In her first deposition, on July 16, 2003, Ms. Bocsy testified that:

Q. Did you believe Michael Kawa was affiliated with a bank of some kind?
A. It was an assumption.
Q. Why did you make that assumption?
A. Because I've never dealt with - - When dealing with Capital City, there was only one person I ever dealt with.
Q. Who was that?
A. Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me.

PA12.

Ms. Bocsy has also made statements to the effect that she did not give a thought to who Mr. Kawa was. PA 44.

*22. On November 24, 1999, Ms. Bocsy issued PO 4191 to Capital City in the amount of $45,275.76 for 306 hose assemblies. Second Am. Compl. ¶ 24; DA 17. PO 4191 states in relevant part:*

> *REMIT PAYMENT TO:*
>
> *Michael Kawa, Esq.*
> *300 Crown Bldg*
> *304 S. Franklin St*
> *Syracuse, NY 13202*

*DA 21.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

*23. PO 4191 incorporated clauses by reference pursuant to FAR 52.252-2. DA 22-23.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement but denies any legal inference that this provision superseded the placement of Michael Kawa's name and address into the remittance clause by the Contracting Officer.

*24. One incorporated clause was FAR 52.232-33. DA 25.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement, but denies any legal inference that this provision superseded the placement of Michael Kawa's name and address into the remittance clause by the Contracting Officer.

*25. FAR 52.232-33 provided that all payments by the Government would be made to the contractor by electronic fund transfer ("EFT") to the EFT information in the Central Contractor Registry ("CCR") database. DA 27. That clause further provided:*

*"In the event that the EFT information changes, the Contractor shall be responsible for providing the updated information to the CCR database." Id.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement in so far as it accurately quotes the FAR, but denies any legal inference that this provision superseded the placement of Michael Kawa's name and address into the remittance clause by the Contracting Officer. In fact, this Court found that Ms. Bocsy assumed that payment would be made by physical check, contradicting the Government's statement that payment would be made by EFT. JGB Enterprises, 63 Fed. Cl. at 325.

*26. The EFT information in the CCR database stated that payment be made to Capital City's bank account. See DA 37.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In support of this statement, defendant cites only to a page 37 of its appendix, which is an E-mail from Philip Kover to Ann Wong, Phyllis Moore, and Karen Spradlin. In fact, the CCR print out available to the plaintiff refers only to Capital City's physical address of:

CAPITAL CITY PIPES, INC.
1872 MILLS ST BLDG F
P.O. BOX 12368
TALLAHASSEE
FL
32301
USA

PA136-137.

27. *Following the issuance of PO 4191 to Capital City, Carolyn Mathews became the post-award contracting officer on PO 4191. JGB Enterprises, 63 Fed. Cl. at 327.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

28. *Sometime in March or April 2000, Ms. Mathews ceased being the contracting officer for contractors in Florida, and Phyllis Moore became the post-award contracting officer on PO 4191. JGB Enterprises, 63 Fed. Cl. at 327; DA 69; DA 6, Declaration of Phyllis E. Moore ("Moore Decl.") ¶ 5.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

29. *At the same time, Ms. Moore also became the post-award contracting officer on several other Capital City contracts, including SPO750-99-C-2508 ("Contract 2508"). JGB Enterprises, 63 Fed. Cl. at 327.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

30. *The pre-award contracting officer is responsible for creating the terms of the contract, whereas the post-award contracting officer is responsible for implementing those terms. See DA 60.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement, since according to the Federal Acquisition Regulations the post-award contracting officer is able to modify contract terms, and thus can create the terms of the contract. Also, this statement is merely Contracting Officer

Moore's personal interpretation of her duties, and does not represent an authoritative interpretation of a Contracting Officer's duties.

*31. The post-award contracting officer generally does not take any action with respect to the contract unless a problem arises. DA 5, Moore Decl. ¶ 3; DA 96.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. This statement is merely Contracting Officer Moore's personal interpretation of her duties. It is submitted that the Federal Acquisition Regulations contain numerous duties to be performed by a post-award contracting officer, whether or not a "problem" arises.

*32. The post-award contracting officer is not responsible for seeing that payment is made pursuant to the contract. DA 5, Moore Decl. ¶ 4; DA 66-68, 97.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. This statement is merely Contracting Officer Moore's personal interpretation of her duties. It is submitted that a Contracting Officer has ultimate responsibility over the administration of a contract, including insuring that payment is made.

