IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, ESQ. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | |
| THE UNITED STATES, | ) | (Judge George W. Miller) |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S PROPOSED ADDITIONAL FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"), plaintiff, Michael Kawa, respectfully submits the following additional proposed findings of un-controverted fact.

APFUF[1] 1. Capital City Pipes ("Capital City") was, at all times relevant to this claim, a business located in Tallahassee, Florida, that was certified by the United States Small Business Administration ("SBA") under the 8(a) program. JGB Enterprises, 63 Fed. Cl. at 323. Beginning in 1998, DSCC "set aside" its requirements for hose assemblies, previously supplied by JGB Enterprises ("JGB"), for Capital City. JGB Enterprises, 63 Fed. Cl. at 323.

APFUF 2. On or around April 30, 1999, Contracting Officer Bocsy forwarded a copy of solicitation number SP0750-99-Q-5778 to Capital City, requesting a quote for certain hose assemblies. Plaintiff's Appendix, page 106 ("PA106").

APFUF 3. On June 15, 1999, Contracting Officer Bocsy called Capital City, as part of ongoing negotiations, to further discuss the offer, informing them that their price was too high and that it would need to drop by 38%. PA112.

[1] "APFUF" refers to Plaintiff's Adiditional Proposed Finding of Uncontroverted Fact.

APFUF 4. On June 18, 1999, Capital City submitted an offer of $190.65 for each hose assembly, "Quoting the manufacturer: Titan Industries." PA113.

APFUF 5. By letter dated June 23, 1999, Capital City advised Contracting Officer Bocsy that it was going to use JGB to assemble and supply the hose assemblies, directly setting forth the quotes given by JGB to Capital City. The quote from JGB was cheaper than previously quoted manufactures, and included packaging and shipping to destination from JGB. This quote was provided to Contracting Officer Bocsy again on the same date, and on July 8, 1999. PA114-116.

APFUF 6. On July 15, 1999 the Government Pre-award Monitor, pursuant to an inter-office memorandum, certified that the solicitation was an 8(a) set-aside and that Capital City was going to be a "dealer," with JGB supplying the hose assemblies. This memorandum stated that a certificate of competence for Capital City was not needed, since "inspection and acceptance must be at actual place of MFG. of hose Assy." Under the section of the memo pertaining to performance and quality history of Capital City, the memo states "ASAP," apparently meaning that the Government considered this an urgent order. PA117.

APFUF 7. By letter dated September 20, 1999, Capital City further advised Contracting Officer Bocsy that "[t]he assembly of this product will be done **by JGB** Enterprises, Inc. at their location, Liverpool, NY (61125)" (emphasis in original). PA118.

APFUF 8. As part of ongoing negotiations, a letter from Capital City to Contracting Officer Bocsy, dated September 24, 1999, stated "JGB Enterprise, Inc will

do the assembly and the pressure testing will be done at their plant in Liverpool, NY." PA119.

APFUF 9. Due to past non-payment by Capital City, JGB doubted that it would be properly paid by Capital City, and was reluctant to enter into a contract to supply the much needed hose assemblies. JGB Enterprises, 63 Fed. Cl. at 323.

APFUF 10. JGB feared that it would construct and ship the hose assemblies directly to the Government, and would then never receive payment from the "dealer," Capital City. (Zywicki Declaration, PA6).

APFUF 11. On October 27, 1999, Mr. Zywicki wrote Mr. Taylor (DSCC Small Business Specialist) and informed him that Capital City was delinquent on over $360,000 to JGB and that JGB had stopped production pending resolution of the matter. He asked Mr. Taylor to "[p]lease contact me immediately with a proposed solution" and sent a "cc" of his letter to both the Contracting Officer and legal counsel at DSCC, among others. PA120. JGB Enterprises, 63 Fed. Cl. at 325.

APFUF 12. During several conversations with Mr. Taylor over the next two weeks, Mr. Taylor suggested to Mr. Zywicki a proposed solution to the problem, where JGB and Capital City would enter into an escrow agreement, using Michael Kawa, Esq. as escrow agent. (Zywicki Declaration, PA6-7).

APFUF 13. On November 9, 1999, Capital City advised Contracting Officer Bocsy that: Also, I am requesting a change of Payment Remittance Address:

**Capital City Pipes, Inc.**
**Michael Kawa Esq.**
**300 Crown Bldg**
**304 S. Franklin Street**
**Syracuse, NY 13202**

PA126.

