# APPENDIX

# INDEX TO APPENDIX


| | |
|---|---|
| Declaration of Michael Kawa | 1 |
| Declaration of Robert Zywicki | 5 |
| Affidavit of Lavern Reising | 9 |
| Excerpts from the July 16, 2003 Deposition of Lu Ann Bocsy | 10 |
| Excerpts from the May 10, 2004 Trial Testimony of Michael Taylor | 13 |
| Excerpts from the December 7, 2007 Deposition of Michael Kawa | 18 |
| Excerpts from the January 8, 2008 Deposition of Lu Ann Bocsy | 27 |
| Excerpts from the January 8, 2008 Deposition of Kathryn Bader | 47 |
| Excerpts from the April 23, 2008 Deposition of Phyllis Moore | 63 |
| Excerpts from the April 23, 2008 Deposition of Lynn Rahtes | 79 |
| July 21, 1999 Solicitation SP0750-99-Q-5778 | 106 |
| June 15, 1999 Conversation Record of Lu Ann Bocsy | 112 |
| June 18, 1999 letter from Capital City Pipes to Lu Ann Bocsy | 113 |
| June 23, 1999 letter from Capital City Pipes to Lu Ann Bocsy | 114 |
| June 23, 1999 second letter from Capital City Pipes to Lu Ann Bocsy | 115 |
| July, 8 1999 letter from Capital City Pipes to Lu Ann Bocsy | 116 |
| May 15, 1999 Inter-office memorandum | 117 |
| September 20, 1999 letter from Capital City Pipes to Lu Ann Bocsy | 118 |
| September 24, 1999 letter from Capital City Pipes to Lu Ann Bocsy | 119 |
| October 27, 1999 letter from JGB to Michael Taylor, et. al. | 120 |
| November 9, 1999 fax from Capital City Pipes to Lu Ann Bocsy | 122 |
| November 10, 1999 Escrow Agreement | 123 |

| | |
|---|---|
| November 10, 1999 letter from Capital City Pipes to Lu Ann Bocsy | 126 |
| November 15, 1999 fax from Capital City Pipes to Lu Ann Bocsy | 127 |
| November 16, 1999 conversation record | 128 |
| November 24, 1999, Purchase Order 4191 | 129 |
| November 19, 1999 CCR Registry | 136 |
| June 1, 1999 Quote from Capital City Pipes | 138 |
| February 10, 2000 Purchase Order N62604-00-P-0104 | 139 |
| March 24, 2000 E-mail from Phyllis Moore to DCMC Clearwater | 144 |
| April 4, 2000 letter annotated by Kathryn Bader | 147 |
| April 5, 2000 letter from Capital City Pipes to Kathy Bader | 148 |
| April 12, 2000 Phyllis Moore Conversation Record | 149 |
| May 31, 2000 letter from JGB to Michael Taylor, et al. | 151 |
| August 14, 2000 E-mail from Phyllis Moore to DCMC Clearwater | 164 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448 |
| | ) | |
| THE UNITED STATES, | ) | (Judge George W. Miller ) |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF MICHAEL KAWA**

I MICHAEL KAWA, declare under penalty of perjury as follows:

1. I am over the age of 18 and competent to make this Declaration. I make this Declaration based on my personal knowledge.

2. I am an attorney, practicing in Syracuse, New York. During all relevant times, my business address was 300 Crown Building, Syracuse, NY 13202.

3. On November 10, 2005, I entered into an escrow agreement with JGB Enterprises, Inc (JGB) and Capital City Pipes, Inc. (Capital City), whereby I was to receive all payments due from the Defense Supply Center Columbus (DSCC) to Capital City, on contracts where JGB was a subcontractor. Under this agreement I was to release and pay funds deposited in escrow upon the receipt of a signed statement from Capital City and JGB providing for a division of the escrow fund between Capital City and JGB.

4. At the time of this agreement, I understood that the purpose of the agreement was to address JGB's concerns regarding non-payment by Capital City. It was my understanding that this Agreement was suggested and encouraged by DSCC personnel, since without such an agreement, JGB was unwilling to ship materials urgently needed by the Government, due to persistent non-payment by Capital City. By

entering into this agreement, it was my understanding that I was facilitating and making possible the Government's receipt of urgently needed military materials.

5. The agreement provided that Capital City and JGB were to take all steps and execute all documents as may be required by DSCC to provide that future payments of the moneys due be made payable to myself, and remitted to my Syracuse, New York, address.

6. Pursuant to this agreement, Capital City did notify the DSCC that the payment remittance address on Purchase Order 4191 should be:

Michael Kawa, Esq.
300 Crown Bldg.
304 S. Franklin Street
Syracuse, NY 1302

7. As contemplated by the parties to the escrow agreement, the payment clause of Purchase Order 4191, entered into between DSCC and Capital City with JGB as a subcontractor, was duly written as:

REMIT PAYMENT TO:

MICHAEL KAWA, ESQ.
300 CROWN BLDG
304 S. FRANKLIN ST
SYRACUSE, NY 13202

8. I was provided with a copy of Purchase Order 4191, and I believed that the payment clause bound the Government to make payment to me. At the very least, I believed that the language on the face of the Purchase Order would obligate the Government to send the check to my address, where I could control it and insure that payment was received by JGB.

9. In reliance upon the language of the Purchase Order, my client, JGB, shipped the items called for by Purchase Order 4191 directly to the Defense Department Depo on February, 8, 2000. When JGB shipped this order, I expected that payment would be made to me as clearly called for by Purchase Order 4191. When the Government accepted this delivery, under the Purchase Order calling for payment to be made to me, there was no further doubt in my mind that payment would have to be made according to the remittance clause. I believed that this acceptance had waived any objections regarding my entitlement to payment.

10. The validity of my rights under Purchase Order 4191 was further confirmed when, on February 10, 2005, a Government supply officer in Gulfport Mississippi issued Purchase Order N62604-00-P-0104 for hose assemblies from Capital City, supplied by JGB. In this Purchase Order, I was also listed under the "remit payment to" clause. Under this Purchase Order, the check was eventually sent to my address, where I was able to control it and assure payment to JGB. I assumed that if the Government was issuing yet another Purchase Order with my name and address in the "remit payment to" clause, there could be no possible doubt regarding my rights under Purchase Order 4191.

11. On April 24, 2000, with absolutely no notice or justification, the Government paid, by Electronic Funds Transfer, the amounts due under Purchase Order 4191 to Capital City. No money whatsoever under Purchase Order 4191 was remitted to my address, as called for by the Purchase Order.

12. As a result of this, according to the language of Purchase Order 4191, I am owed $45,275.76, plus interest. Due to this non-payment, I am unable to carry out my duties as contemplated when the escrow agreement was signed.

