IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MICHAEL KAWA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-448C |
| | ) | (Judge George W. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED ADDITIONAL FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of this Court, defendant respectfully responds to plaintiff's proposed additional findings of uncontroverted fact as follows:

1. Capital City Pipes ("Capital City") was, at all times relevant to this claim, a business located in Tallahassee, Florida, that was certified by the United States Small Business Administration ("SBA") under the 8(a) program. JGB Enterprises, 63 Fed. Cl. at 323. Beginning in 1998, DSCC "set aside" its requirements for hose assemblies, previously supplied by JGB Enterprises ("JGB"), for Capital City. JGB Enterprises, 63 Fed. Cl. at 323.

Response:

Defendant does not dispute this proposed fact.

2. On or around April 30, 1999, Contracting Officer Bocsy forwarded a copy of solicitation number SP0750-99-Q-5778 to Capital City, requesting a quote for certain hose assemblies. Plaintiff's Appendix, page 106 ("PA106").

Response:

Defendant does not dispute that a copy of solicitation number SP0750-99-Q-5778 was forwarded to Capital City, requesting a quote for certain hose assemblies. Defendant notes that the date on the quote request is July 21, 1999, not April 30, 1999, and that the request does not

state that it was forwarded by Ms. Bocsy.

3. On June 15, 1999, Contracting Officer Bocsy called Capital City, as part of ongoing negotiations, to further discuss the offer, informing them that their price was too high and that it would need to drop by 38%. PA112.

Response:

Defendant does not dispute that, on June 15, 1999, Contracting Officer Bocsy called Capital City to discuss the offer, informing them that their price was too high and that it would need to drop by 38%. Defendant disputes plaintiff's characterization of the call as being part of "ongoing negotiations."

4. On June 18, 1999, Capital City submitted an offer of $190.65 for each hose assembly, "Quoting the manufacturer; Titan Industries." PA113.

Response:

Defendant does not dispute this proposed fact.

5. By letter dated June 23, 1999, Capital City advised Contracting Officer Bocsy that it was going to use JGB to assemble and supply the hose assemblies, directly setting forth the quotes given by JGB to Capital City. The quote from JGB was cheaper than previously quoted manufacturers, and included packaging and shipping to destination from JGB. This quote was provided to Contracting Officer Bocsy again on the same date, and on July 8, 1999. PA 114-116.

Response:

Defendant does not dispute that the June 23, 1999 letter from Capital City to Ms. Bocsy listed two JGB quotes and stated that the quotes included packing and shipping to the

destination. Defendant disputes that the letter indicated that Capital City was going to use JGB to assemble and supply the hose assemblies or that the quoted prices were given by JGB to Capital City. Defendant does not have sufficient information either to confirm or dispute that the quote from JGB was cheaper than previously quoted manufacturers, and avers that it is immaterial for the purpose of resolving the pending motion. Defendant further disputes that the quote was provided to Ms. Bocsy again on the same date, and on July 8, 1999, as each of the three referenced quotes contained different prices.

6. On July 15, 1999 the Government Pre-award monitor, pursuant to an inter-office memorandum, certified that the solicitation was an 8(a) set-aside and that Capital City was going to be a "dealer," with JGB supplying the hose assemblies. The memorandum stated that a certificate of competence was not needed, since "inspection and acceptance must be at actual place of MFG. of hose Assy." Under the section of the memo pertaining to performance and quality history of Capital City, the memo states "ASAP," apparently meaning that the Government considered this an urgent order. PA117.

Response:

Defendant does not dispute that the July 15, 1999 inter-office memorandum states that the solicitation was an 8(s) set-aside, that Capital City was going to be the "dealer," that JGB was supplying the hose assemblies, and that a certificate of competence was not needed. Defendant also does not dispute that the memorandum stated that "inspection and acceptance must be at actual place of MFG. of hose Assy," but disputes that the memorandum states that this is why a certificate of compliance was not needed. Defendant does not dispute that memorandum states "ASAP" in the performance and quality history section, but disputes that

"ASAP" meant that the Government considered this to be an urgent order. The "ASAP" merely indicates that the performance and quality history was needed as soon as possible.

7. By letter dated September 20, 2000, Capital City further advised Contracting Officer Bocsy that "[t]he assembly of this product will be done **by JGB** Enterprises, Inc. at their location, Liverpool, NY (61125)" (emphasis in original). PA118.

Response:

Defendant does not dispute this proposed fact, except to the extent that the word "further" implies that Capital City had previously informed Ms. Bocsy that the assembly of the product would be done at their location.

8. As part of ongoing negotiations, a letter from Capital City to Contracting Officer Bocsy, dated September 24, 1999, stated "JGB Enterprise, Inc will do the assembly and the pressure testing will be done at their plant in Liverpool, NY." PA119.

Response:

Defendant does not dispute this proposed fact, except for plaintiff's characterization of the letter as being part of "ongoing negotiations."

9. Due to past non-payment by Capital City, JGB doubted that it would be properly paid by Capital City, and was reluctant to enter into a contract to supply the much needed hose assemblies. JGB Enterprises, 63 Fed. Cl. at 323.

Response:

Defendant does not have sufficient information either to confirm or dispute this proposed fact, and avers that it is immaterial for the purpose of resolving the pending motion.

10. JGB feared that it would construct and ship the hose assemblies directly to the

Government, and would then never receive payment from the "dealer," Capital City. (Zywicki Declaration, PA6).

Response:

Defendant does not have sufficient information either to confirm or dispute this proposed fact, and avers that it is immaterial for the purpose of resolving the pending motion.

11. On October 27, 1999, Mr. Zywicki wrote Mr. Taylor (DSCC Small Business Specialist) and informed him that Capital City was delinquent on over $360,000 to JGB and that JGB had stopped production pending resolution of the matter. He asked Mr. Taylor to "[p]lease contact me immediately with a proposed solution" and sent a "cc" letter to both the Contracting Officer and legal counsel at DSCC, among others. PA120. JGB Enterprises, 63 Fed. Cl. at 325.