*33. Payments are made electronically by the Defense Finance and Accounting Service ("DFAS"), and the post-award contracting officer is only contacted by DFAS if there was a problem. See DA 66-68.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement, since it implies that payment under PO 4191 was to be made electronically. Since a physical address had been placed into Contract 4191 as a remittance address, it followed that P.O. 4191 called for a check to be

sent to that address, rather than payment being made electronically. Also, as seen above, the actual CCR registration for Capital City Pipes at the time of award contained only a physical address. Furthermore, this Court found that Ms. Bocsy assumed that payment would be made by physical check, contradicting the Government's statement that payment would be made by EFT. JGB Enterprises, 63 Fed. Cl. at 325.

*34. The contractor invoices DFAS directly for payment. DA 108.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement, as it is incomplete. In her deposition testimony, Lynne Rathes testifies that delivery must also be confirmed by a DCMC office prior to payment being released to the contractor. PA 93-95.

*35. The Defense Contract Management Command ("DCMC") Clearwater was responsible for administering PO 4191, among other Capital City contracts. See DA 9, Declaration of Lynne Rahtes ("Rahtes Decl.") ¶ 9.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*36. DCMC is now known as the Defense Contract Management Agency ("DCMA"). DA 8, Rahtes Decl. ¶ 3.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*37. The DCMC Clearwater office is now the St. Petersburg Office. DA 8, Rahtes Decl. ¶ 4.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*38. Lynne Rahtes was the DCMC administrative contracting officer ("ACO") assigned to PO 4191. DA 9, Rahtes Decl. ¶ 9.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*39. The ACO has no authority to substantively modify contracts without authorization from the DSCC contracting officer. DA 8, Rahtes Decl. ¶ 5.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees, since FAR 42.302 contains a wide variety of powers normally exercised by the contract administration officer, including many that may be considered substantive. Plaintiff further avers that in this case, such a full delegation was indeed made to DCMC Clearwater. See PA 144

*40. Absent a valid completed assignment of payment, the ACO would require permission from the DSCC contracting officer to change the payee. DA 9, Rahtes Decl. ¶ 6.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement, as the testimony of ACO Rahtes implies that assignments (which change the payee) are put in place by Contracting Specialists at DCMC Clearwater without involvement of the DSCC Contracting Officer:

> Q. Now, as we said, this is a Notice of Assignment. Would processing assignments be the sort of thing your office would do pursuant to administering a contract?
> A. Yes.
> Q. All right. Would you personally process Notices of Assignment as a general procedure?
> A. Personally, no. . .

Q. Would you contract administrators, as a general rule, speak to you before processing a Notice of Assignment"
A. Probably.

PA 90- 91

*41. Kathryn Bader was the DCMC contract specialist assigned to Capital City contracts. DA 1, Declaration of Kathryn M. Bader ("Bader Decl.") ¶ 3.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*42. Ms. Bader reported to Ms. Rahtes. DA 88.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*43. At the time she was the contract specialist assigned to Capital City contracts, Ms.Bader was not a contracting officer, and had no authority to independently make changes to contracts. DA 9, Rahtes Decl.¶ 7; DA 2, Bader Decl. ¶ 5.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees, since Ms. Bader was a member of a contracting "team" at DCMC Clearwater that had been delegated full authority to take any actions necessary. According to Ms. Rahtes:

A. I was the ACO for this contract.
Q. So you were administering the contract?
A. Yes, along with my team.

PA 81

Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify a contract?
A. It's a delegation to the contract administration team. . .
Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
A. That's what is says.

PA 95-96.

*44. Ms. Bader was not responsible for remittance addresses, or for where or to whom payment was sent. DA 2, Bader Decl. ¶ 6; DA 89, 90.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. Ms. Bader clearly and unequivocally testified that she was responsible for seeing that payment was made. :

Q. And what would your duties entailed while you were employed out of the St. Petersburg office?
A. I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly.
Q. Make sure they got paid correctly?
A. Correct.
Q. How would you ensure that they got paid correctly?
A. Review of DD 250 or vouchers or invoices, then - -
Q. Would you have also looked at a contract?
A. I'm sorry?
Q. Would you also have looked at a contract?
A. Oh, but definitely.

PA 50-51

*45. On February 8, 2000, JGB shipped the hose assemblies for PO 4191 to Defense Department Depot. Second Am. Compl. ¶ 28; JGB Enterprises, 63 Fed. Cl. at 326.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

*46. On April 24, 2000, the Government paid for the hose assembles under PO 4191 by EFT directly into Capital City bank's account. Second Am. Compl. ¶ 37, JGB Enterprises, 63 Fed. Cl. at 326-37.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*47. Capital City did not pay JGB for the hose assemblies under PO 4191. JGB Enterprises, 63 Fed. Cl. at 327.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*48. During the time she was the post-award contracting officer for Capital City contracts, Ms. Moore did not have any discussions with Ms. Mathews concerning Capital City. DA 6, Moore Decl. ¶ 6; DA 58-59.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*49. Ms. Moore did not have any discussions with Mr. Taylor about JGB's problems with Capital City until after payment had been made on PO 4191. DA 6, Moore Decl. ¶ 6; DA 64.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point. Furthermore, Mr. Taylor expressly testified that he had frequent conversations with Ms. Moore regarding JGB and Capital City:

Q. And you kept Ms. Moore apprised of your conversations with Capital City Pipes regarding the joint bank account?
A. Actually, she kept me apprised of what was going on.
Q. Kept you apprised of the- - of the discussions regarding establishment of a joint bank account, if you will?
A. Yes.
Q. Do you recall discussions with Ms. Moore concerning the possibility of using an escrow agreement to resolve the J.G.B. nonpayment problem?
A. Yes.