APFUF 14. Following receipt of the November 9, 1999 facsimile, Ms. Bocsy contacted Capital City, allegedly because the number of lines requested exceeded that which could be typed into the remittance address. DA[2] 3, Declaration of LuAnn Bocsy ("Bocsy Decl.") ¶ 4; see also DA 92-93. In Plaintiff's view, the alleged issue with the number of lines is not credible or reasonable. In her January 8, 2008 deposition, Ms. Bocsy testified:

Q. Four lines of information. Why couldn't you put Michael Kawa, Esquire and Capital City Pipe on the same line?

A. I could have. I didn't.

PA 36.

APFUF 15. In her January 8, 2008 deposition, Ms. Bocsy first claimed that Capital City Pipes told her "nothing" during this call, and when pressed, claimed to be unable to remember the substance of the call. Bocsy testified:

Q. Lets slow down for a minute. You called her right after you got this fax on 11/9/99?
A. I am going to say yes, to the best of my recollection.
Q. Okay. And then what did she tell you over the phone?
A. Nothing. If she had told me something on the phone, there would be a conversation record.
Q. Well, is there a conversation record documenting it?
A. I'm not sure. . .

Q. Well, I'm not asking about procedures. I'm asking if you can remember your conversation with her.
A. No.
Q. No, you can't remember it?
A. No, I can't.

PA 32-36.

[2] "DA" refers to Defendant's Appendix in support of it Motion for Summary Judgment.

APFUF 16. On November 10, 1999, Capital City and JGB entered into an escrow agreement whereby Michael Kawa, Esq. was appointed as an escrow agent for receipt of payments under all DSCC-Capital City contracts under which JGB was the subcontractor. Under the escrow agreement, Capital City agreed to execute the necessary documents to ensure that all payments under the remaining Capital City prime contracts would be payable to Michael Kawa, Esq., who would then distribute the appropriate amounts to JGB and Capital City. PA 123-125.

APFUF 17 Mr. Kawa has been an attorney for approximately 35 years, practicing in the areas of business and real estate law. PA 21.

APFUF 18. It was JGB's, as well as Michael Kawa, Esq.'s, intention not to ship any hose assemblies to the Government unless it was paid. (Kawa Declaration, PA1). At the time of signing this agreement, Michael Kawa believed "[b]y entering into this agreement, I was facilitating and making possible the Government's receipt of urgently needed military materials." (Kawa Declaration, PA1).

APFUF 19. Capital City followed up with a letter to Contracting Officer Bocsy dated November 10, 1999, stating:

> I requested a change in the payment remittance address:
>
> **Michael Kawa, Esq.**
> **300 Crown Bldg.**
> **304 S. Franklin Street**
> **Syracuse, NY 13202**

PA 126.

APFUF 20. The conflict between the November 9, 1999, letter and the November 10, 1999, letter apparently caused "confusion" and on November 15, 1999, Capital City sent a fax to Contracting Officer Bocsy. The fax stated:

> Good Morning, Luann, I apologize fot (sic) the confusion this may have caused. We are requesting the payment address be changed to:
>
> MICHAEL KAKA (sic), ESQ.
> 300 CROWN BLDEG (sic)
> 304 S FRANKLIN STREET
> SYRACUSE, NY 13202
>
> If you have any questions please call me
> THANK YOU

PA 127.

APFUF 21. The next day, on November 16, 1999, Contracting Officer Bocsy telephoned Capital City regarding an increase in quantity. PA128.

APFUF 22. DSCC ultimately awarded Purchase Order 4191 on November 24, 1999 to Capital City. JGB Enterprises, 63 Fed. Cl. at 325.

APFUF 23. At the time of signing PO 4191, Contracting Officer Bocsy assumed that payment would be made by physical check. JGB Enterprises, 63 Fed. Cl. at 325.

APFUF 24. Purchase Order 4191 was in the amount of $45,275.76 for 306 hose assemblies, and was signed by Contracting Officer Bocsy on November 19, 1999. PA106-122. Contracting Officer Bocsy complied with Capital City's requests of November 10 and 15, 1999, and personally typed Michael Kawa, Esq.'s name and address into Purchase Order 4191. PA31. The language in the Purchase Order read:

**REMIT PAYMENT TO:**

**MICHAEL KAWA, ESQ.**
**300 CROWN BLDG**
**304 S. FRANKLIN ST.**
**SYRACUSE NY 13202**

PA129.