13. Due to the bankruptcy of Capital City, I am required to turn a percentage of this money over to the trustee in bankruptcy; however, the Government's non-payment has prevented me from properly forwarding these funds.

14. It is my understanding that the agreement under which I became an escrow agent was suggested and encouraged by the Government, and the Government has benefited from my services. If I had known that the Government would not honor its written obligations, I never would have agreed to serve as escrow agent for Purchase Order 4191, and the Government would not have received the urgently needed hose assemblies. My services directly resulted in the shipment of the material to the Government. At all times, I relied upon the objective language of Purchase Order 4191, and I submit, that reliance was entirely reasonable.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 31 2007

Michael Kawa, Esq.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448 |
| | ) | |
| THE UNITED STATES, | ) | (Judge George W. Miller ) |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF ROBERT ZYWICKI**

I ROBERT ZYWICKI, declare under penalty of perjury as follows:

1. I am over the age of 18 and competent to make this Declaration. I make this Declaration based on my personal knowledge.

2. I am currently President of JGB Enterprises, Inc. ("JGB"). At the time of the events in question, I was Vice President and Chief Operating Officer of JGB. JGB is in the business of manufacturing hose assemblies and other products for military and commercial uses.

3. Prior to 1999, JGB had been awarded several contracts and purchase orders to supply hose assemblies to the Defense Supply Center Columbus ("DSCC"). In early 1999, JGB was approached by Lee Gillam and Thelma Williams of Capital City Pipes, Inc., a small disadvantaged business ("SDB") located in Tallahassee Florida. Mr. Gilliam stated that the DSCC Small Business Specialist, Michael Taylor, suggested that Capital City contact JGB to if JGB could manufacture and supply the products covered by the SDB set-aside contracts awarded to Capital City by DSCC. Prior to this initial contact, JGB had never heard of or done business with Capital City. Upon information and belief, Capital City had no experience or capability relating to hose assemblies.

4. JGB began working as a subcontractor to Capital City. In 1999, Capital City received several contracts and purchase orders from DSCC to supply hose assemblies, including but not limited to the 4191 Purchase Order. JGB agreed to be Capital City's supplier. However, in reality and as DSCC was well aware, JGB performed almost 100% of the contracts. JGB purchased all of the materials, assembled them into hose assemblies, made presentations to the Government Quality Assurance Representative, tested all items, packaged all items, paid all freight charges, shipped the product directly to the Government, and even sent the required form DD-250s directly to the DSCC. Capital City's sole responsibility on the initial contracts (prior to Purchase Order 4191) was to collect payment from the Government, take its mark-up, and pay JGB. An even this it did not do correctly. Beginning with the first shipment to DSCC, Capital City failed to timely pay JGB.

5. By October of 1999, Capital City's failure to pay JGB for shipments under other DSCC contracts (Purchase Order 4191 had not yet been signed) had become a serious problem. I had several conversations with Mr. Taylor of DSCC about Capital City's failure to pay JGB. On October 27, 1999, I wrote Mr. Taylor and informed him that Capital City was delinquent on over $360,000 to JGB and that JGB had stopped production pending resolution of the matter. I asked Mr. Taylor to "([p]lease contact me immediately with a proposed solution." (Exhibit A). I sent a "cc" of my letter to both the Contracting Officer and legal counsel at DSCC, among others.

6. I had several conversations with Mr. Taylor over the next two weeks. Mr. Taylor and I discussed a proposed solution to our problem that we ultimately implemented with Capital City. Specifically, Capital City and JGB entered into an

escrow agreement whereby JGB's local attorney, Michael Kawa, was appointed as escrow agent for receipt of payments under the DSCC-Capital City contracts. Under the escrow agreement, Capital City agreed to execute the necessary documents to ensure that all payments under the remaining DSCC-Capital City contracts would go directly to Mr. Kawa, who would distribute the appropriate amounts to JGB.

7. On November 10, 1999, Capital City revised its open quotation on the Solicitation that would become Purchase Order 4191 to change the remittance address to Michael Kawa. (Exhibit B). Thus, when the 4191 Purchase Order was awarded to Capital City, Mr. Kawa was designated as the payee. (Exhibit C at page 5 of 7). This assured JGB that we would be paid under the 4191 Purchase Order. Accordingly, we shipped the items under this Purchase Order directly to DSCC on February 8, 2000.

8. Subsequent to the shipment of the hose assemblies under Purchase Order 4191, we learned that DSCC did not remit payment to Michael Kawa as required by Purchase Order 4191 but, instead, electronically transferred the funds directly to Capital City.

9. As we feared, Capital City did not pay JGB for the items it shipped under Purchase Order 4191. Capital City has declared Chapter 7 bankruptcy.

10. In short, upon information and belief, DSCC knew exactly why Capital City and JGB wanted the payee and remittance address on Purchase Order 4191 changed to Mr. Kawa. Simply put, DSCC urgently needed these hose assemblies and duped JGB into shipping them, only to re-direct payment to Capital City after the goods were delivered.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct.

Executed on January 31 2007

Robert Zywicki
President
JGB Enterprises, Inc.

Melissa S. Gaylord 1/31/07

MELISSA S GAYLORD
Notary Public - State of New York
No 01GA6116909
Qualified in Onondaga County
My Comm. Expires Oct 12, 2008

February 17, 2006

ACKNOWLEDGEMENT

I, Lavern Reising, residing at 5775 Mountain Shadow View Black Forest, CO 80908, having served as a Disbursing Officer, an agent of the United States Treasury, for the Defense Finance and Accounting Service and the United States Army from 1983 thru 1996 consider myself to be an expert witness on Government payment procedures.

I have read Purchase Contract #SP0750-00-M-4191 and attached MIRP chronology sheet for this contract. Based on my expert opinion, the Government is obligated to remit payment under contract SP0750-00-M-4191 to Mike Kawa. When the Government administratively changed the "pay to" and sent the money to the Prime Contractor, Capital City Pipes, this was an erroneous or improper payment. There was no modification issued on this contract changing the "remit to" address. Therefore, payment must be made to Mike Kawa in accordance with the terms of the contract.

Signed 2-17-06
Date

State of CO )
) ss.:
County of EL PASO )

On the 17th day of FEB in the year 2006 before me, the undersigned, personally appeared LAVERN REISING personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument the individual or the person upon behalf of which the individual acted executed the instrument.

SUBSCRIBED AND SWORN BEFORE ME THIS 17th DAY OF FEB 20 06

NOTARY - EL PASO COUNTY - COLORADO
MY COMMISSION EXPIRES 4/13/2009

JEREMIE R. MARILL NOTARY PUBLIC STATE OF COLORADO
My Commission Expires 04/13/2009

IN THE UNITED STATE COURT OF FEDERAL CLAIMS

- - -

J.G.B. Enterprises, Inc.,:

Plaintiff, :

vs. : Case No. 01-680C

The United States of America, :

:

Defendant.