Response:

Defendant does not dispute this proposed fact, except that the letter stated "[p]lease contact me immediately with a proposed resolution," not "solution." Defendant also notes that the letter stated that the debts were for Contracts SP0750-99-C-2505 ("2505") and SP0750-99-C-2506 ("2506"), and that JGB had stopped production on Contract 2506. Neither Contract 2505 nor Contract 2506 are at issue in this litigation.

12. During several conversations with Mr. Taylor over the next two weeks, Mr. Taylor suggested to Mr. Zywicki a proposed solution to the problem, where JGB and Capital City would enter into an escrow agreement, using Michael Kawa, Esq. as escrow agent. (Zywicki Declaration, PA6-7).

Response:

Defendant disputes this proposed fact. Mr. Taylor only had one or two discussions with

Mr. Zywicki following receipt of the October 27, 1999 letter. Defendant's Appendix ("DA") 51. Mr. Taylor did not discuss the possibility of an escrow agreement with Mr. Zywicki, but rather with Lee Gilliam, president of Capital City. DA 51. There is no evidence that Mr. Taylor was the one who suggested the escrow agreement. See DA 52, PA 6-7. Finally, there is no evidence that Mr. Taylor suggested that Mr. Kawa be the escrow agent.

13. On November 19, 1999, Capital City advised Contracting Officer Bocsy that:

Also, I an requesting a change of Payment Remittance Address:

> Capital City Pipes, Inc.
> Michael Kawa Esq.
> 300 Crown Bldg
> 304 S. Franklin Street
> Syracuse, NY 13202

PA126.

Response:

Defendant does not dispute this proposed fact, but notes that the referenced facsimile is not PA126, but can be found at DA 11.

14. Following receipt of the November 9, 1999 facsimile, Ms. Bocsy contacted Capital City, allegedly because the number of lines requested exceeded that which could be typed into the remittance address. DA 3, Declaration of LuAnn Bocsy ("Bocsy Decl.") ¶ 4; see also DA 92-93. In Plaintiff's view, the alleged issue with the number of lines is not credible or reasonable. In her January 8, 2008 deposition, Ms. Bocsy testified:

> Q. Four lines of information. Why couldn't you put Michael Kawa, Esquire and Capital City Pipe on the same line?
> A. I could have. I didn't.

PA36.

Response:

Defendant does not dispute that Ms. Bocsy contacted Capital City following receipt of the November 9, 1999 facsimile. Defendant also does not dispute that Ms. Bocsy testified as quoted above. Defendant does dispute, however, plaintiff's allegation that the "alleged issue with the number of lines is not credible or reasonable." "[I]t is well settled that a party may not defeat a properly supported motion for summary judgment by raising generalized questions as to the credibility of the movant's affiants." Medical Devices of Fall River, Inc. v. United States, 19 Cl. Ct. 77, 82 (1989) (citing Robinson v. Cheney, 876 F.2d 152, 162 (D.C. Cir. 1989)). Furthermore, Ms. Bocsy's quoted deposition testimony does not call into question the credibility or reasonableness of her statement that her reason for contacting Capital City was because the number of lines requested exceeded that which could be typed into the remittance address. Immediately following the excerpt quoted above, Ms. Bocsy testified as follows:

> Q. Okay. You chose not to; is that correct?
> A. I chose to fill in - -
> Q. Would you answer my question, please?
> A. I filled in the information the contractor provided, sir.
>
> * * * * * * * * * * * * * * * *
>
> Q. My question was: You chose not to put Michael Kawa, Esquire and Capital Cities Pipe, Inc. on the same line; is that correct? Either "yes" or "no." I'm not asking why you did. I'm asking the fact that you didn't do that.
> A. The use of the word "chose" is inappropriate. I did not put it in because a more recent fax had directed me to a different address.

PA 36-37. Although Ms. Bocsy technically could have placed "Michael Kawa" and "Capital City" on the same line without contacting Capital City, she instead chose to notify Capital City of the problem and permit it to revise the address as it wanted. It was entirely reasonable for Ms. Bocsy to consult Capital City rather than making the change herself. She then utilized the

address provided by Capital City in a later facsimile. PA 37.

15. In her January 8, 2008 deposition, Ms. Bocsy first claimed that Capital City Pipes told her "nothing" during this call, and when pressed, claimed to be unable to remember the substance of the call. Bocsy testified:

> Q. Lets slow down for a minute. You called her right after you got this fax on 11/9/99?
> A. I am going to say yes, to the best of my recollection.
> Q. Okay. And then what did she tell you over the phone?
> A. Nothing. If she had told me something on the phone, there would be a conversation record.
> Q. Well, is there a conversation record documenting it?
> A. I'm not sure. . .
>
> Q. Well, I'm not asking about procedures. I'm asking if you can remember your conversation with her.
> A. No.
> Q. No, you can't remember it?
> A. No.

PA 32-36.

<u>Response</u>:

Defendant does not dispute that Ms. Bocsy testified as quoted above, but otherwise disputes this proposed fact. Ms. Bocsy did not testify that Capital City told her "nothing" during the conversation, but rather that Capital City told her nothing that she would have documented because the requested remittance address was clarified in a later facsimile:

> Q. I think you testified, and you correct me if I'm wrong, that you document all your telephone conversations. And I asked you is there documentation of your telephone conversation on 11/9/99 when you called her, and you said - - and if I'm hearing your testimony correctly, and correct me if I'm wrong - - that you didn't think anything come out of the telephone conversation so you didn't write anything down. Is that a fair statement?
> MS. COHEN: Objection; mischaracterization of testimony.
> Q. Well, tell me how it's mischaracterized.
> MS. COHEN: Go ahead, Ms. Bocsy, you can answer.