PA16-17.

*50. Ms. Moore did not have any discussions with Ms. Bocsy until after JGB filed its claim. DA 6, Moore Decl. ¶ 6; DA 41.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*51. Ms. Moore never spoke to Ms. Rahtes. DA 6, Moore Decl. ¶ 6; DA 71.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital

City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*52. Ms. Moore never had any communications with Mr. Kawa. DA 6, Moore Decl. ¶ 8; DA 76.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement, to the extent that it may refer to the period prior to the filing of Mr. Kawa's claim.

*53. On April 12, 2000, Ms. Moore talked to Thelma Williams of Capital City about a vendor payment issue and an account where monies could be set aside for the vendor. DA 35- 36, 62, 63.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*54. April 12, 2000 was the first time Ms. Moore spoke to Ms. Williams. DA 65.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*55. Ms. Moore did not have any contact with JGB prior to receiving its May 31, 2000 request for equitable adjustment. DA 6, Moore Decl. ¶ 7; DA 70.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*56. Ms. Moore does not recall reviewing the Contract 2508 or the PO 4191 file when she took over as post-award contracting officer on those contracts. DA 6, Moore Decl. ¶ 9; DA 61.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*57. Ms. Moore did not have any involvement with PO 4191, other than the March 10 and March 24, 2000 ALERT messages sent to DCMC concerning all of Capital City's contracts. DA 6, Moore Decl. ¶ 10; DA 30-33.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point. Furthermore, Mr. Taylor expressly testified that he had frequent conversations with Ms. Moore regarding JGB and Capital City:

Q. And you kept Ms. Moore apprised of your conversations with Capital City Pipes regarding the joint bank account?
A. Actually, she kept me apprised of what was going on.
Q. Kept you apprised of the- - of the discussions regarding establishment of a joint bank account, if you will?
A. Yes.
Q. Do you recall discussions with Ms. Moore concerning the possibility of using an escrow agreement to resolve the J.G.B. nonpayment problem?
A. Yes.

PA16-17.

*58. Ms. Moore did not make any changes to PO 4191. DA 6, Moore Decl. ¶ 12.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*59. Ms. Moore sent the ALERT messages to DCMC because Capital City was an 8(a) contractor and because it had been delinquent in shipment. DA 6, Moore Decl. ¶ 10; DA 98-99.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*60. Sending this type of ALERT message was Ms. Moore's usual practice for 8(a) contractors, particularly those who were delinquent, and had nothing to do with JGB's alleged payment problems. DA 6, Moore Decl. ¶ 10.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the J.G.B and Capital City Situation to non-credible. Specifically in regards to the March 24, 2000 message, the Court stated: "Moore's ALERT message identified the contract 2508 deliveries as being 161 days delayed. At her deposition Moore testified that she understood the reason for this delay was JGB's allegation that it had never been paid for past deliveries. At trial, Moore denied that she knew the reason for the delay." 63 Fed. Cl. at 327-328. Thus, plaintiff is unable to accept Contracting Officer Moore's testimony on this point.

61. *Ms. Rahtes does not recall receiving the ALERT messages, but would have interpreted the authorization "to take whatever contractual actions necessary" as authorization to continue or perform surveillance. DA 9, Rahtes Decl. ¶ 12; DA 106-07.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. According to Ms. Rahtes:

A. I was the ACO for this contract.
Q. So you were administering the contract?
A. Yes, along with my team.

PA 81

Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify a contract?
A. It's a delegation to the contract administration team. . .
Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
A. That's what is says.

PA 95-96.

62. *Ms. Rahtes would not have interpreted the March 24 ALERT message as authorization to change the payee of the contract or to determine to whom payment should be made. DA 9, Rahtes Decl. ¶ 12.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. According to Ms. Rahtes:

A. I was the ACO for this contract.

Q. So you were administering the contract?
A. Yes, along with my team.

PA 81

Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify a contract?
A. It's a delegation to the contract administration team. . .
Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
A. That's what is says.

PA 95-96.