APFUF 25. Mr. Kawa felt that the language of P.O. 4191 bound the Governement to make payment to him. "And my answer is because they had my name as the payee on 4191. I mean to me that means they intended to contract with me. They intended to pay me." PA 22. "I don't think you have to use the word assignment. It's pretty clear that notification from Capital City says send money to Michael Kawa. And the Government said, fine, we're going to send the money to Michael Kawa and here is 4191 that says we're going to remit payment to him." PA 23.

APFUF 26. In regards to this remittance address, Contracting Officer Bocsy testified as follows:

Q - - where you have "Remit Payment To: Michael Kawa, Esquire, " you typed that in?
A. Yes.
Q. And "remit payment to" meant what to you? What does that mean? Pay Kawa?
A. Payment should be remitted to that address.
Q. All right. Well, it was more than an address there, it's an individual, isn't it?
A. In this case.

PA 43-44.

APFUF 27. Kathryn Bader, a contracting specialist at DCMC Clearwater who was involved in administering P.O. 4191 also testified that: "Remittance address is where the funding is to be paid to." PA 56-57.

APFUF 28. A CCR print out dated November 19, 1999 refers only to Capital City's physical address of:

CAPITAL CITY PIPES, INC.
1872 MILLS ST BLDG F
P.O. BOX 12368
TALLAHASSEE
FL
32301
USA

PA 136- 137.

APFUF 29. Contracting Bocsy testified that she printed this CCR entry out on the same day she issued P.O 4191. PA 30.

APFUF 30. The offer previously submitted by Capital City Pipes in response to solicitation SP0750-99-Q-5778 had given two addresses for Capital City Pipes:

Capital City Pipes, Inc.
P.O. Box 12368
Tallahassee FL 32310

Capital City Pipes, Inc.
1872 Mills St. Bldg F
Tallahassee FL 32310

PA138.

APFUF 31. Contracting Officer Boscy testified the she understood on of these addresses to be Capital City Pipe's actual address, and one to be a remittance address. PA 28-29.

APFUF 32. At various times, Contracting Officer Bocsy has testified that she believed Mr. Kawa to work for a bank (PA12), that she did not give any thought as to whom Kawa was (PA44), and that she believed Mr. Kawa to be an employee of Capital City Pipes. Ms. Bocsy's knowledge at this time is an open issue of material fact. Ms. Bocsy testified that:

Q. Did you believe Michael Kawa was affiliated with a bank of some kind?
A. It was an assumption.
Q. Why did you make that assumption?
A. Because I've never dealt with - - When dealing with Capital City, there was only one person I ever dealt with.
Q. Who was that?
A. Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me. PA12.

APFUF 33. In her more recent deposition on January 8, 2008, prior to making her claim that she believed Mr. Kawa to be affiliated with Capital City Pipes, she testified that:

Q. An you thought that Michael Kawa was some sort of banker?
A. I really didn't give any thought to who Michael Kawa was.

PA 44.

APFUF 34. No modification was ever entered into to remove Michael Kawa, Esq. as the payee, or to change the address for payment. JGB Enterprises, 63 Fed. Cl. 319.

APFUF 35. Mr. Kawa was provided with a copy of the Purchase Order, and "believed that the payment clause bound the Government to make payment to me." (Kawa Declaration, PA2).

APFUF 36. The Government needed the hose assemblies "ASAP," according to the memorandum of July 15, 1999. PA 117.

APFUF 37. The Purchase Order 4191 provided that it was to be administered by DCMC Clearwater in St. Petersburg Florida. PA 129.

APFUF 38. After signing the Purchase Order, pre-award Contracting Officer Bocsy was replaced by post-award Contracting Officer Moore. JGB Enterprises, 63 Fed. Cl. 325.

APFUF 39. Moore testified that she would ordinarily not take any action with regard to a contract unless a problem arose, and that the administration of the contract had been delegated to DCMC Clearwater. PA 65, 66-67. Contracting Officer Moore testified that the Federal Acquisition regulations allowed certain functions to be delegated to DCMC Clearwater. PA 67. Contracting Officer Moore specifically testified that DCMC Clearwater could be given authority to modify contracts:

Q. Would the DCMC verify that the product was delivered, for example?
A. Yes, they would.
Q. All. right. And - -
A. Or could.
Q. They could. And would they ever be allowed to make contract modifications?
A. Yes.