- - -

V O L U M E I

- - -

July 16, 2003

Deposition of

Lu Ann Bocsy,

a witness herein, called by the Plaintiff for cross-examination under the applicable Rules of Federal Court Procedure, taken before me, Laura E. Thornsberry, a Registered Professional Reporter and Notary Public in and for the State of Ohio, taken pursuant to notice, at the offices of DSCC, 3990 East Broad Street, Columbus, Ohio, on Wednesday, July 16, 2003, commencing at approximately 2:18 p.m.

- - -

APPEARANCES:

JOSEPH P. HORNYAK, Esquire
Sonnenschein Nath & Rosenthal LLP
1301 K Street, N.W.
Suite 600 East Tower
Washington, D. C. 20005
202.408.6345,

On behalf of the Plaintiff.

ADA E. BOSQUE, Esquire
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 12072
Washington, D.C. 20530
220.305.3091,

On behalf of the Defendant.

VASSO MONTA, Esquire
Office of General Counsel
DSCC-G
3990 East Broad Street
Columbus, Ohio 45431
614.692.3284,

On behalf of DSCC.

\- - -

BY MR. HORNYAK:

Q. Did you believe Michael Kawa was affiliated with a bank of some kind?

A. It was an assumption.

Q. Why did you make that assumption?

A. Because I've never dealt with -- When dealing with Capital City, there was only one person I ever dealt with.

Q. Who was that?

A. Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me.

Q. Were you aware at the time that you awarded the 4191 contract that Capital City had failed to pay J.G.B. Enterprises on certain existing contracts?

A. No.

Q. Did you subsequently learn that?

A. I learned that at the time of the protest.

Q. What protest? You mean lawsuit?

A. I learned that when I was called to Gail Booth's office to review the folder with her based upon the protests.

MS. BOSQUE: The claim.

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

| | | |
|---|---|---|
| J.G.B. ENTERPRISES, INC., | ) | |
| Plaintiff, | ) | Volume I |
| vs. | ) | Civil Action No. 01-680C |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

PROCEEDINGS

Before the Honorable George W. Miller, taken before Linda G. Sturm, RDR/CRR, a Notary Public in and for the State of Ohio, at the Joseph P. Kinneary United States Federal Courthouse, 85 Marconi Drive, Columbus, Ohio, on May 10, 2004, at 9:53 a.m.

-=0=-





APPEARANCES:

Joseph P. Hornyak
SONNENSCHEIN NATH & ROSENTHAL LLP

JGB Enterprises
1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
(202) 408-6345

on behalf of the Plaintiff

Ada E. Bosque
Trial Attorney, Commercial Litigation Branch
U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
1100 L Street, N.W.
Room 12072
Washington, D.C. 20530
(202) 305-3091

on behalf of the Defendant

ALSO PRESENT:

Robert G. Zywicki, Vice President
J.G.B. Enterprises, Inc.
115 Metropolitan Drive
Liverpool, New York 13088
(315) 451-2770

Vasso Monta, Associate Counsel
Defense Supply Center Columbus

Allison D. Pugsley, Law Clerk
The Honorable George W. Miller
UNITED STATES COURT OF FEDERAL CLAIMS
717 Madison Place, N.W.
Washington, D.C. 20005
(202) 219-0283

-=0=-





INDEX OF EXAMINATION


| FOR THE PLAINTIFF: | PAGE |
|---|---|
| ROBERT G. ZYWICKI | |
| DIRECT BY MR. HORNYAK: | 32 |
| CROSS BY MS. BOSQUE: | 101 |
| CAROLYN F. MATHEWS | |
| DIRECT BY MR. HORNYAK: | 108 |
| DIRECT BY MS. BOSQUE: | 172 |

MICHAEL A. TAYLOR
DIRECT BY MR. HORNYAK: 181
CROSS BY MS. BOSQUE: 205
REDIRECT BY MR. HORNYAK: 214

LU ANN BOCSY
DIRECT BY MR. HORNYAK: 218
DIRECT BY MS. BOSQUE: 251
CROSS BY MR. HORNYAK: 256






INDEX OF JOINT EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | June 1999 Letter from Karen Spradlin | 114 |
| 3 | 2508 Contract | 117 |
| 4 | Record of telephone call between Carolyn Mathews, Jay Bernhardt, and Robert Zywicki | 119 |
| 5 | Record of conversation between Carolyn Mathews and Lynn Rahtes | 125 |

Q. That's correct.

A. Yes.



Q. In other words, there were two separate sets of conversations, if you will, one when the problem first arose in October of 1999 where you discussed the possibility of an escrow agreement; correct?

A. Yes.

Q. And then there were some discussions with Capital City Pipes about a joint bank account sometime in 2000?

A. Well, I believe that the discussion with Capital City Pipe later on was just mainly to resolve the issue. I don't remember which came first, whether escrow or bank account. The problem was getting -- or establishing some type of format for J.G.B. to get paid.

Q. Are you familiar with a woman at the center named Phyllis Moore?

A. Yes.

Q. Was it your understanding that she was a contracting officer with some responsibility for Capital City prime contracts?

A. Yes.

Q. And you kept Ms. Moore apprised of your conversations with Capital City Pipes regarding the joint bank account?
A. Actually, she kept me apprised of what was going on.
Q. Kept you apprised of the -- of the discussions regarding establishment of a joint bank account, if you will?
A. Yes.
Q. Do you recall discussions with Ms. Moore concerning the possibility of using an escrow agreement to resolve the J.G.B. nonpayment problem?
A. Yes.
Q. We I believe earlier discussed a woman named Lu Ann Bocsy. You know Ms. Bocsy; correct?
A. Yes.
Q. And you communicate with Ms. Bocsy with regard to some Capital City contracts?
A. Yes.
Q. Let me make the record clear. Concerning the award of some contracts to Capital City Pipes; correct?



A. Correct.
Q. Is it fair to say that she relied on you to negotiate prices with Capital City

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

MICHAEL KAWA,

Plaintiff,

ORIGINAL

-against-

No. 06-448C

(Judge George W. Miller)

THE UNITED STATES,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EXAMINATION BEFORE TRIAL of MICHAEL J. KAWA, held on December 7, 2007, at the offices of MICHAEL J. KAWA, Attorney at Law, 304 South Franklin Street, Syracuse, New York, commencing at 10:00 AM, before Brenda K. Boyce, Registered Professional Reporter and Notary Public in and for the State of New York.

A P P E A R A N C E S:

For the Plaintiff:

CAMARDO LAW FIRM, PC
Attorneys at Law
127 Genesee Street
Auburn, New York 13021
(315) 252-3846

BY: JOSEPH A. CAMARDO, JR, ESQ.