> A. Every telephone conversation is not documented on a one-way conversation; as an example, my calling her to verify this information
>
> As there is another fax in here clarifying the remittance address, I would have told her to submit the clarification in writing, therefore, a telephone conversation, a one-way telephone conversation without feedback that I did not use for documentation of that folder would not have been relevant.

PA 34-35. Additionally, while Ms. Bocsy testified that she did not specifically recall the conversation with Capital City, she also stated that "if there is an additional fax clarifying this remittance address, I would have told her to supply it in writing" because that was "standard procedure." PA 35.

16. On November 10, 1999, Capital City and JGB entered into an escrow agreement whereby Michael Kawa, Esq. was appointed as an escrow agent for receipt of payments under all DSCC-Capital City contracts under which JGB was the subcontractor. Under the escrow agreement, Capital City agreed to execute the necessary documents to ensure that all payments under the remaining Capital City prime contracts would be payable to Michael Kawa, Esq., who would then distribute the appropriate amounts to JGB and Capital City. PA 123-125.

Response:

Defendant does not dispute this proposed fact.

17. Mr. Kawa has been an attorney for approximately 35 years, practicing in the area of business and real estate law.

Response:

Defendant does not dispute this proposed fact.

18. It was JGB's, as well as Michael Kawa, Esq.'s intention not to ship any hose assemblies to the Government unless it was paid. (Kawa Declaration, PA1). At the time of

signing this agreement, Michael Kawa believed "[b]y entering into this agreement, I was facilitating and making possible the Government's receipt of urgently needed military materials." (Kawa Declaration, PA1).

Response:

Defendant does not have sufficient information either to confirm or dispute this proposed fact, and avers that it is immaterial for the purpose of resolving the pending motion.

19. Capital City followed up with a letter to Contracting Officer Bocsy dated November 10, 1999, stating:

> I requested a change in the payment remittance address:
>
> Michael Kawa, Esq.
> 300 Crown Bldg.
> 304 S. Franklin Street
> Syracuse, NY 13202

PA 126.

Response:

Defendant does not dispute this proposed fact.

20. The conflict between the November 9, 1999 letter and the November 10, 1999, letter apparently caused "confusion" and on November 15, 1999, Capital City sent a fax to Contracting Officer Bocsy. The fax stated:

> Good Morning, Luann. I apologize fot (sic) the confusion this may have caused. We are requesting the payment address be changed to:
>
> MICHAEL KAKA (sic), ESQ.
> 300 CROWN BLDEG (sic)
> 304 S FRANKLIN STREET
> SYRACUSE, NY 13202
>
> If you have any questions please call me

THANK YOU

PA127.

Response:

Defendant does not dispute that this proposed fact accurately quotes the facsimile, but disputes that it was an alleged conflict between the earlier letters that caused the referenced "confusion." There is no evidence that the word "confusion" was referring to the previous letters.

21. The next day, on November 16, 1999, Contracting Officer Bocsy telephoned Capital City regarding an increase in quantity. PA128.

Response:

Defendant does not dispute this proposed fact.

22. DSCC ultimately awarded Purchase Order 4191 on November 24, 1999 to Capital City. JGB Enterrpises, 63 Fed. Cl. at 325.

Response:

Defendant does not dispute this proposed fact.

23. At the time of signing PO 4191, Contracting Officer Bocsy assumed that payment would be made by physical check. JGB Enterprises, 63 Fed. Cl. at 325.

Response:

Defendant does not dispute this proposed fact.

24. Purchase Order 4191 was in the amount of $45,275.76 for 306 hose assemblies, and was signed by Contracting Officer Bocsy on November 19, 1999. PA106-122. Contracting Officer Bocsy complied with Capital City's requests of November 10 and 15, 1999, and

personally typed Michael Kawa, Esq.'s name and address into Purchase Order 4191. PA31. The language in the Purchase Order read:

> REMIT PAYMENT TO:
>
> MICHAEL KAWA, ESQ.
> 300 CROWN BLDG
> 304 S. FRANKLIN ST.
> SYRACUSE, NY 13202

PA129.

Response:

Defendant does not dispute this proposed fact.

25. Mr. Kawa felt that the language of P.O. 4191 bound the Government to make payment to him. "And my answer is that because they had my name as the payee on 4191. I mean to me that means they intended to contract with me. They intended to pay me." PA22. "I don't think you have to use the word assignment. It's pretty clear that notification from Capital City says send money to Michael Kawa and here is 4191 that says we're going to remit payment to him." PA23.

Response:

Defendant does not dispute that the proposed fact accurately quotes Mr. Kawa's deposition testimony. Defendant does not have sufficient information either to confirm or dispute the substance of Mr. Kawa's testimony regarding what he believed, and avers that it is immaterial for the purpose of resolving the pending motion.

26. In regards to the remittance address, Contracting Officer Bocsy testified as follows:

> Q. - - where you have "Remit Payment To: Michael Kawa, Esquire,"

you typed that in?
A. Yes.
Q. And "remit payment to" meant what to you? What does that mean? Pay Kawa?
A. Payment should be remitted to that address.
Q. All right. Well, it was more than an address there, it's an individual, isn't it?
A. In this case.

PA 43-44

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bocsy's deposition testimony.

27. Kathryn Bader, a contracting specialist at DCMC Clearwater who was involved in administering P.O. 4191 also testified that: "Remittance address is where the funding is to be paid to." PA 56-57.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bader's deposition testimony.

28. A CCR print out dated November 19, 1999 refers only to Capital City's physical address of :

CAPITAL CITY PIPES, INC.
1872 MILLS ST BLDG F
P.O. BOX 12368
TALLAHASSEE
FL
32301
USA

PA 136-137.

Response:

Defendant does not dispute this proposed fact.

29. Contracting Officer Bocsy testified that she printed this CCR entry out on the same day she issued P.O. 4191. PA 30.

Response:

Defendant does not dispute this proposed fact.