*63. Ms. Moore had no involvement in payment of contracts unless DFAS or the contractor contacted her about a payment problem. DA 6, Moore Decl. ¶ 4; see also DA 66-68.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. This statement is merely Contracting Officer Moore's personal interpretation of her duties. It is submitted that the Federal Acquisition Regulations contain numerous duties to be performed by a post-award contracting officer, whether or not a "problem" arises.

*64. It was not Ms. Moore's responsibility to ensure that payments were made pursuant to the contract. DA 6, Moore Decl. ¶ 4; DA 66-68, 97.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. This statement is merely Contracting Officer Moore's personal interpretation of her duties. It is submitted that a Contracting Officer has ultimate responsibility over the administration of a contract, including insuring that payment is made.

*65. It is DFAS's responsibility, not the contracting officer's responsibility, to ensure that payments are made pursuant to the contract. DA 42.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with this statement. This statement is merely Contracting Officer Moore's personal interpretation of her duties. It is submitted that a Contracting Officer has ultimate responsibility over the administration of a contract, including insuring that payment is made

*66. As to PO 4191, Ms. Moore was not contacted about a payment problem until after JGB filed its request for equitable adjustment. DA 6, Moore Decl. ¶ 13.*

*PLAINTIFF'S RESPONSE:*

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point. As mentioned above, Michael Taylor testified that Ms. Moore actually kept him informed regarding the JGB payment problems.

*67. Ms. Moore does not recall ever knowing what the remittance address was on PO 4191 until after JGB filed its request for equitable adjustment. DA 7, Moore Decl. ¶ 14; DA 44-45, 46-47.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*68. Ms. Moore was not aware of where or to whom payment on PO 4191 was sent until after JGB filed its request for equitable adjustment. See DA 7, Moore Decl. ¶ 14; DA 47, 100.*

PLAINTIFF'S RESPONSE:

Plaintiff disagrees. In JGB Enterprises, 63 Fed. Cl. at 327, this Court expressly found much of Ms. Moore's testimony regarding her knowledge of the JGB and Capital City Situation to non-credible. Thus, plaintiff is unable to accept her testimony on this point.

*69. Ms. Bader does not recall exactly when she learned of Mr. Kawa's role as an escrow agent, but it was at least as early as April 4, 2000. DA 34.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement.

*70. Ms. Bader did not have any responsibilities for remittance addresses or making payment on PO 4191. DA 2, Bader Decl. ¶ 6.*

PLAINTIFF'S RESPONSE:

Ms. Bader clearly and unequivocally testified that she was responsible for seeing that payment was made. :

Q. And what would your duties entailed while you were employed out of the St. Petersburg office?

A. I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received,

review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly.
Q. Make sure they got paid correctly?
A. Correct.
Q. How would you ensure that they got paid correctly?
A. Review of DD 250 or vouchers or invoices, then - -
Q. Would you have also looked at a contract?
A. I'm sorry?
Q. Would you also have looked at a contract?
A. Oh, but definitely.

PA 50-51

*71. Though Ms. Rahtes was the ACO assigned to Capital City contracts, she did not participate in the day-to-day administration of those contracts and does not specifically recall anything about PO 4191, Contract 2508, JGB, or Mr. Kawa. DA 9, Rahtes Decl. ¶ 10; DA 102.*

PLAINTIFF'S RESPONSE:

As will be explained in plaintiff's brief, Ms. Rahtes and her office destroyed their files regarding Purchase Order 4191, after having notice of a claim by JGB. It is submitted that her in-ability to testify specifically no these matters is a result of the improper destruction of records, and thus all inferences must be drawn against the Government.

*72. At the time Ms. Rahtes was assigned to Capital City contracts, she was also the ACO assigned to hundreds of contracts. DA 9, Rahtes Decl. ¶ 9; DA 105.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

*73. On November 18, 2005, Mr. Kawa submitted a certified claim for $45,275.76 to the contracting officer. Second Am. Compl. ¶ 40.*

PLAINTIFF'S RESPONSE:

Plaintiff agrees with this statement

*74. On January 13, 2006, Ms. Bocsy denied Mr. Kawa's claim. DA 72. She stated in relevant part:*

> *You were neither an assignee of funds nor a third party beneficiary under this purchase order, and you did not have an implied-in-fact contract with the government. The government awarded the purchase order to Capital City Pipes. When Capital City Pipes asked me to change the remittance address, I did not know nor have any reason to know about your relationship to JGB. I did not intend to assign payments to you, to establish a third-party beneficiary relationship with you, or to contract with you.*

Id.

PLAINTIFF'S RESPONSE:

Plaintiff disagrees with the merits of this statement, but agrees that it is an accurate quote.

Dated: July 21, 2008

s/Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
127 Genesee Street
Auburn, New York 10321
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorney for Plaintiff