PA 67.

APFUF 40. Michael Taylor, DSCC Small Business Specialist, discussed the possibility of using an escrow agreement to resolve the JGB non-payment problems with Contracting Officer Moore. PA 16-17.

APFUF 41. Contracting Officer Moore also kept Michael Taylor informed about discussions regarding establishment of a joint bank account for JGB and Capital City. PA 16-17.

APFUF 42. Based on the Purchase Order citing Mr. Kawa as the payee, JGB shipped the items for Purchase Order 4191 directly to the Government on February 8, 2000. JGB Enterprises, 63 Fed. Cl. 326; Zywicki Declaration, PA 7.

APFUF 43. The Government accepted this delivery made under Purchase Order 4191, which named Michael Kawa, Esq. as the remittance address. JGB Enterprises, 63 Fed. Cl. 326.

APFUF 44. Mr. Kawa "expected that payment would be made to me as clearly called for by Purchase Order 4191. When the Government accepted this delivery, under the Purchase Order calling for payment to be made to me, there was no further doubt in my mind that payment would have to me made according to the remittance clause." (Kawa Declaration, PA3).

APFUF 45. On March 24, 2000, DSCC Contracting Officer Phyllis Moore sent an E-mail message to Capital City's ACO at DCMC Clearwater with an attached list of all contracts and purchase orders awarded to Capital City, including Purchase Order 4191. PA 144, 145. Moore sent this message because of delayed deliveries, and Contracting Officer Moore understood the reason for this delay was JGB's allegation that it had never been paid for past deliveries. See 63 Fed. Cl. at 327-328.

APFUF 46. DCMC Clearwater was the office administering Purchase Order 4191, as stated on the face of the Purchase Order. Moore requested that the ACO "maintain surveillance" of these contracts/orders. PA 144, 145. Moore's March 24, 2000 message to the ACO concluded as follows:

> THIS SERVES AS AUTHORIZATION FOR THE ACO TO TAKE WHATEVER CONTRACTUAL ACTIONS NECESSARY TO KEEP THESE ORDERS VIABLE. THE MATERIAL ON THESE CONTRACTS ARE [sic] URGENTLY NEEDED.

PA 144.

APFUF 47. At the time this March 24, 2000 message was sent, Lynne Rahtes was the ACO at Clearwater assigned to Purchase Order 4191. PA 81-82. She was on a "team" with contracting Specialist Kathryn Bader, who was also assigned to Purchase Order 4191. PA 83.

APFUF 48. This March 24, 2000 E-mail was a delegation to the ACO's team and DCMC Clearwater to take any contractual actions necessary. According to Ms. Rahtes, who was the ACO at DCMC Clearwater:

A. I was the ACO for this contract.
Q. So you were administering the contract?
A. Yes, along with my team.

PA 81

Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify a contract?
A. It's a delegation to the contract administration team. . .
Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
A. That's what is says.

PA 95-96.

APFUF 49. At the time of this March 24, 2008 ALERT message, the Government had not yet made payment for the shipments under Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

APFUF 50. DSCC contracting officer Moore confirmed that an ACO such as Lynne Rathes was: "a person who does pretty much the same thing as the PCO [purchasing contracting officer], except for they don't buy. . . " and stated that "They're heading their own agency, a lot of them. . ." PA 69-70.

APFUF 51. Contracting Officer Moore testified that an ACO is not subsidiary to or less senior that an post-award contracting officer. PA 69.

APFUF 52. Contracting Officer Moore also confirmed that in regards to an existing contract, an ACO can "do most of what a PCO does." PA70.