For the Defendant:

DEPARTMENT OF JUSTICE
Commercial Litigation Branch
Civil Division
1100 L Street NW
Attn: Classification Unit, 8th Floor
Washington, DC 20530
(202) 353-7978

BY: MEREDYTH D. COHEN, ESQ.

Also Present:

Robert G. Zywicki, JGB Enterprises

* * *

Amended Complaint. And Response to Interrogatories.

**Q. Did you review any other documents?**

A. No. I don't -- other than the Complaint and the attachments to the Complaint and the Interrogatories. Production of Documents I believe was another set of paperwork.

**Q. Did you speak with anyone other than your counsel before this -- about this case?**

A. Within the last couple of days?

**Q. In preparation for the deposition.**

A. No.

**Q. What is your current job?**

A. I'm a solo practitioner attorney.

**Q. How long have you been a solo practitioner?**

A. I've been in practice for myself for 20 years. 1986. And before that I used to work for some law firms after I got out of law school. So I've been an attorney for 35 years.

**Q. Which law firms did you work for?**

A. I worked for O'Hara, O'Hara & Vars from 1973 to 1981. And Blitman & King from '81 to '86.

**Q. And then you became a solo practitioner?**

A. Yes.

**Q. What bar membership do you have?**

A. New York State; Federal District Court, Northern District and Western District of New York.

**Q. Are there any others?**

A. No.

**Q. Have you ever had any others in the past?**

A. No.

**Q. Have you ever been subject to disciplinary action by any of those bars?**

A. No.

**Q. What is your area of practice?**

A. It's -- I would say general practice, but it's pretty much real estate, general business related. And estate.

**Q. Business and estate?**

A. Yeah. General business representing companies, corporations, small businesses.

**Q. Where did you attend undergraduate college?**

A. Le Moyne College in Syracuse.

**Q. What year did you graduate?**

A. '69.

**Q. Where did you attend law school?**

A. Syracuse University.

**Q. What year did you graduate from there?**

A. '72.

**earlier, how does that show any intent to contract with you?**

A. Well, because they had my name --

MR. CAMARDO: Objection. I don't think the 64 mentions anything about an escrow agreement. It talks about intended to contract. We're talking about 4191.

A. Right. And my answer is because they had my name as the payee on 4191. I mean to me that means they intended to contract with me. They intended to pay me.

I mean to me it's a pretty simple deal. You have a government contract, 4191, that says they are going to pay me. You have an escrow agreement between the parties that say I'm going to receive the money.

Q. **Are you aware that a request was made to change the remittance address on the solicitation that eventually became 4191?**

A. Changed from what to what?

Q. **A -- changed -- a change to your address.**

A. Again, reviewing these documents --

MR. CAMARDO: Object to the question. Because what's in a solicitation versus what's in a contract are -- it's not really a change. A contract come out with

doesn't -- doesn't include the word assignment. But the -- it has a specific reference to me, to pay me.

Q. **How is including your address an affirmative acknowledge of an assignment to you?**

MR. CAMARDO: Objection. Calls for a legal conclusion.

A. Well, because the government itself acknowledged in 4191 that the money should be sent to me.

I mean if Capital City Pipes is notifying the government to send the money to me, I would say that that's the document that says give me the money, assign the money from Capital City Pipes to me.

I don't think you have to use the word assignment. It's pretty clear that notification from Capital City says send the money to Michael Kawa. And the government said, fine, we're going to send the money to Michael Kawa and here is 4191 that says we're going to remit payment to him.

I mean to me it can't be any more clear than that.

Q. **Would you please turn to page 14 of Exhibit 2.**

A. Sure.

Q. **In paragraph 43.**

A. Yes.

**Q. Do you know if Ms. Bocsy signed an acknowledgment to the notice of assignment?**

MR. CAMARDO: Objection. The notice of assignment, I mean --

A. I don't know what --

MR. CAMARDO: You are assuming that there is a notice of assignment outside the contract.

**Q. Were you registered in the Central Contractor Registry?**

A. No.

**Q. Do you have a beneficial interest in 4191?**

MR. CAMARDO: Objection. Calls for legal conclusion what beneficial interest means.

**Q. Did you expect to receive any benefit from 4191?**

MR. CAMARDO: Objection. Again, benefit is construed with the law.

A. Well, I mean as escrow agent, I suppose if I received the check. Not a personal benefit. But as escrow agent.

The only thing that I'm being benefited by is receiving the money that was supposed to be paid to me and

then ultimately disbursing it.

**Q. If the money had to be ultimately disbursed to JGB and Capital City, how is that a benefit to you?**

MR. CAMARDO: Objection. Again, it calls for a legal conclusion. He's an attorney with an obligation.

A. The only benefit is that it helps me fulfill my duties as escrow agent.

**Q. The Complaint alleges that the remittance address designates you as a payee. Is that correct?**

A. The Complaint?

**Q. Yes.**

A. Yeah.

**Q. Exhibit 2.**

A. Without specifically referring to a paragraph number, I believe generally it does allege that the money should be paid to me.

**Q. Did the escrow agreement provide for you to either -- to be the payee or just to receive the payment?**

MR. CAMARDO: Objection. I think the document speaks for itself.

A. Do you have a copy of it? The escrow agreement? Off the top of my head, I don't recall the exact language of the escrow agreement. My understanding

A. Is that what the document says? Asserting causes of action separate and distinct from those asserted by JGB in the previous litigation, yes, that's what paragraph six does state.

**Q. Can you explain how your cause of action is separate and distinct from that of JGB in the previous litigation?**

A. Again, I don't know what JGB's claims in the previous litigation were. But my claim is separate and distinct from any claim that JGB may have. Because my claim is as escrow agent. JGB couldn't have made any claim as escrow agent because they weren't an escrow agent.

**Q. Aren't you requesting payment of the same money that JGB was requesting in the previous litigation?**

A. I don't know what JGB claimed in the previous litigation.

**Q. Are you requesting payment pursuant to 4191 of $45,275?**

A. Yes.

**Q. Are you aware that that money has already been paid to Capital City?**

A. Yeah, I guess I understood that did take place.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA,

Plaintiff,

vs. INDEX No.: 06-448C

THE UNITED STATES OF AMERICA,

Defendant.

_____________________________________/

Deposition of LU ANN BOCSY, held on January 8, 2008, at the Defense Supply Center Columbus, 3990 East Broad Street, Columbus, Ohio, commencing at 12:05 p.m., before Maria DiPaolo Jones, Court Reporter and Notary Public in and for the State of Ohio.

APPEARANCES:

Camardo Law Firm, PC
By: Mr. Joseph A. Camardo, Jr., Esq.
And
By: Mr. Adam H. Van Buskirk, Esq.
127 Genesee Street
Auburn, New York 13021
On behalf of the Plaintiff.
(Via Speakerphone)

By: Ms. Meredyth Cohen, Esq.
U.S. Department of Justice
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
On behalf of the Defendant.
(Via Speakerphone)

By: Ms. Vasso K. Monta, Esq.
DSCC Office of Counsel
3990 East Broad Street
Columbus, Ohio 43215
On behalf of the witness.