30. The offer previously submitted by Capital City Pipes in response to solicitation SP0750-99-Q-5778 had given two addresses for Capital City Pipes:

Capital City Pipes, Inc.
P.O. Box 12368
Tallahassee FL 32310

Capital City Pipes, Inc.
1872 Mills St. Bldg F
Tallahassee FL 32310

PA 138.

Response:

Defendant does not dispute this proposed fact.

31. Contracting Officer Bocsy testified that she understood one of these addresses to be Capital City Pipe's actual address, and one to be a remittance address. PA 28-29.

Response:

Defendant does not dispute this proposed fact.

32. At various times, Contracting Officer Bocsy has testified that she believed Mr. Kawa to work for a bank (PA12), that she did not give any thought as to who Mr. Kawa was (PA44), and that she believed Mr. Kawa to be an employee of Capital City Pipes. Ms. Bocsy's

knowledge at this time is an open issue of material fact. Ms. Bocsy testified that:

Q. Did you believe Michael Kawa was affiliated with a bank of some kind?
A. It was an assumption.
Q. Why did you make that assumption?
A. Because I've never dealt with - - When dealing with Capital City, there was only one person I ever dealt with.
Q. Who was that?
A. Thelma, I believe her name is. I don't recall her last name. But it would have been the woman who was quoting to me. PA12.

Response:

Defendant does not dispute that Ms. Bocsy testified as described. Defendant disputes, however, that Ms. Bocsy's knowledge about Mr. Kawa is an open issue of material fact. Ms. Bocsy further testified that: "I mean, I didn't dwell on the thought of who Michael Kawa was. I assumed that he was a person related to Capital City Pipes; he could have worked in their offices, could have worked in their shipping, billing section." PA 44. It is undisputed that Ms. Bocsy believed Mr. Kawa to be associated with Capital City in some way; her belief about his exact relationship with Capital City is immaterial to the issues raised upon summary judgment. As this Court found in JGB Enterprises, Ms. Bocsy did not know the purpose of changing the remittance address. JGB Enterprises, 63 Fed. Cl. at 335. Ms. Bocsy intended to benefit Capital City, not Mr. Kawa.

33. In her more recent deposition on January 8, 2008, prior to making her claim that she believed Mr. Kawa to be affiliated with Capital City Pipes, she testified that:

Q. And you thought that Michael Kawa was some sort of banker?
A. I really didn't give any thought to who Michael Kawa was.

PA 44.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bocsy's deposition testimony. Defendant notes, however, the testimony quoted in its response to proposed fact 32, which immediately followed the above-quoted testimony. When Ms. Bocsy stated that she did not give any thought to who Michael Kawa was, she meant that she did not dwell on it, but just assumed that he was related to Capital City.

34. No modification was ever entered into to remove Michael Kawa, Esq. as the payee, or to change the address for payment. JGB Enterprises, 63 Fed. Cl. 319.

Response:

Defendant disputes this proposed fact. Mr. Kawa was not the payee and Mr. Kawa's address was not the address for payment. Payment was to be made by electronic funds transfer to the information in the CCR database, which was Capital City's bank account. DA 27, 37.

35. Mr. Kawa was provided with a copy of the Purchase Order, and "believed that the payment clause bound the Government to make payment to me." (Kawa Declaration, PA2).

Response:

Defendant does not have sufficient information either to confirm or dispute this proposed fact, and avers that it is immaterial for the purpose of resolving the pending motion.

36. The Government needed the hose assemblies "ASAP," according to the memorandum of July 15, 1999. PA 117.

Response:

Defendant disputes this proposed fact. The memorandum does not state that the hose assemblies were needed "ASAP"; it merely states that the performance and quality history was

needed as soon as possible.

37. The Purchase Order 4191 provided that it was to be administered by DCMC Clearwater in St. Petersburg, Florida. PA 129.

Response:

Defendant does not dispute this proposed fact.

38. After signing the Purchase Order, pre-award Contracting Officer Bocsy was replaced by post-award Contracting Officer Moore. JGB Enterprises, 63 Fed. Cl. 325.

Response:

Defendant does not dispute this proposed fact.

39. Moore testified that she would ordinarily not take any action with regard to a contract unless a problem arose, and that the administration of the contract had been delegated to DCMC Clearwater. PA 65, 66-67. Contracting Officer Moore testified that the Federal Acquisition regulations allowed certain functions to be delegated to DCMC Clearwater. PA 67. Contracting Officer Moore specifically testified that DCMC Clearwater could be given the authority to modify contracts:

> Q. Would the DCMC verify that the product was delivered, for example?
> A. Yes, they would.
> Q. All right. And - -
> A. Or could.
> Q. They could. And would they ever be allowed to make contract modifications?
> A. Yes.

PA 67.

Response:

Defendant does not dispute that Ms. Moore testified that she would ordinarily not take

any action with regard to a contract unless a problem arose, and that PO 4191 was administered by DCMC Clearwater. Defendant disputes that Ms. Moore testified that the Federal Acquisition Regulations allowed certain functions to be delegated to DCMC Clearwater. Defendant does not dispute that Ms. Moore testified that DCMC Clearwater could be allowed to make contract modifications. Defendant avers, however, that DCMC Clearwater had no authority to substantively modify contracts without authorization from the DSCC contracting officer. DA 8.

40. Michael Taylor, DSCC Small Business Specialist, discussed the possibility of using an escrow agreement to resolve the JGB non-payment problems with Contracting Officer Moore. PA 16-17.

Response:

Defendant does not dispute this fact, but avers that these discussions did not occur until after payment had been made on PO 4191. DA 6.

41. Contracting Officer Moore also kept Michael Taylor informed about discussions regarding establishment of a joint bank account for JGB and Capital City. PA 16-17.

Response:

Defendant does not dispute that this proposed fact accurately describes Mr. Taylor's testimony, except that there is no evidence that JGB was specifically mentioned. Defendant further avers that there discussions did not occur until after payment had been made on PO 4191. DA 6.