APFUF 53. According to Contracting Officer Moore, it would have been DCMC Clearwater, not herself, who would have told the paying office to release payment on Purchase Order 4191. Contracting Officer Moore testified that:

> Q. All right. Looking at this specific purchase order 4191, what are the steps that would lead to payment being made in this specific instance?
> A. In this specific instance, hopefully the material was delivered.
> Q. Okay. And when the material is delivered, who would verify it was delivered, how would it be verified?
> A. Well, it would be in the system and since this was origin inspection it looks like, then there would be a DD250 submitted to the payment office along with -- you know, they'll also look at whatever the system said and then they would make payment.
> Q. All right. Who would prepare this DD250?
> A. The DCMC office.
> Q. Would that be DCMC Clearwater?
> A. Yes, if that's where the material was being inspected.
> Q. All right. So in this particular instance the DCMC office would prepare this form and forward it onto the paying unit, so to speak; is that correct?
> A. Yes.
> Q. And then the paying unit would release payment based on that?
> A. Yes.

PA 71-73.

APFUF 54. Rahtes testified that the contract administrators under her supervision processed notices of assignment pursuant to administering contracts, and testified that her contract administrators would "probably" speak to her before processing a notice of assignment. PA 90-91.

APFUF 55. A document dated April 4, 2000 contains a handwritten note on a DCMC Fax transmittal sheet to Contracting Specialist Kathy Bader at DCMC

Clearwater, indicating: "Mike says there is an escrow acct between JGB and Cap. City and Mr. Kawa is the attorney who controls it." PA147. Ms. Bader thus knew of Mr. Kawa's role as an escrow agent at least as early as April 4, 2000. Defendant's PFUF 69.

APFUF 56. On April 5, 2000, Capital City contacted Ms. Bader, at DCMC St. Petersburg, Florida, regarding Contract 2508 (another DSCC contract with Capital City as prime contractor and JGB as subcontractor), responding to "questions" asked by Contracting Officer Bader in a letter dated March 30, 2000. Capital City informed the Contracting Officer that:

> 1. Mr. Michael Kawa, Esq. is an attorney and Capital City Pipes President and CEO Mr. Lee Gilliam and JGB Enterprises, Inc President/ CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, ESQ as a go-between on this contract.
>
> 2. This Notice of Assignment is not for a loan. The purpose is for the disbursement of the funds related to the above-mentioned contract.

PA 148.

APFUF 57. Ms. Bader was unable to recall one way or another whether she had spoken with the "PCO" [Purchasing Contracting Officer] or anyone else with regards to this April 5, 2008 correspondence. She did state that she "could have" discussed this correspondence with others. PA 54-55. As will be explained below, the relevant DCMC files with regard to P.O. 4191 have been destroyed by the Government, so the question of whether Ms. Bader informed Ms. Rahtes and/or Ms. Moore should be resolved against the government.

APFUF 58. Ms. Bader did state that she would have placed the April 5, 2008 letter in the DCMC files. PA54.

APFUF 59. Lynn Rahtes had full access to the DCMC files. PA 88-89.

APFUF 60. Contracting Officer Moore also had access to the DCMC files. PA 73.

APFUF 61. Ms Rahtes was unable to recall if she had personally reviewed the documents stating that Mr. Kawa was an escrow agent or "go between," but Mr. Rahtes did indicate that documents clearly stating this fact would have ordinarily been placed in files which she had access:

Q. All right. And would you please read the first numbered paragraph.

A. "Mr. Michael Kawa, Esquire is an attorney and Capital City Pipes president and CEO, Mr. Lee Gilliam and JGB Enterprises, Incorporated, president/CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, Esquire as a go-between on this contract. If you require a copy of the agreement in order for this contract to be fulfilled, please let me know."

Q. All right. Thank you. And you can take a moment to look at this correspondence. But is this the type of correspondence that would normally be placed in the file?

A. Yes.

PA98.

APFUF 62. Lynn Rahtes was unable to remember one way or another if her team had ever made any reports to contracting Officer Moore regarding Purchase Order 4191, as had been requested by Contracting Officer Moore's March 24, 2000 E-mail message. PA 97.

APFUF 63. Kathryn Bader has testified that her team at DCMC Clearwater had a large role in the payment of contracts, and actually insured that a check was issued. Ms. Bader clearly stated: "I ensured that the shipping documents were accurate, that they

were submitted to DFAS for remittance, that DFAS processed them through their system in a timely fashion, and that DFAS issued a check." PA61.

APFUF 64. Ms. Bader also testified that "I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly." PA 50.

APFUF 65. Ms. Bader testified that she definitely looked at the contracts which she was assigned, including Purchase Order 4191. PA 51, 59.