Q. Okay. Going down towards the, on 206 down towards the bottom of the page there's a line there, I can't really read it on mine, it looks like it's line g, Remittance Address. Do you see that?

A. Correct.

Q. And there's a box that is checked that says "Other"?

A. Uh-huh.

Q. That's a different address than what's in block 14, correct?

A. Correct.

Q. And it appears to be there's two different addresses for Capital City there, correct?

A. I'm going to say that I don't agree with that. What it appears to me in block 8 is that that is Capital City's actual address. What appears in block g of the remittance address is a PO box.

Q. Right. There's two different addresses, correct?

A. I don't know. I don't know that that PO box is not located at that address.

Q. Okay. But technically there's two different addresses, whether or not they're located there or --

A. Technically, visually there appears to be two separate addresses.

Q. All right. Let's just hold that document for a second and let's go to document 189.

A. Okay.

Q. Could you identify that document?

A. It is a copy of the printout from the Central Contractors Registration, CCR.

Q. Have you ever seen this document before?

A. Yes.

Q. When would you have seen this document?

A. When I printed it out.

Q. And when did you print it out?

A. 11/19/1999.

Q. Is there any significance as to that date, 11/19/1999?

A. It's just the date that it's printed out.

Q. Okay. Would that have been around a date that the purchase order was issued to Capital Cities?

A. What was the date on that one?

Q. Directing your attention to document 180.

A. Yeah, I just found it. The issue date of the document is 11/19/1999.

Q. All right. So the same date then, correct?

A. Correct.

Q. I want you to just draw your attention on 189 to Street Address No. 1.

A. Okay.

Q. Do you see that, 1872 Mills Street, Building F?

A. Uh-huh.

Q. And going over to document 206, do you see that address at all on 206?

A. It appears in block 8.

Q. Fourteen, right?

A. No. Block 8.

Q. Eighteen?

A. You're on document 206?

ask -- to the best of my memory I did ask for clarification as to what that was supposed to be.

Q. What did she tell you?

A. She sent another fax.

Q. You said you asked her. Did you have a telephone conversation with her?

A. Yeah, I just asked her to clarify it. Everything has to be provided --

Q. Let's slow down for a minute. You called her right after you got this fax on 11/9/99?

A. I am going to say yes, to the best of my recollection.

Q. Okay. And then what did she tell you over the phone?

A. Nothing. If she had told me something on the phone, there would be a conversation record documenting that.

Q. Well, is there a conversation record documenting it?

A. I'm not sure.

Q. Well, you just alluded, and correct me if I'm wrong, that you wrote down what

she discussed with you, correct?
A. If she had --
Q. Slow down for a second, okay? Did you just tell me that a second ago?
A. Yes.
Q. Okay. So why didn't you write that down, that I called her and she didn't say anything?
A. Because that's not documentation for a folder to have.
Q. Why not? It documents a phone call.
A. I didn't document the phone call to her requesting that she clarify this.
Q. So you don't document all phone calls, do you?
A. I document relevant telephone calls.
Q. What you consider to be relevant at the time, correct?
A. Correct.
Q. Okay. So there's a possibility you could have had a discussion with her on 11/9.
A. Discussion of?
Q. You didn't think it was relevant,

correct?

A. I'm sorry, I really don't know how to answer that question. What discussion are you asking that I had that I didn't feel relevant?

Q. I think you testified, and you correct me if I'm wrong, that you document all your telephone conversations. And I asked you is there documentation of your telephone conversation on 11/9/99 when you called her, and you said -- if I'm hearing your testimony correctly, and correct me if I'm wrong -- that you didn't think anything come out of the telephone conversation so you didn't write anything down. Is that a fair statement?

MS. COHEN: Objection; mischaracterization of testimony.

Q. Well, tell me how it's mischaracterized.

MS. COHEN: Go ahead, Ms. Bocsy, you can answer.

A. Every telephone conversation is not documented on a one-way conversation; as an

example, my calling her to verify this information.

As there is another fax in here clarifying the remittance address, I would have told her to submit that clarification in writing, therefore, a telephone conversation, a one-way telephone conversation without feedback that I did not use for documentation of that folder would not have been relevant.

Q. Do you know this for a fact? You said "I would have told her."

A. I'm going to tell you that if there's an additional fax clarifying, that I requested she supply that.

Q. I'm sorry?

A. I'm telling you that if there is an additional fax clarifying this remittance address, I would have told her to supply it in writing.

Q. You said "I would have." Did you?

A. To the best of my recollection. It's the standard procedure.

Q. Well, I'm not asking about procedures. I'm asking if you can remember

your conversation with her.
A. No.
Q. No, you can't remember it?
A. No, I can't.
Q. Okay. All right. I'm curious about something here. You mentioned about the five lines, that you can only type five lines of information in.
A. No; you can only put in four lines of information.
Q. Four lines of information. Why couldn't you put Michael Kawa, Esquire and Capital Cities Pipe on the same line?
A. I could have. I didn't.
Q. Okay. You chose not to; is that correct?
A. I chose to fill in --
Q. Would you answer my question, please?
A. I filled in the information that the contractor provided, sir.
Q. Look it, please, please don't talk over me. I'm trying to ask a question, I will give you equal time to respond.
MS. COHEN: Mr. Camardo, she was

attempting to answer the question.

MR. CAMARDO: She couldn't have attempted to answer my question. Let me get my whole question out. I mean, I don't know how she can answer a question without hearing the question. Let's just slow down and take a deep breath everybody, okay. Listen to my question, you can answer my question, but I'd like to get an answer to my question.

Q. My question was: You chose not to put Michael Kawa, Esquire and Capital Cities Pipe, Inc. on the same line; is that correct? Either "yes" or "no." I'm not asking why you did. I'm asking the fact that you didn't do that.

A. The use of the word "chose" is inappropriate. I did not put it in because a more recent fax had directed me to a different address.

Q. I'm not asking you what you did or didn't do. I'm asking, in fact, you could have done it, correct?

A. I've already answered that yes.

Q. Okay. All right. So why, then,

did Capital Cities send another fax, then, taking Capital Cities Pipe's name off of their request change of remittance address?