42. Based on the Purchase Order citing Mr. Kawa as payee, JGB shipped the items for Purchase Order 4191 directly to the Government on February 8, 2000. JGB Enterprises, 63 Fed. Cl. 326; Zywicki Declaration, PA 7.

Response:

Defendant does not dispute that JGB shipped the items for Purchase Order 4191 directly to the Government on February 8, 2000. Defendant does not have sufficient information either to confirm or dispute the reason that JGB shipped the items, and avers that it is immaterial for the purpose of resolving the pending motion.

43. The Government accepted this delivery made under Purchase Order 4191, which named Michael Kawa, Esq. at the remittance address. JGB Enterprises, 63 Fed. Cl. 326.

Response:

Defendant does not dispute this proposed fact.

44. Mr. Kawa "expected that payment would be made to me as clearly called for by Purchase Order 4191. When the Government accepted this delivery, under the Purchase Order calling for payment to be made to me, there was no further doubt in my mind that payment would have been made according to the remittance clause." (Kawa Declaration, PA3).

Response:

Defendant does not dispute that this proposed fact accurately quotes Mr. Kawa's declaration. Defendant does not have sufficient information to either confirm or dispute the substance of the declaration, but avers that it is immaterial for purposes of resolving the pending motion.

45. On March 24, 2000, DSCC Contracting Officer Phyllis Moore sent an E-mail message to Capital City's ACO at DCMC Clearwater with an attached list of all contracts and purchase orders awarded to Capital City, including Purchase Order 4191. PA 144, 145. Moore sent this message because of delayed deliveries, and Contracting Officer Moore understood the

reason for the delay was JGB's allegation that it had never been paid for past deliveries. See 63 Fed. Cl. at 327-328.

Response:

Defendant does not dispute the first sentence of this proposed fact, except that the e-mail was sent to Warren Slack at DCMC Clearwater, not to the ACO. PA 144. Defendant does not dispute that the e-mail was sent because Capital City had been delinquent in shipment. Defendant disputes that Ms. Moore knew that the reason for the dealy was JGB's allegation that it had never been paid for past deliveries. DA 6.

46. DCMC Clearwater was the office administering Purchase Order 4191, as stated on the face of the Purchase Order. Moore requested that the ACO "maintain surveillance" of these contracts/orders. PA 144, 145. Moore's March 24, 2000 message to the ACO concluded as follows:

> THIS SERVES AS AUTHORIZATION FOR THE ACO TO TAKE WHATEVER CONTRACTUAL ACTIONS NECESSARY TO KEEP THESE ORDERS VIABLE. THE MATERIAL ON THESE CONTRACTS ARE [sic] URGENTLY NEEDED.

PA 144.

Response:

Defendant does not dispute this proposed fact, except that the e-mail was sent to Warren Slack, not to the ACO.

47. At the time this March 24, 2000 message was sent, Lynne Rahtes was the ACO at Clearwater assigned to Purchase Order 4191. PA 81-82. She was on a "team" with contracting Specialist Kathryn Bader, who was also assigned to Purchase Order 4191. PA 83.

Response:

Defendant does not dispute this proposed fact, but further avers that Ms. Bader reported to Ms. Rahtes, and Ms. Rahtes would review certain actions taken by Ms. Bader. DA 88, PA 85.

48. This March 24, 2000 E-mail was a delegation to the ACO's team and DCMC Clearwater to take any contractual actions necessary. According to Ms. Rahtes, who was the ACO at Clearwater:

> A. I was the ACO for this contract.
> Q. So you were administering the contract?
> A. Yes, along with my team.

PA 81

> Q. In an contracting sense, you did have overall responsibility for this Purchase Order 4191?
> A. Ultimately, yes. But the contract administrators are also responsible for the administration. And the ACO would generally provide guidance or direction if needed.

PA 85-86

> Q. All right. But looking at this e-mail stating, "This serves as authorization for the ACO to take whatever contractual actions necessary to keep these orders viable," that would be a delegation to the ACO, giving them the authority to modify the contract?
> A. It's a delegation to the contract administration team. . .
> Q. All right. So if Mr. Slack - - so Contracting Officer Moore here was delegating to your team the authority to take any contractual action necessary, correct?
> A. That's what it says.

PA 95-96.

Response:

Defendant does not dispute this proposed fact, except that there is no evidence that the e-mail was a delegation to all of DCMC Clearwater. Defendant further avers that Ms. Rahtes did

not testify that the delegation would give the ACO authority to modify the contract and that Ms. Rahtes would have interpreted the delegation as authorization to continue or perform surveillance, not as authorization to change the payee of the contract or to determine to whom payment should be made. DA 9. Defendant avers that, even assuming that the team was delegated authority that modify the contract, there is no evidence that a member of the team other than the ACO, such as Ms. Bader, would have had authority to do so without Ms. Rahtes' approval. See DA 2, 9.

49. At the time of this March 24, 200[0] ALERT message, the Government had not yet made payment for the shipments under Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

Response:

Defendant does not dispute this proposed fact.

50. DSCC Contracting Officer Moore confirmed that as ACO such as Lynne Rahtes was: "a person who does pretty much the same thing as the PCO [purchasing contracting officer], except for they don't buy . . ." and stated that "They're heading their own agency, a lot of them. . ." PA 69-70.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Moore's testimony. Defendant disputes that this description refers to Ms. Rahtes specifically. Defendant avers that Ms. Moore also testified that she could not remember and did not know the functions of an ACO. PA 69-70.

51. Contracting Officer Moore testified that an ACO is not subsidiary to or less senior

than a[] post-award contracting officer. PA 69.

Response:

Defendant does not dispute this proposed fact.