APFUF 66. On April 12, 2000, in a hand-written memorandum of a telephone call, Contracting Officer Moore stated, in regards to Contract 2508,

> Since this material is urgently needed, I will entertain on a one time basis of this award, changing the remittance address to a bank or whatever is agreeable.

PA149-150.

APFUF 67. At the time Contracting Officer Moore made this memorandum, payment had not yet been made on Purchase Order 4191, and she was responsible for administering Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

APFUF 68. Lynne Rahtes confirmed that her team at DCMC Clearwater knew who Mr. Kawa was prior to payment being made on Purchase Order 4191:

> Q. All right. And so it would be fair to say that a member of your team knew who this Michael Kawa was before payment being made on 4191?
>
> A. Apparently.

PA 100.

APFUF 69. Ms. Bader testified that "I did nothing to ensure that Michael Kawa got paid." PA62.

APFUF 70. On April 24, 2000, without informing Mr. Kawa, the Government directly paid, by EFT, the amounts due under the Purchase Order to Capital City. JGB Enterprises, 63 Fed. Cl. 326, 327.

APFUF 71. Capital City did not pay JGB for the items shipped under Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

APFUF 72. If Michael Kawa "had known that the Government would not honor its written obligations, I never would have agreed to serve as escrow agent for PO 4191, and the Government would not have received the urgently needed hose assemblies." PA4.

APFUF 73. According to the Affidavit of Lavern Reising, retired Disbursing Officer, the Government's failure to pay Kawa was contrary to proper procedures. PA9.

APFUF 74. On May 31, 2000, JGB Enterprises, Inc., ("JGB") sent a letter to DCMC Clearwater and DSCC clearly demanding payment on Contract 2508 and Purchase Order 4191, among other contracts. PA 151-163.

APFUF 75. This notification came approximate 37 days after final payment on Purchase Order 4191.

APFUF 76. DSCC Contracting Officer Phyllis Moore confirmed that this letter was in fact received by Defense Supply Center Columbus. PA74.

APFUF 77. The fax confirmation sheet following the letter shows that it was sent to the Commander of DCMC Clearwater at fax number 727-579-3106. PA 162. Lynne Rathes, confirmed that the number 727-579-3106 was the correct fax number for the Commander of DCMC Clearwater. PA102.

APFUF 78. ACO Lynne Rahtes, who was responsible for administering Purchase Order 4191 and Contract 2508, could recall no action whatsoever that was taken to preserve files after this notification. PA 102.

APFUF 79. On August 14, 2000, Contracting Officer Phyllis Moore sent an E-Mail to DCMC Clearwater, stating, in regards to Purchase Order 4191 and Contract 2508, "THE CONTRACTING OFFICER HAS RECEIVED A REQUEST FOR EQUITABLE ADJUSTMENT FROM THE CONTRACTOR'S SUB CONTRACTOR FOR THE ABOVE AWARDS." PA164.

APFUF 80. Ms. Moore confirmed that after sending this message to DCMC Clearwater she took action to preserve the files within her immediate control at DSCC, and she would not have expected DCMC to destroy any contract files after having received such a message from her. PA 77-78.

APFUF 81. ACO Lynne Rahtes again could not recall any action that was taken by DCMC Clearwater to preserve files after this second notification. PA 104.

APFUF 82. During the deposition of Lynne Rahtes, it was revealed that that "anyone" could add or remove documents from the files:

Q. Okay. Was there a particular secretary or assistant that was responsible for maintaining these files?

A. No.

Q. All right. So the particular contract specialist that had something they wanted to put in the file could go and put it in this Lectriever, as you call it?

A. Yes.

Q. All right. Who could remove documents from this Lectriever?

A. Anyone.

PA88.

APFUF 83. Lynne Rahtes testified that since payment was made on Purchase Order 4191 on April 24, 2000, the earliest that the documents could have been destroyed pursuant to DCMC policy would have been October 24, 2000. PA 100-101. Thus the Purchase Order 4191 documents were destroyed after both the notification from JGB in May of 2000, and after the notification by Contracting Officer Moore in August of 2000.

Dated: July 21, 2008

s/Joseph A. Camardo, Jr.
Joseph A. Camardo, Jr.
127 Genesee Street
Auburn, New York 10321
Tel: (315) 252-3846
Fax: (315) 252-3508

Attorney for Plaintiff