A. I don't know why they removed Capital City. I asked them to clarify the remittance address.

Q. Did you tell them you can only type four lines into the computer?

A. I don't remember.

Q. There's a possibility you told them that?

A. Yes.

Q. I want to direct your attention to document -- I want you to go to Exhibit-5, document 244.

A. Okay. I'm sorry, 244?

Q. 244 under Exhibit-5.

A. Okay.

Q. Can you identify this document?

A. It's an e-mail from Capital City Pipes to Carolyn Matthews dated November 10th, 1999.

Q. Now, you mentioned it was an e-mail. Is it a letter or an e-mail?

A. To what are you referring?
Q. To document 244.
A. It looks to me like a fax or a letter. It does not look like e-mail.
Q. Okay. Well, you just mentioned the word "e-mail."
A. I'm sorry.
Q. I thought I should be looking at something else. No problem.
The date of the document is November 10th, '99, correct? And it's under contract last four digits 2508, correct?
A. Correct.
Q. Did you see this document at the time it was sent on or around November 10th, 1999?
A. No.
Q. Last sentence down, or last paragraph down says, "We have spoke with JGB Enterprises and are resolving the misunderstanding." Do you know what misunderstanding they're talking about?
A. No.
Q. And they also requested the

remittance address be Michael Kawa, Syracuse, New York; is that correct?

A. Correct.

Q. But you know nothing of any misunderstanding, correct?

A. Correct.

Q. Okay. And that's as of November 10th, 1999. Right?

A. This letter is of November 10th, 1999.

Q. Okay. Now I want to direct your attention to document 192.

A. Okay.

Q. Can you identify that document?

A. It is a fax to me from Thelma Williams requesting or clarifying the confusion of the remittance address and requesting the remittance address.

Q. What confusion was there?

A. To the best of my recollection, it will be because there was too many lines in the original request.

Q. Okay. And directing your attention back to 193.

A. Yes.
Q. That's a letter dated November 10th, 1999 --
A. Yes.
Q. -- right? Asking the remittance address be changed to Michael Kawa, correct?
A. Correct.
Q. So why five days later was there some confusion about that?
A. I don't know. I don't know why there's two separate faxes.
Q. You don't know anything about the confusion.
A. I know the confusion of the remittance address, to the best of my recollection, being too many numbers of lines.
Q. But that was taken care of as of November 10th, 1999.
A. Correct.
Q. Directing your attention back to document 244.
A. Okay.
Q. Could the confusion have been that

there was a misunderstanding with J.G.B.?
A. No.
Q. You know that for a fact?
A. I know for a fact that I did not know that there was a problem between Capital City Pipes and J.G.B.
Q. Going now to document 192.
A. Okay.
Q. Do you see the name Michael Kaka, K-a-k-a?
A. Yeah.
Q. Why didn't you type "Michael Kaka," K-a-k-a, into Purchase Order 4191?
A. I probably did not realize the mistake.
Q. Well, they're asking for Michael Kaka, aren't they?
A. That's what's typed on this fax.
Q. So why didn't you utilize "Michael Kaka"?
A. Because I probably didn't recognize it as an error from the one that she sent in from November 10th.
Q. Are you guessing now, or you

document 200 is, again?
A. Document Number 200 is a letterhead fax from Capital City Pipes to myself referencing that solicitation number giving updated pricing.
Q. Does that mention the words "Michael Kawa" in there?
A. No.
Q. It mentions the words "J.G.B.," though, correct?
A. Correct.
Q. And then directing your attention to 183 --
A. Okay.
Q. -- where you have "Remit Payment To: Michael Kawa, Esquire," you typed that in?
A. Yes.
Q. And "remit payment to" meant what to you? What does that mean? Pay Kawa?
A. Payment should be remitted to that address.
Q. All right. Well, it was more than an address there, it's an individual, isn't it?

A. In this case.
Q. And you thought that Michael Kawa was some sort of banker?
A. I really didn't give a thought to who Michael Kawa was.
Q. Didn't give any thought to who Michael Kawa was.
A. I mean, I didn't dwell on the thought of who Michael Kawa was. I assumed that he was a person related to Capital City Pipes; he could have worked in their offices, could have worked in their shipping, billing section.
Q. Did you assume that Michael Kawa was affiliated with a bank?
A. I assumed Michael was affiliated with Capital City Pipes.
Q. Would you answer my question?
A. No.
Q. You did not assume that he was affiliated with a bank.
A. No.
Q. I'm going to direct your attention to tab 1, page 44. Could you go to page

44 on the bottom? Do you see that page?
A. Yes.
Q. The question was asked of you by Mr. Hornyak at line 2 "Question: Did you believe Michael Kawa was affiliated with a bank of some kind?
"Answer: It was an assumption."
Was that your testimony at the time?
A. Apparently. I'm going to say as it's typed here --
Q. Let me finish my question, please. "Question: Why did you make that assumption?
"Answer: Because I've... dealt with -- When dealing with Capital City, there was only one person I ever dealt with.
"Question" -- well, let me just ask you, you answered the question that way, correct?
A. Correct.
Q. "Question: Who was that?
"Answer: Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me."

That's the way you answered the question, correct?
A. Correct.
MR. CAMARDO: Just give me a minute.
I don't have anything further.
MS. COHEN: Could we take five minutes, please?
MR. CAMARDO: Yeah.
MS. COHEN: All right.
(Whereupon, Recess taken.)

EXAMINATION

BY-MS.COHEN:
Q. Ms. Bocsy, can I turn your attention to Bates Number 42 in your document binder?
A. Okay.
Q. At the top of the page, the question was "Is Michael Kawa a separate entity than Capital City Pipes?" And you responded "I don't know"; is that correct?
A. I'm sorry, are you on page 42?
Q. Yes.
A. Okay. Are you looking at line 7?
Q. Yes.
A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA,

Plaintiff,

vs. INDEX No.: 06-448C

THE UNITED STATES,

Defendant.

_______________________________________/

Deposition of KATHRYN BADER, held on January 8, 2008, in the General Counsel's Library at the Defense Contracts Management Agency, 6350 Walker Lane, Alexandria, Virginia, commencing at 10:00 a.m., before Neal R. Gross, Court Reporter and Notary Public in and for the State of Virginia.

APPEARANCES:
On Behalf of the Plaintiff:
BY: JOSEPH A. CAMARDO, JR., ESQ.
ADAM VAN BUSKIRK
Camardo Law Firm, P.C.
127 Genesee Street
Auburn, New York 13021
(315) 252-3846

On Behalf of the Defendant:
BY: MEREDYTH D. COHEN, ESQ.
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L Street, NW
Washington, DC 20530
(202) 353-7978
(202) 514-8624
-and-
BY: VASSO MONTA, ESQ.
Defense Supply Center Columbus
3990 E Broad Street
Columbus, Ohio 43213

Q. And how about the term third-party beneficiary?

A. I don't recall that at all.

Q. Okay. Now, you mentioned that you're employed currently with DCMC?

A. Correct.

Q. Okay. And what location would you -- would that be at?

A. DCMA Headquarters, Alexandria, Virginia.

Q. And how long have you been at DCMA Headquarters in Alexandria, Virginia?

A. A year and a half.

Q. And in that year and a half timeframe, what positions have you held?

A. I'm a performance advocate in contracting.

Q. And briefly, what does that sort of position entail? What would be your duties?

A. I've been assigned a chapter out of the DCMA Guidebook to monitor and provide service to the CMO field personnel.

Q. What sort of services would you provide to the CMO service personnel?

duties?