52. Contracting Officer Moore also confirmed that in regards to an existing contract, an ACO can "do most of what a PCO does." PA 70.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Moore's testimony. Defendant avers, however, that Ms. Moore also testified that she could not remember and did not know that functions of an ACO. PA 69-70. Furthermore, defendant avers that an ACO's duties would not include substantive modifications to contracts without authorization from the DSCC contracting officer. DA 8.

53. According to Contracting Officer Moore, it would have been DCMC Clearwater, not herself, who would have told the paying office to release payment on Purchase Order 4191. Contracting Officer Moore testified that:

> Q. All right. Looking at this specific purchase order 4191, what are the steps that would lead to payment being made in this specific instance?
> A. In this specific instance, hopefully the material was delivered.
> Q. Okay. And when the material is delivered, who would verify it was delivered, how would it be verified?
> A. Well, it would be in the system and since this was origin inspection it looks like, then there would be a DD250 submitted to the payment office along with - you know, they'll also look at whatever the system said and then they would make payment.
> Q. All right. Who would prepare this DD250?
> A. The DCMC office.
> Q. Would that be DCMC Clearwater?
> A. Yes, if that's where the material was being inspected.
> Q. All right. So in this particular instance the DCMC office would prepare this form and forward it onto the paying unit, so to speak; is

that correct?
A. Yes.
Q. And then the paying unit would release payment based on that?
A. Yes.

PA 71-73.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Moore's testimony. Defendant disputes, however, that Ms. Moore testified that DCMC Clearwater would have told the paying office to release payment on Purchase Order 4191. Ms. Moore stated that DCMC Clearwater would prepare the DD250 form "if that's where the material was being inspected." PA 72. According to the July 15, 1999 inter-office memorandum, inspection and acceptance on Purchase Order 4191 was required to be at the place of manufacturing, which was not DCMC Clearwater. PA 117. Furthermore, even assuming that DCMC Clearwater prepared the DD250, the DD250 merely verified delivery to the paying office. As Ms. Moore testified, the paying office would look at the DD250 and "whatever the system said," then make payment. PA 72. In this case, the CCR directed that payment be made to Capital City's bank account. See DA 37.

54. Rahtes testified that the contract administrators under her supervision processed notices of assignment pursuant to administering contracts, and testified that her contract administrators would "probably" speak to her before processing a notice of assignment. PA 90-91.

Response:

Defendant does not dispute that this proposed fact accurately summarizes Ms. Rahtes' testimony. Defendant avers, however, that there is no evidence that a contract administrator

could have completed an assignment of payment absent approval from Ms. Rahtes. See DA 2, 9.

55. A document dated April 4, 2000 contains a handwritten note on a DCMC Fax transmittal sheet to Contracting Specialist Kathy Bader at DCMC Clearwater, indicating "Mike says there is an escrow acct between JGB and Cap. City and Mr. Kawa is the attorney who controls it." PA 147. Ms. Bader thus knew of Mr. Kawa's role as an escrow agent at least as early as April 4, 2000. Defendant's PFUF 69.

Response:

Defendant does not dispute this proposed fact.

56. On April 5, 2000, Capital City contacted Ms. Bader, at DCMC St. Petersburg, Florida, regarding Contract 2508 (another DSCC contract with Capital City as prime contractor and JGB as subcontractor), responding to "questions" asked by Contracting Officer Bader in a letter dated March 30, 2000. Capital City informed the Contracting Officer that:

> 1. Mr. Michael Kawa, Esq. is an attorney and Capital City Pipes President and CEO Lee Gilliam and JGB Enterprises, Inc President/ CEO Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, ESQ as a go-between on this contract.
> 2. This Notice of Assignment is not for a loan. The purpose is for the disbursement of the funds related to the above-mentioned contract.

PA 148.

Response:

Defendant does not dispute this proposed fact, except that Ms. Bader was not a contracting officer during the time she was the contract specialist assigned to Capital City contracts. DA 2, 9. Defendant further notes that the letter specifically stated that Mr. Kawa was a "go-between on this contract" and that the purpose of the Notice of Assignment was the "disbursement of funds related to the above-mentioned contract," both referring to Contract

2508, not Purchase Order 4191. (emphasis added)

57. Ms. Bader was unable to recall one way or the other whether she had spoken with the "PCO" [Purchasing Contracting Officer] or anyone else with regards to this April 5, 200[0] correspondence. She did state that she "could have" discussed this correspondence with others. PA 54-55. As will be explained below, the relevant DCMC files with regard to P.O. 4191 have been destroyed by the Government, so the question of whether Ms. Bader informed Ms. Rahtes and/or Ms. Moore should be resolved against the government.

<u>Response</u>:

Defendant does not dispute the first two sentences of this proposed fact. Defendant does not dispute that the DCMC files pertaining to Purchase Order 4191 were probably destroyed, but avers that this is immaterial for purposes of resolving the pending motion. As set forth in our response to plaintiff's proposed fact 56, the April 5, 2000 correspondence refers specifically to Contract 2508. The Contract 2508 files were not destroyed, but were retained by Ms. Bader for informational purposes. SA 1,[1] Declaration of Kathryn M. Bader ("Bader Decl.) ¶ 4. Additionally, the Purchase Order 4191 DCMC files were destroyed pursuant the records management procedure that DCMC had in place at the time. SA 6-7, Declaration of Lynne T. Rahtes ("Rahtes Decl.") ¶ 4-5. Accordingly, no adverse inferences should be made against the Government.

58. Ms. Bader did state that she would have placed the April 5, 2008 letter in the DCMC files. PA54.

---

[1] "SA" refers to defendant's supplemental appendix attached to its reply to plaintiff's opposition to its motion for summary judgment.

<u>Response</u>:

Defendant does not dispute this proposed fact.

59. Lynne Rahtes had full access to the DCMC files. PA 88-89.

<u>Response</u>:

Defendant does not dispute this proposed fact.