A. That was as a contract specialist for DCMA St. Petersburg.

Q. Contract specialist?

A. Correct. Administrator, specialist, the same thing, different name.

Q. All right. And that's DCMA?

A. St. Petersburg, correct.

Q. And how long were you in that position as a contract specialist in St. Petersburg?

A. I believe from 1998 until 2004.

Q. And what would your duties have entailed while you were employed out of the St. Petersburg office?

A. I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly.

Q. Make sure they got paid correctly?

A. Correct.

Q. How would you ensure that they got paid correctly?
A. Review of DD 250 or vouchers or invoices, then --
Q. Would you have also looked at a contract?
A. I'm sorry?
Q. Would you also have looked at a contract?
A. Oh, but definitely.
Q. Okay. Are you familiar at all with a company by the name of Capital Cities Pipes, Inc.?
A. Yes.
Q. And how would you have been familiar with that company?
A. At one time, I was assigned cognizance of their administration.
Q. Do you recall when that would have been?
A. I know 2000 from looking at the documents. I don't know if that extended in to 1999 or not.
Q. Okay. So approximately around 2000?

A. Correct.
Q. Are you familiar at all with a company by the name of JGB Enterprises?
A. Only that they dealt with Capital City Pipes.
Q. Could you be a little more specific? When you said they dealt with them, how did they deal with them?
A. Oh, subcontractor to Capital City Pipes.
Q. Subcontractor to Capital City Pipes, okay. Are you at all familiar with an individual by the name of Michael Kawa, K-A-W-A?
A. Only that his name appeared in the documents.
Q. And what documents are we speaking of?
A. Contracts and then subsequent e-mails, the Notice of Assignment paperwork we started with Capital City Pipes.
Q. Now, you said you were a contract specialist, correct?
A. Correct.

Q. Okay. And that you would report to whom, say in the year 2000?

A. The administrative contracting officer, Ms. Lynne Rahtes.

Q. Okay. Do you know who Ms. Rahtes would report to, only if you know, say in the year 2000?

A. We had several team leaders at that time. I'm not sure which one was in charge of the team at that time.

Q. Team leaders? Could you give me any names?

A. The last that I worked for in 2004 was William Anderson. I believe --

Q. How about 2000?

A. No, I don't remember.

Q. Okay. Do you recall who the commander would've been in the year 2000?

A. No.

Q. I want you to go in to your packet of information there at Exhibit-5 and I want you to find a document bates stamped on the right-hand corner 0240.

A. I have it.

contracts this escrow agreement would cover.

A. There are none specifically stated.

Q. Okay. Matter of fact, in paragraph eight, it states Capital City is a private contractor of the United States Defense Supply Construction Center (DSCC) for the manufacture and shipment of hose assemblies pursuant to various agreements between Capital Cities and DSCC. It states that, correct?

A. It states that.

Q. Okay. Do you know what agreements those would've been on?

A. No.

Q. But you were handling Capital City, though, correct?

A. Contracts assigned to me at DCMA St. Petersburg, yes.

Q. Now, what, if anything, did you do after you received this letter?

A. What letter?

Q. 0240, the April 5, 2000 letter. What would you have done with the letter?

A. I would have filed it.

Q. Anything else?

A. There's nothing in this letter that pertains to my actions as administrator of the contract at DCMA St. Pete. It would've been in-file information for future use, but it did not affect my administration efforts.

Q. You did nothing except just file the letter?

A. Probably.

Q. Well, do you know for a fact? Don't guess now.

A. No, I do not know for a fact.

Q. Okay. So you can't remember what you would have done?

A. No.

Q. Did you talk to anybody with respect to this letter? Did you talk to anybody within DCMC St. Petersburg?

A. I don't remember.

Q. Did you talk to the PCO about this letter?

A. I don't remember.

Q. You could have though, correct?

A. I could have.

Q. Just give me one second, okay?

Q. I want to direct your attention down to the line where it states, "Remittance address." Do you see that?

A. I do.

Q. Okay. Explain what that -- what your interpretation is of that line, remittance address.

MS. COHEN: Objection; vague. What do you mean by interpretation?

MR. CAMARDO: She's a contract specialist. She's gone through a series of courses, and I'm just asking for her opinion or her interpretation on what she feels that word remittance address means.

THE WITNESS: On this document, the PCO opted to use an alternate remittance address other than the norm, which would have been block 14.

BY-MR.CAMARDO:

Q. Did you understand my question? I didn't ask what the PCO did or didn't do. I asked what's your interpretation of the word remittance address?

A. Remittance address is where the

funding is to be paid to.
Q. Okay. And in this case, the line was checked, "Other." Is that correct?
A. It is.
Q. Okay. And the PCO didn't check that line to your knowledge, did she?
A. I have no idea.
Q. This is a quote, isn't it, Request for Quotations?
A. It is a Request for Quotation.
Q. Okay. And the address that's checked states, "Capital Cities Pipes, Inc., P.O. Box 12368, Tallahassee, Florida, 32310." Is that correct?
A. It does.
Q. Okay. And that's different than the address listed at block 14, isn't it?
A. It is.
Q. There's two different addresses there, correct, for Capital Cities?
A. Correct.
Q. Now, would Capital Cities have an obligation to report any place, to your knowledge, these two addresses?

Q. And when would you have seen this document?

A. When I was administering it.

Q. So you administered the 4191 contract?

A. I believe so.

Q. And just looking at block 7, it says, "DCMC Clearwater." That would be your organization, correct?

A. Correct.

Q. And directing your attention to page 5 of 7.

MS. COHEN: What is the bates number for that?

MR. CAMARDO: 183.

THE WITNESS: I have it.

BY-MR.CAMARDO:

Q. And there's a "Remit payment to?"

A. Correct.

Q. And the remit payment to is Michael Kawa?

A. Correct.

Q. And Michael Kawa is supposed to get paid according to this contract?

A. He is listed as the remit payment address.
Q. And did Michael Kawa get paid?
A. I have no idea.
Q. When you were administering the contract, I think -- I was -- strike that.
I think you testified earlier that one of your functions as a contract specialist was to ensure payment to the contractor. Did you not say that?
A. To ensure payment, correct.
Q. How did you ensure that Michael Kawa got paid?
A. Not Michael Kawa. I ensured that payment, that was monitoring MOCAS, the DFAS payment system, to see if the check had been -- that the acceptance documentation had been approved, was in the system, and was being paid.
Q. But I think you also testified you looked at the contracts --
A. I looked at --
Q. -- did you not?
A. I looked at the contract.