60. Contracting Officer Moore also had access to the DCMC files. PA 73.

<u>Response</u>:

Defendant does not dispute this proposed fact, but notes that Ms. Moore worked at the DSCC office in Columbus, Ohio, whereas the DCMC office was located in Clearwater, Florida. Thus, as Ms. Moore testified, she could have requested that specific documents be provided to her, but could not have simply walked into the file room and viewed the files. <u>See</u> PA 73.

61. Ms. Rahtes was unable to recall if she had personally reviewed the documents stating that Mr. Kawa was an escrow agent or "go between," but Ms. Rahtes did indicate that documents clearly stating this fact would have ordinarily been placed in files [to] which she had access:

> Q. All right. And would you please read the first numbered paragraph.
> A. "Mr. Michael Kawa, Esquire is an attorney and Capital City Pipes president and CEO, Mr. Lee Gilliam and JGB Enterprises, Incorporated, president/CEO Mr. Jay Bernhardt signed an agreement to utilize Mr. Michael Kawa, Esquire as a go-between on this contract. If you require a copy of the agreement in order for this contract fo be fulfilled, please let me know."
> Q. All right. Thank you. And you can take a moment to look at this correspondence. But is this the type of correspondence that would normally be placed in the file?
> A. Yes.

PA98.

Response:

Defendant does not dispute this proposed fact, except that Ms. Rahtes' testimony referred only to the April 5, 2008 document referring to Mr. Kawa as a "go between," but not to any documents referring to Mr. Kawa as an escrow agent.

62. Lynn[e] Rahtes was unable to remember one way or another if her team had ever made reports to contracting Officer Moore regarding Purchase Order 4191, as had been requested by Contracting Officer Moore's March 24, 2000 E-mail message. PA 97.

Response:

Defendant does not dispute this proposed fact.

63. Kathryn Bader has testified that her team at DCMC Clearwater had a large role in the payment of contracts, and actually insured that a check was issued. Ms. Bader clearly stated: "I ensured that the shipping documents were accurate, that they were submitted to DFAS for remittance, that DFAS processed them through their system in a timely fashion, and that DFAS issued a check." PA61.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bader's testimony. Defendant disputes, however, that Ms. Bader ever said that DCMC Clearwater has a "large role" in the payment of contracts. Defendant avers that Ms. Bader also testified that "[w]here DFAS sent the payment was not part of my job" and that "[p]ayment to Michael Kawa was not part of my job." PA 60, 62.

64. Ms. Bader also testified that "I was assigned several contractors that we had administration of their contracts. It was my job to address the contracts when they were

received, review them, monitor them, make sure they got shipped and paid correctly, and then were closed correctly." PA 50.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bader's testimony.

65. Ms. Bader testified that she definitely looked at the contracts which she was assigned, including Purchase Order 4191. PA 51, 59.

Response:

Defendant disputes this proposed fact. Ms. Bader testified that, in general, she would have looked at a contract to make sure that it got paid. She never stated that she looked specifically at Purchase Order 4191. PA 51, 59.

66. On April 12, 2000, in a hand-written memorandum of a telephone call, Contracting Officer Moore stated, in regards to Contract 2508,

> Since this material is urgently needed, I will entertain on a one time basis of this award, changing the remittance address to a bank or whatever is agreeable.

PA 149-150.

Response:

Defendant does not dispute this proposed fact.

67. At the time Contracting Officer Moore made this memorandum, payment had not yet been made on Purchase Order 4191, and she was responsible for administering Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

Response:

Defendant does not dispute this proposed fact.

68. Lynne Rahtes confirmed that her team at DCMC Clearwater knew who Mr. Kawa was prior to payment being made on Purchase Order 4191:

> Q. All right. And so it would be fair to say that a member of your team knew who this Michael Kawa was before payment being made on 4191?
> A. Apparently.

PA 100.

Response:

Defendant does not dispute that this proposed face accurately quotes Ms. Rahtes' testimony. Defendant disputes that Ms. Rahtes confirmed that "her team" knew who Mr. Kawa was. Defendant avers that, after being shown the April 5, 2000 letter to Ms. Bader and a document showing that payment was made on April 24, 2000, Ms. Rahtes stated that "apparently" a member of her team (referring to Ms. Bader) knew who Mr. Kawa was. PA 99-100.

69. Ms. Bader testified that "I did nothing to ensure that Michael Kawa got paid." PA62.

Response:

Defendant does not dispute that this proposed fact accurately quotes Ms. Bader's testimony. Defendant avers, however, that Ms. Bader also testified that "[w]here DFAS sent the payment was not part of my job" and that "[p]ayment to Michael Kawa was not part of my job." PA 60, 62. Furthermore, the testimony above followed repeated argumentative questioning by counsel (to which counsel for defendant objected) during which Ms. Bader attempted to explain

that ensuring that Michael Kawa got paid was not part of her job. See PA 59-62.

70. On April 24, 2000, without informing Mr. Kawa, the Government directly paid, by EFT, the amounts due under the Purchase Order to Capital City. JGB Enterprises, 63 Fed. Cl. 326, 327.

Response:

Defendant does not dispute this proposed fact, but avers that the payment was made by EFT according to the terms of the contract. See DA 25, 27, 37.

71. Capital City did not pay JGB for the items shipped under Purchase Order 4191. JGB Enterprises, 63 Fed. Cl. 326, 327.

Response:

Defendant does not dispute this proposed fact.

72. If Michael Kawa "had known that the Government would not honor its written obligations, I never would have agreed to serve as escrow agent for P[urchase] O[rder] 4191, and the Government would not have received the urgently needed hose assemblies." PA4.

Response:

Defendant does not dispute that this proposed fact accurately quotes Mr. Kawa's declaration. Defendant does not have sufficient information either to confirm or dispute what Mr. Kawa would or would not have done, and avers that it is immaterial for the purpose of resolving the pending motion. Defendant disputes that it "did not honor its written obligations," as it made payment pursuant to the terms of the contract. See DA 25, 27, 37.