Q. And didn't this contract say that Michael Kawa had to get paid?

A. The contract states that he is the remit payment address.

Q. And my question is how did you ensure that Michael Kawa got paid?

MS. COHEN: Asked and answered.

MR. CAMARDO: I still haven't heard an answer to it, but --

THE WITNESS: I ensured that payment was made. Where DFAS sent the payment was not my -- part of my job.

BY-MR.CAMARDO:

Q. I'm not asking that. I'm asking how did you, Ms. Bader, ensure that Michael Kawa got paid? If you didn't do that, that's fine.

MS. COHEN: Objection; asked and answered and argumentative.

MR. CAMARDO: I don't think I'm being argumentative at all. I'd just like to get an answer to my question.

Q. What did you do to ensure that Michael Kawa got paid?

A. I ensured that the shipping documents were accurate, that they were submitted to DFAS for remittance, that DFAS processed them through their system in a timely fashion, and that DFAS issued a check.

MR. CAMARDO: Okay. Stenographer, could you read back my question? We can keep going over this until I get an answer.

THE COURT REPORTER: Your last question?

MR. CAMARDO: Yes, sir.

(Whereupon, Read back of Counsel Camardo's question.)

MR. CAMARDO: "What did you do to ensure that Michael Kawa got paid?"

MS. COHEN: The same objection.

BY-MR.CAMARDO:

Q. Do you understand the question, Ms. Bader?

A. I understand your question.

Q. All right. Could you give me answer to it, please? I'm not asking about DD 250s or ensured that Capital Cities got paid or anything else. I want to know what you did

to ensure that Michael Kawa got paid, and if you did nothing, then just state that you did nothing.

A. Payment to Michael Kawa was not part of my job.

Q. I didn't ask you that. What did you do to ensure that Michael Kawa got paid pursuant to the contract?

MS. COHEN: Objection; asked and answered.

MR. CAMARDO: I still haven't heard an answer.

THE WITNESS: Payment to Michael Kawa was not part of my job.

BY-MR.CAMARDO:

Q. What did you do to ensure that Michael Kawa, pursuant to this contract, got paid? If you did nothing or it's not part of your job, then just tell me you did nothing.

A. I did nothing to ensure that Michael Kawa got paid.

Q. Okay. Thank you. Okay. Can we go to document 189?

IN THE UNITED STATES

COURT OF FEDERAL CLAIMS

---

MICHAEL KAWA,

Plaintiff,

vs. Index No. 06-448C

THE UNITED STATES,

Defendant.

_______________________________/

Deposition of PHYLLIS E. MOORE, held on April 23, 2008, at the Offices of DSCC, Office of Counsel, 3990 East Broad Street, Columbus, Ohio, commencing at 10:00 a.m., before Sandra D. Kin, Court Reporter and Notary Public in and for the State of Ohio.

APPEARANCES:

Camardo Law Firm, P.C.
By: Mr. Adam Van Buskirk, Esq.
(Via telephone)
127 Genesee Street
Auburn, NY 13021
On behalf of the Plaintiff.

U.S. Department of Justice Civil Division
By: Ms. Meredyth Cohen, Esq.
(Via telephone)
Trial Attorney
Commercial Litigation Branch
1100 L St. NW.
Room 12016
Washington, D.C. 20530
On behalf of the Defendant.

Defense Supply Center Columbus
By: Ms. Vasso K. Monta, Senior Counsel
Office of General Counsel
3990 East Broad Street
Columbus, Ohio 43216
On behalf of the Witness.

responsibility for this contract begin, would it begin after a signature?

A. For --

MS. COHEN: Objection, vague. What contract are you referring to?

MR. VAN BUSKIRK: I'm speaking generally of the duties of the position.

MS. COHEN: You can answer, Ms. Moore.

A. Yes, after the award.

BY-MR.VANBUSKIRK:

Q. All right. And when a contract is assigned to you after the award, what would be the first action you would take to administer this contract?

A. The first action would be nothing if there's no problem.

Q. All right. So you would only take action if a problem came to your attention?

A. In most instances.

Q. All right. When would you take action without a problem coming to your attention?

A. Probably never.

A. Yes.
Q. All right. At that time were you a post-award contracting officer?
A. Yes.
Q. All right. And if you'd look down at block 24 this order is signed by a Luann Bocsy, correct?
A. Yes.
Q. And would that be a pre-award contracting officer?
A. Yes.
Q. Okay. Now, at some point did this purchase order come to be administered by you after its award?
A. Yes.
Q. All right. And if you look at block 7, it says there that it's administered by a place called DCMC Clearwater, correct?
A. Yes.
Q. Now, what is DCMC Clearwater?
A. Well, it's activity -- a government activity that we assign upon award if there is origin inspection or some other type of special things that's required by the

contractor purchase order.
Q. All right. So when it says administered by DCMC Clearwater, certain functions have been delegated to them; is that correct?
A. Yes, sir.
Q. All right. And generally, you don't have to list them all, but generally what functions would a DCMC office perform?
A. Well, they do inspections. If you have, say, forward pricing agreements -- there are a lot of things that the DCMC office would do.
Q. Would the DCMC verify that the product was delivered, for example?
A. Yes, they would.
Q. All right. And --
A. Or could.
Q. They could. And would they ever be allowed to make contract modifications?
A. Yes.
Q. All right. Now, I understand that -- now, getting back to you're post-award contracting officer. Have you been trained

in the Federal Acquisition Regulations?
A. Yes, sir.
Q. All right. Now, are you familiar with Federal Acquisition Regulations allowing delegation to a DCMC office?
A. Yes, sir.
Q. All right. So when it says in block 7 administered by DCMC Clearwater, would they generally be performing the functions authorized by the FAR?
A. Not necessarily. It depends on the criticality. It depends on different -- other things. It wouldn't just do the functions under FAR let's say because they were there. It still depends on the contract and what the buyer has authorized them to do.
Q. So -- and you would be the buyer, correct?
A. No.
Q. All right. Who would be the buyer on 4191?
A. Luann Bocsy.
Q. All right. But after you take over

the next paragraph it states, "This serves as an authorization for the ACO to take whatever contractual action is necessary to keep these orders viable." Correct?

A. Yes.

Q. Okay. And who would be the ACO?

A. I wouldn't --

MS. COHEN: Objection. Asked and answered.

Q. Do you know who the ACO is?

A. No, I don't.

Q. All right. Well, would the ACO be a person under your supervision, so to speak?

A. Under my -- no.

Q. Is the chain of command -- would the ACO be someone who was subsidiary or less senior than the post-award contracting officer?

A. No.

Q. What are the functions of an ACO?

A. Well, it depends. The ACO is a person who does pretty much the same thing as the PCO, except for they don't buy. I forget. There's a, you know, a lot of