73. According to the Affidavit of Lavern Reising, retired Disbursing Officer, the Government's failure to pay Kawa was contrary to proper procedures. PA9.

Response:

Defendant does not dispute that the proposed fact accurately summarizes the referenced affidavit. Defendant disputes, however, that the Government did not follow proper procedures, as it made payment pursuant to the terms of the contract. See DA 25, 27, 37.

74. On May 31, 2000, JGB Enterprises, Inc. ("JGB") sent a letter to DCMC Clearwater and DSCC clearly demanding payment on Contract 2508 and Purchase Order 4191, among other contracts. PA 151-163.

Response:

Defendant does not dispute this proposed fact, except that the letter was addressed to Michael Taylor, not DCMC Clearwater or DSCC. Copies were sent to Ms. Moore and Ann Turner at DSCC and the Commander of DCMC Clearwater. PA 153.

75. This notification came approximate[ly] 37 days after final payment on Purchase Order 4191.

Response:

Defendant does not dispute this proposed fact.

76. DSCC Contracting Officer Phyllis Moore confirmed that this letter was in fact received by Defense Supply Center Columbus. PA74.

Response:

Defendant does not dispute this proposed fact.

77. The fax confirmation sheet following the letter shows that it was sent to the Commander of DCMC Clearwater at fax number 727-579-3106. PA 162. Lynne Ra[ht]es,

confirmed that the number 727-579-3106 was the correct fax number for the Commander of DCMC Clearwater. PA102.

Response:

Defendant does not dispute this proposed fact.

78. ACO Lynne Rahtes, who was responsible for administering Purchase Order 4191 and Contract 2508, could recall no action whatsoever that was taken to preserve files after this notification. PA 102.

Response:

Defendant does not dispute this proposed fact.

79. On August 14, 2000, Contracting Officer Phyllis Moore sent an E-mail to DCMC Clearwater, stating, in regards to Purchase Order 4191 and Contract 2508, "THE CONTRACTING OFFICER HAS RECEIVED A REQUEST FOR EQUITABLE ADJUSTMENT FROM THE CONTRACTOR'S SUB CONTRACTOR FOR THE ABOVE AWARDS." PA 164.

Response:

Defendant does not dispute that this proposed fact accurately quotes the text of the e-mail. Defendant avers that the e-mail was not sent to all of DCMC Clearwater, but just to Warren Slack. Defendant avers that the e-mail also stated that:

> UNTIL FURTHER NOTICE, YOU ARE REQUESTED TO SUSPEND ANY INSPECTIONS AND OR ACCEPTANCE OF SUPPLIES FOR THIS CONTRACTOR UNTIL FURTHER NOTICE BY THIS OFFICE.
>
> THIS IS A REQUEST FOR THE ACO TO SEND APPROPRIATE PERSONNEL TO THE CONTRACTOR'S FACILITY FOR THE PURPOSE OF CONDUCTING AN INDEPTH (sic) FINANCIAL RESPONSIBILITY ANALYSIS. REQUEST YOUR OFFICE ADVISE

> WHEN ACTION WILL BE TAKEN AND GIVE A PROJECTED COMPLETION DATE. THIS INFORMATION IS NEEDED TO ANSWER THE SUBCONTRACTOR'S REQUEST FOR EQUITABLE ADJUSTMENT.

PA 164. Thus, the reasons for the e-mail were to request that DCMC suspend inspections and/or acceptance of supplies from Capital City and to request that DCMC conduct a financial responsibility analysis of Capital City.

80. Ms. Moore confirmed that after sending this message to DCMC Clearwater she took action to preserve the files within her immediate control at DSCC, and she would not have expected DCMC to destroy any contract files after having received such a message from her. PA 77-78.

Response:

Defendant does not dispute that Ms. Moore testified that she took action to preserve her own files at DSCC. Counsel for plaintiff asked Ms. Moore "Based on your knowledge of government contracting, would it be – did you expect DCMC Clearwater to destroy their 4191 files after receiving this alert?" Counsel for defendant then objected to the question on the basis of speculation. Following counsel's objection, Ms. Moore testified that she would not have expected DCMC to destroy their files after receiving this kind of alert from her. PA 77-78.

81. ACO Lynne Rahtes again could not recall any action that was taken by DCMC Clearwater to preserve files after the second notification. PA 104.

Response:

Defendant does not dispute this proposed fact, except to the extent that the term "notification" implies that the August 14, 2000 e-mail was a notification to preserve documents.

82. During the deposition of Lynne Rahtes, it was revealed that [] "anyone" could add

or remove documents from the files:

> Q. Okay. Was there a particular secretary or assistant that was responsible for maintaining these files?
> A. No.
> Q. All right. So the particular contracting specialist that had something they wanted to put in the file could go and put it in this Lectriever, as you call it?
> A. Yes.
> Q. All right. Who could remove documents from this Lectriever?
> A. Anyone.

PA 88.

<u>Response</u>:

Defendant does not dispute this proposed fact.

83. Lynne Rahtes testified that since payment was made on Purchase Order 4191 on April 24, 2000, the earliest that the documents could have been destroyed pursuant to DCMC policy would have been October 24, 2000. PA 100-101. Thus the Purchase Order 4191 documents were destroyed after both the notification from JGB in May of 2000, and after the notification by Contracting Officer Moore in August of 2000.

<u>Response</u>:

Defendant does not dispute the first sentence of this proposed fact. While defendant admits that the DCMC Purchase Order 4191 files were probably destroyed at some point, there is no evidence as to when, or even if the destruction took place. Thus, defendant disputes the second sentence of this proposed fact.

Respectfully Submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ FRANKLIN E. WHITE, JR.
FRANKLIN E. WHITE, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street NW
Attn: Classification Unit
8th Floor
Tel: (202) 353-7978
Fax: (202) 514-8624
Washington, DC 20530

August 5, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 5th day of August, 2008, a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED ADDITIONAL FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN