# In the United States Court of Federal Claims

No. 06-448 C
Filed March 23, 2009
TO BE PUBLISHED

| | | |
|---|---|---|
| MICHAEL KAWA, | ) | Tucker Act, 28 U.S.C. § 1491; Contract |
| | ) | Disputes Act, 41 U.S.C. § 601 *et seq.*; res |
| Plaintiff, | ) | judicata; claim preclusion; issue preclusion; |
| | ) | privity; substantive legal relationship; real party |
| | ) | in interest; third-party beneficiary; assignment |
| v. | ) | of right to payment; implied-in-fact contract; |
| | ) | ratification |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Joseph A. Camardo, Jr., Auburn, New York, for plaintiff.

Leslie Cayer Ohta, Trial Attorney, Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director, Peter D. Keisler, Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

## OPINION AND ORDER

GEORGE W. MILLER, Judge.

Plaintiff Michael Kawa filed this suit in June of 2006, alleging, as is relevant here, that the Government breached an implied contract with him, that he was a third-party beneficiary of a contract between the Government and Capital City Pipes, and/or that he was assigned the rights to payment under the Capital City Pipes contract. In its opinion of June 28, 2007, the Court concluded that plaintiff possessed standing to sue, was a real party in interest and had pled sufficient facts to proceed to trial (docket entry 24). Subsequent to a trial, the Court now concludes that (1) there was no implied contract between plaintiff and the Government; (2) plaintiff was not a third-party beneficiary of the Capital City Pipes contract; and (3) plaintiff was not assigned any rights under the Capital City Pipes contract.

I.      **Background**[1]

JGB Enterprises ("JGB"), located in Liverpool, New York, is a manufacturer and distributor of hoses and hose assemblies for, as is relevant here, B-52, F-111 and C-135 aircraft. Joint Ex. 21.  Prior to 1998, JGB supplied these hoses to the Government, specifically the Defense Supply Center Columbus ("DSCC"), located in Columbus, Ohio.  Trial Transcript (docket entries 77 & 80, Oct. 20 and Nov. 3, 2008) ("Trial Tr.") at 110.  DSCC is a component of the Defense Logistics Agency ("DLA") and is responsible for awarding purchase orders and contracts for goods and services, as well as administering those contracts and purchase orders after award.  Second Am. Compl. ("Compl.") ¶ 2 (docket entry 15, Nov. 17, 2006); Trial Tr. at 200-02, 282.

This action arises out of a Request for Quote issued to Capital City Pipes ("Capital City") that was eventually embodied in a Purchase Order numbered SP0750-00-M-4191 ("PO 4191"). The tale begins on April 30, 1999, when Lu Ann Boscy, a pre-award Contracting Officer ("CO"), requested a quote from Capital City regarding provision of hose assemblies.  Joint Ex. 3, Compl. ¶ 8.  Because this was a sole source solicitation, Ms. Boscy then entered negotiations with Capital City.  Trial Tr. 211-12; Joint Ex. 12.  As a CO, Ms. Boscy possessed a $100,000 warrant—that is, the ability to obligate the Government up to $100,000.  Trial Tr. at 200.

On June 9, 1999 Capital City responded to the request, proposing to obtain the hose assemblies from Titan Industries, with a quote containing two addresses for Capital City: the remittance address was listed as "P.O. Box 12368, Tallahassee FL," while the contractor's address was "1872 Mills St., Bldg F, Tallahassee, FL."  Joint Ex. 4; Trial Tr. at 214-15.  Ms. Boscy informed Capital City on multiple occasions that its quote was too high.   Trial Tr. at 215-20.  Capital City addressed those concerns by lowering its price and changing manufacturers from Titan Industries to JGB.  *Id.* at 217-18.   After the switch to JGB as supplier, the price was lowered a few more times.  Joint Exs. 8-9.

Ms. Boscy completed a Request for Contractor's Performance History ("CPH") for Capital City on July 15, 1999.  Joint Ex. 11; Trial Tr. at 222.  This performance history evaluation needed to be completed before award of the contract could be made, so she asked that processing be expedited because the hose assemblies were on back order.  Joint Ex. 11; Trial Tr.

---

[1]  This recitation of facts sets forth certain of the Court's findings of fact in accordance with Rule of the Court of Federal Claims ("RCFC") 52(a). Additional findings of fact and rulings on mixed questions of fact and law are set forth in later sections of this Opinion and Order. In this section, the Court summarizes necessary background facts relevant to the subject of this opinion.  For a more complete account of the background facts and procedural history of this case, the reader is referred to *JGB Enterprises, Inc. v. United States*, 63 Fed. Cl. 319 (2004); *JGB Enterprises, Inc. v. United States*, 71 Fed. Cl. 468 (2006); *Kawa v. United States*, 77 Fed. Cl. 294 (2007); and *JGB Enterprises, Inc. v. United States*, 83 Fed. Cl. 20 (2008).

at 223, 225-26, 263-64.  The Request for CPH indicated that Capital City would act as a "dealer," and that because the materials would be coming from JGB, inspection and acceptance of the final product should occur at JGB's premises.  Joint Ex. 11; Trial Tr. at 227-28.  Capital City confirmed by letters of September 20 and 24 that JGB would be assembling and testing the product in Liverpool, New York.  Joint Exs. 13, 14.  Ms. Boscy was fully aware that JGB, located in Liverpool, New York, was supplying the product.  Trial Tr. at 227-28, 230.

The pre-award correspondence included a number of communications regarding the information to be contained in the "remit to" block of the eventual purchase order.  On November 9, 1999, Capital City faxed Ms. Boscy confirming its prior offer to provide the hose assemblies and asking for a "change of payment remittance address" on its quote to:

> Capital City Pipes, Inc.
> Michael Kawa, Esq.
> 300 Crown Building
> 304 S. Franklin St.
> Syracuse, NY 13202

Compl. ¶ 17; Joint Ex. 16; Trial Tr. at 233. Ms. Boscy advised Capital City that the number of lines in this address exceeded the lines she could type into the remittance address block of the purchase order.  Trial Tr. at 234.

Capital City then requested a change in the remittance address to:

> Michael Kawa, Esq.
> 300 Crown Bldg.
> 304 S. Franklin Street
> Syracuse, N.Y. 13202

Compl. ¶ 19; Joint Ex. 17; Trial Tr. at 245.

On November 15, Capital City sent another fax in which it apologized for any confusion and confirmed that the remittance address should be:

> Michael Kaka (sic), Esq.
> 300 Crown Building
> 304 S. Franklin St.
> Syracuse, NY 13202

Compl. ¶ 20; Joint Ex. 18; Trial Tr. at 245.  Ms. Boscy was unable to recall what the reference to "confusion" meant.  Trial Tr. at 245-46.

On November 19, Ms. Boscy checked the Central Contractor Registry ("CCR") to confirm that Capital City was registered (which is required before award of a purchase order). Trial Tr. at 262-64.  She printed the screens containing basic information about Capital City. Joint Ex. 23; Trial Tr. at 262-64.  Capital City's address in the CCR was "1872 Mills St Bldg F, P.O. Box 12368, Tallahassee, FL 32031, USA," Joint Ex. 23, which was consistent with the information Capital City had provided in its quote, Joint Ex. 4.  Ms. Boscy, an employee of DSCC, did not have access to the portion of the registry containing banking information because that data may only be viewed by employees of the Defense Finance and Accounting Service ("DFAS").  *JGB*, 63 Fed. Cl. at 326.

On November 19, Ms. Boscy issued PO 4191 to Capital City in the amount of $45,275.76 for 306 hose assemblies.  Compl. ¶ 24; Joint Ex. 21.  The "remit to" block of PO 4191 read:

> REMIT PAYMENT TO:
>
> MICHAEL KAWA, ESQ.
> 300 CROWN BLDG
> 304 S. FRANKLIN ST.
> SYRACUSE, NY 13202

Compl. ¶ 24; Joint Ex. 21.

Although Capital City never requested to be paid by check, Ms. Boscy assumed that payment would be by physical check.  Trial Tr. at 278.  Ms. Boscy further believed that payment would be remitted to Michael Kawa at the address in the purchase order.  *Id.* at 253-54.  Ms. Boscy testified that in changing the remittance address prior to the issuance of the purchase order she had formed no firm belief as to who Michael Kawa was, other than assuming he was associated with Capital City in some fashion, possibly as a banker.  *Id.* at 267-69.

There is no evidence in the record that anyone from the Government, JGB, or Capital City communicated any further information regarding Michael Kawa's identity to Ms. Boscy.  In fact, however, he was an escrow agent JGB had insisted be inserted into various Capital City purchase orders for which JGB was supplying product, because JGB was having significant difficulties receiving payment from Capital City.  JGB had threatened Capital City that it would withhold the hose assemblies on those other purchase orders if arrangements were not made to ensure payment.  *Id.* at 154.   In a previous trial, a JGB Vice President testified that he "assumed that Bocsy was communicating with" other Government employees who were aware of JGB's significant payment problems.  *JGB*, 63 Fed. Cl. at 326.  Jay Bernhardt, the CEO of JGB, likewise testified in this trial that he relied upon Capital City to communicate with Ms. Boscy regarding JGB's payment problems prior to the award of PO 4191.  Trial Tr. at 153.  Unfortunately, that was not the case.  Ms. Boscy testified not only that she was unaware of the payment controversy, but that if she had been aware that JGB was not getting paid, or that there was a possibility that JGB would not deliver the product, she would "have taken steps to dissolve the 8(a) and move on to a different type of set aside or a different type of solicitation."  *Id.* at 276.

Michael Kawa was a lawyer who had been representing JGB on various matters for over 20 years. *Id.* at 61. Due to JGB's difficulties with Capital City, he prepared an escrow agreement in November of 1999, with the purpose of providing JGB "reasonable assurance that it will receive payment for its work performed pursuant to its subcontract with Capital City relating to the agreements between Capital City and DSCC." Joint Ex. 19. Mr. Kawa himself consented to act as the escrow agent to receive funds payable on Capital City's contracts where JGB was the subcontractor, and to release those funds in accordance with instruction of the parties. Joint Ex. 19; Trial Tr. at 62. The escrow agreement required both Capital City and JGB to execute any documents necessary to ensure that the Government would pay Mr. Kawa rather than Capital City. Joint Ex. 19. Mr. Bernhardt testified that he intended that the escrow agreement would be global in nature and apply to any Government contract that involved both Capital City and JGB. Trial Tr. at 120-21. Mr. Kawa likewise believed that whenever payment was due to Capital City for items supplied by JGB as subcontractor, he (Mr. Kawa) would receive a physical check from the Government. *Id.* at 65.

In light of this escrow agreement, when Mr. Bernhardt saw PO 4191, with Mr. Kawa's name in the "remit to" block, he believed that it reflected the Government's acceptance of an assignment from Capital City to JGB of the right to receive payment and "felt very comfortable that the DFAS would honor the payment on the assignment of claims." *Id.* at 119. Mr. Bernhardt thought that the "remit to" block on PO 4191 would control the payee and method of payment. *Id.* at 117. To Mr. Bernhardt, the "remit to" clause in PO 4191 was a "contract document" that "overrides everything else in existence." *Id.* at 196.

Once the purchase order was issued, responsibility transferred from the pre-award contracting officer, Ms. Boscy, to a post-award contracting officer: first to Carolyn Matthews, and then, in February of 2000, to Phyllis Moore. *Id.* at 283. Ms. Moore had ultimate authority over PO 4191, but day-to-day administration was handled by Defense Contract Management Command ("DCMC") Clearwater in Clearwater, Florida. *Id.* at 440. Personnel at DCMC Clearwater, including Lynne Rahtes and Kathryn Bader, were involved in an ultimately unsuccessful attempt to assign Capital City's claim for payment under another purchase order (2508) to Mr. Kawa. *Id.* at 404-05; Joint Exs. 37, 38. There is no evidence in the record that either Ms. Bader or Ms. Rahtes took any action specifically aimed at ensuring, altering or otherwise concerned with payment under PO 4191.

In March of 2000, JGB shipped the items ordered in PO 4191 directly to the Defense Department Depot, issuing an invoice to Capital City on the same day. Joint Ex. 32; Joint Ex. 34 (indicating acceptance of delivery); Joint Ex. 33 (invoice). One day after shipment, CO Moore issued an "alert" requesting that DCMC Clearwater place Capital City under "surveillance." Trial Tr. at 291; Joint Ex. 35. This "alert" specifically listed PO 4191 as one of the contracts to be placed under surveillance. Joint Ex. 35. On March 24, 2000, CO Moore sent another email to DCMC Clearwater with a list of contracts awarded to Capital City, including PO 4191. Trial Tr. at 450; Joint Ex. 36. This email requested that DCMC Clearwater "maintain surveillance" of the

identified contracts, and concluded by authorizing that office to "take whatever contractual actions necessary to keep these orders viable." Joint Ex. 36.

Unfortunately, the Government did not send the PO 4191 payment to Mr. Kawa. *JGB*, 63 Fed. Cl. at 326-27. Instead, on April 24, 2000, without informing JGB or Mr. Kawa, it paid PO 4191 by Electronic Funds Transfer ("EFT") to "Capital City Bank." *Id.*; Joint Ex. 44. JGB subsequently attempted to expedite payment, and was told that payment had already been made to Capital City. Trial Tr. at 134. Mr. Bernhardt immediately called the acting director of DFAS, Phil Kover, who confirmed that Capital City had been paid for PO 4191. *Id.* at 135. According to Mr. Bernhardt, Mr. Kover stated that someone in the Government had observed a discrepancy between the remit to address and the EFT information, which referred to Capital City's bank. *Id.* at 136. Mr. Bernhardt further testified that Mr. Kovar stated that, faced with the conflict between the remit to address and DOD directives requiring all payments to be made by EFT, they "just flipped a coin and Capital City won."[2] *Id.* at 136.

Mr. Bernhardt next telephoned Lee Gilliam, the CEO of Capital City, who denied receiving the money. *Id.* Mr. Bernhardt then undertook "a year or two-year odyssey in the state of Florida" to attempt to retrieve the funds from Capital City, which ultimately went into bankruptcy. *Id.* at 140-41. After these unsuccessful efforts, he retained a Washington D.C. law firm, which filed a lawsuit against the United States on behalf of JGB, attempting to recover payment for PO 4191 and another purchase order, 2508. *Id.* at 144.

The Court ultimately concluded that JGB was a third-party beneficiary under PO 2508. *JGB*, 63 Fed. Cl. at 334. With respect to PO 4191, however, the Court found that JGB did not qualify as a third-party beneficiary because Ms. Boscy, the government official with authority to bind the Government prior to award, "was never informed of the situation between JGB and Capital City." *Id.* at 335. JGB had relied entirely upon Capital City to communicate with Ms. Boscy, and "JGB's mistaken assumptions regarding what CO Bocsy knew cannot bind the Government." *Id.* ("JGB could have protected its rights by taking the same steps it took regarding contract 2508—informing the CO about the non-payment issue and the purpose of modifying the remittance clause.").

On November 17, 2005, Michael Kawa submitted a claim for payment under PO 4191 to Ms. Boscy pursuant to the Contract Disputes Act. Joint Ex. 45; 41 U.S.C. § 605(a). The claim alleged that (1) payment under PO 4191 had been assigned to Michael Kawa; (2) Mr. Kawa was a third-party beneficiary; and (3) there was an implied-in-fact contract between Mr. Kawa and the Government. *Id.* On November 22, Mr. Kawa amended the claim amount to $45,275.76 from $43,987.50. *Id.*

---

[2] Mr. Kovar is now deceased. No government witness testified to these events, nor did any documentary evidence support this testimony. The Court is not inclined to credit Mr. Bernhardt's testimony that the Government's decision regarding the method of payment was decided by the flip of a coin.

On January 13, 2006, Ms. Boscy denied Mr. Kawa's claim, asserting that:

> You [Mr. Kawa] were neither an assignee of funds nor a third party beneficiary under this purchase order, and you did not have an implied-in-fact contract with the government.  The government awarded the purchase order to Capital City Pipes.  When Capital City Pipes asked me to change the remittance address, I did not know nor have any reason to know about your relationship to JGB.  I did not intend to assign payments to you, to establish a third-party beneficiary relationship with you, or to contract with you.  As the Court of Federal Claims previously held in the case filed by JGB, it is irrelevant what Taylor knew because he cannot bind the government.

Joint Ex. 46.  On June 6, 2006,  Mr. Kawa filed the instant complaint against the Government (docket entry 1) invoking the Court's jurisdiction under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, and the Tucker Act, 28 U.S.C. § 1491(a)(1).

Defendant sought to dismiss the *Kawa* litigation because Mr. Kawa (1) lacked standing; (2) was not the real party in interest; (3) had not sufficiently alleged an implied-in-fact contract to establish jurisdiction; (4) was barred by issue preclusion; and (5) was barred by claim preclusion. The Court denied the motion to dismiss.  *Kawa v. United States*, 77 Fed. Cl. 294 (2007).  Trial was held on October 27 and 28, 2008, with closing argument on January 30, 2009.

The Government presently argues that Mr. Kawa's lawsuit is barred by *res judicata*; that is, the outcome of the JGB lawsuit.  In the alternative, defendant claims that  Mr. Kawa is not the real party in interest because he was required to turn over any and all funds he received to other entities, principally JGB.  Plaintiff asserts that the facts set forth above and at trial render him a third party beneficiary of the Capital City/Government contract, or failing that, that the Government entered into an implied-in-fact contract with him, or, in the alternative, that the Government assigned Capital City's right to payment under PO 4191 to him.  The Court addresses each of those contentions below

## II.      Mr. Kawa Is A Proper Plaintiff

### A.      *Res Judicata* Does Not Bar Mr. Kawa's Claim

Earlier in the proceedings, the Government argued that Mr. Kawa's complaint was barred by the doctrine of *res judicata* because JGB had been a "virtual representative" of Mr. Kawa in the earlier action by JGB, relying in part on *Tyus v. Schoemehl*, 93 F.3d 449, 455 (8th Cir. 1996). Def.'s Supp. Mot. to Dismiss at 23 (docket entry 18, Dec. 19, 2006); *see also Media Tech. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366 (Fed. Cir. 2003) (using virtual representation analysis).  This Court rejected that argument because "the Government has not shown that plaintiff's relationship with JGB meets the Eighth Circuit's criteria for virtual representation as set forth in *Tyus*, nor has it proposed an alternative test to establish privity."  *Kawa*, 77 Fed. Cl. at

7

309. The Supreme Court has since specifically abrogated *Tyus*, and disapproved of the doctrine of virtual representation. *Taylor v. Sturgell*, 128 S. Ct. 2161 (2008).

In its post-trial brief, the Government reiterated its argument that *res judicata* bars Mr. Kawa's complaint, omitting reference to virtual representation, and instead asserting that "Michael Kawa is a privy of JGB because Michael Kawa and JGB are really and substantially, in interest, the same," and "[b]oth claims involve JGB's claim that the Government should be ordered to pay JGB the amount paid to Capital City Pipes for PO 4191." Defendant's Proposed Conclusions of Law and Proposed Findings of Fact (docket entry 84, Jan. 2, 2009) ("Def.'s Proposed Conclusions") at 2-3.

Some untangling of the terminology may be necessary. *Res judicata* is sometimes used as a synonym for claim preclusion and sometimes as encompassing both claim preclusion and issue preclusion. Under the doctrine of claim preclusion "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Issue preclusion, also known as collateral estoppel, denotes the idea that "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude litigation of the issue in a suit on a different cause of action involving a party to the first case." *Id.*

In general, "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party." *Hansberry v. Lee*, 311 U.S. 32, 40 (1940). Because the parties to the two lawsuits are not the same, *i.e.*, JGB sued the United States in the first, and Kawa sues the United States in the second, the defendant is seeking to bind Kawa, a non-party, to the results of the JGB litigation.

The defendant therefore asserts non-mutual (or non-party) defensive preclusion, and the Court analyzes both non-mutual issue preclusion and non-mutual claim preclusion below. Over time, courts have adopted a fairly liberal rule with respect to issue preclusion, such that "non-mutual issue preclusion is permitted unless it would be unfair." 18A FED. PRAC. & PROC. § 4464. However, the rule for non-mutual claim preclusion (which is more onerous, given that when it applies, it forbids litigation of both matters that were raised and those that could have been raised in the prior litigation) is "much less developed," with courts sometimes permitting preclusion despite failing to make proper findings. *Id.* § 4464.1. For claim or issue preclusion to apply here, therefore, Mr. Kawa's complaint must satisfy both the test for preclusion generally and fall within one of the exceptions to the rule forbidding preclusion of non-parties.[3]

---

[3] The Supreme Court has recently described the several exceptions to the general prohibition against non-mutual preclusion as falling into six categories: (1) where a person agrees to be bound by the result of a prior litigation to which he was not a party; (2) where there exists a pre-existing substantive legal relationship between the party to be bound and a party to the judgment; (3) where a non-party to the first suit was adequately represented by someone with the same interests who was a party to the first suit; (4) where a non-party to the first suit assumed

       1.      *Issue Preclusion Does Not Bar Mr. Kawa's Lawsuit*

    For issue preclusion to apply: (1) the issue presented in the second action must be identical to one decided in the first action; (2) the issue must have been actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the party against whom estoppel is invoked had a full and fair opportunity to litigate the issue in the first action. *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001). Defendant cannot proceed past the first prong of this test, however, because the issue before the Court in this lawsuit is not the same as the one upon which it rendered judgment in the *JGB* litigation.

    The first litigation addressed only whether Ms. Boscy knew that Mr. Kawa was an agent for JGB, not whether she knew Mr. Kawa was independent from Capital City (even if she did not know of his JGB affiliation). That is, the first trial involved whether an agreement existed between the United States and JGB such that the Government should be ordered to pay JGB. The second trial addressed whether an agreement existed between the United States and Mr. Kawa such that the Government should be ordered to pay Mr. Kawa. Because the issues litigated and decided in the first trial were not identical to those presented here, issue preclusion cannot apply. At oral argument, counsel clarified that the Government does not assert that Mr. Kawa's lawsuit is barred by issue preclusion. Transcript of Oral Argument (docket entry 94, March 5, 2009) ("Oral Arg. Tr.") at 65. The Government thus appears to concede that the issues presented by the two complaints were not the same. *See Kawa*, 77 Fed. Cl. at 307-08 ("Here, plaintiff argues that he entered into an express or implied-in-fact contract with the Government, that he was a third-party beneficiary of Purchase Order 4191, and that Capital City assigned him its right to receive payment under the purchase order. Whether plaintiff entered into such contracts, was an intended beneficiary, or was an assignee are all issues that were neither litigated nor decided in the prior case. As a result, issue preclusion does not prevent plaintiff from bringing this action based on those theories.").

       2.      *Claim Preclusion Does Not Bar Mr. Kawa's Lawsuit*

    The Government instead relies upon claim preclusion, which, if applicable, would bar both claims that were litigated and those that might have been litigated in the prior action. *Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1323 (Fed. Cir. 2008). The Government therefore maintains that because whether Ms. Boscy knew that Mr. Kawa was distinct from Capital City and intended to benefit him separately from Capital City *could have* been litigated in the first trial, Mr. Kawa's complaint should be barred. To determine whether claim preclusion applies, the court looks to whether "(1) there is identity of parties (or their privies); (2) there has

_____

control over the first suit (in which an adverse judgment was entered); (5) where a non-party to the first suit is acting as a proxy for a party against whom judgment was entered in the first lawsuit; or (6) where a special statutory scheme expressly forecloses successive litigation by nonlitigants. *Taylor*, 128 S. Ct. at 2172-73.

been an earlier final judgment on the merits of a claim; and (3) the second claim is based on the same set of transactional facts as the first." *Jet, Inc. v. Sewage Aeration Systems*, 223 F.3d 1360, 1362 (Fed. Cir. 2000). The party arguing for claim preclusion bears the burden to demonstrate that this test is met, and "the circumstances for preclusion 'must be certain to every intent.'" *Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*, 424 F.3d 1229, 1234 (Fed. Cir. 2005) (quoting *Russell v. Place*, 94 U.S. (4 Otto) 606, 610 (1876)).

Beginning with the second prong of the claim preclusion test, there appears to be no dispute that the prior action resulted in final judgment on the merits of JGB's claim. *See JGB Enters., Inc. v. United States*, 63 Fed. Cl. 319 (2004). But although the same general facts are involved in both actions, the present lawsuit does not, as the defendant insists, "involve JGB's claim that the Government should be ordered to pay JGB the amount paid to Capital City Pipes for PO 4191." Defendant's Proposed Conclusions at 3. Mr. Kawa instead alleges that the Government intended to benefit or entered into a contract with *him*, and should be ordered to pay *him* the amount due (but allegedly already paid) to Capital City for PO 4191. Whether that contention has merit is beside the point; it is a cause of action that JGB, as a separate entity from Mr. Kawa, could not have raised in the prior lawsuit, nor could Kawa, as a non-party, have been expected to litigate it there. *Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). The defendant's allegations thus fail the third prong of the claim preclusion test: the lawsuits do not involve the same claim. *Cf. Chromalloy Am. Corp. v. Kenneth Gordon (New Orleans), Ltd.*, 736 F.2d 694, 698 (Fed. Cir. 1984).

The defendant devotes most of its efforts to the first prong of the claim preclusion test, attempting to show that Kawa and JGB are "privies"[4] in the apparent belief that if it can show privity, then it can overcome the fact that the complaints present different claims. Defendant vigorously advances three theories of privity: (1) control of Mr. Kawa by JGB as its proxy; (2) collusion between Mr. Kawa and JGB, and (3) the substantive legal relationship between Mr. Kawa and JGB.[5] Oral Arg. Tr. at 74-75.

Although defendant was at pains to point out JGB's role in controlling this lawsuit (or colluding with Mr. Kawa), that control is legally irrelevant if neither issue preclusion nor claim preclusion applies. Here, JGB has litigated and lost on the existence of a contract with, intent to benefit, or assignment of rights to JGB. JGB could not have, and did not, litigate whether a contract existed between Mr. Kawa and the Government, whether the Government intended to

---

[4] The term "privity" has been used in the briefing as "a way to express the conclusion that non-party preclusion is appropriate on any ground." *Taylor*, 128 S. Ct. at 2172.

[5] Defendant expressly disclaimed reliance upon an "adequate representation" theory of non-party preclusion. Oral Arg. Tr. at 63.

benefit Mr. Kawa, or whether the Government assigned rights to Mr. Kawa.  Thus, claim
preclusion does not operate to bar Mr. Kawa's lawsuit.[6]

As for the allegation that Mr. Kawa is bound by the judgment in the JGB litigation due to
the substantive legal relationship between himself and JGB, the existence of a substantive legal
relationship might be relevant if, for example, it qualified as a successive interest in property.
Defendant argues that "courts have found privity in certain relationships," Def.'s Proposed
Conclusions at 2, but makes no specific argument about why Mr. Kawa as an escrow agent is the
same as a trustee or successive owner of property.  It is at least questionable whether an escrow
agent for multiple parties has the sort of substantive legal relationship with one of those parties to
support invocation of *res judicata*.  *See Roberts v. Porter, Davis, Saunders & Churchill*, 389
S.E.2d 361 (Ga. Ct. App. 1989).  The "general rule" is that "concurrent property relationships do
not justify precluding nonparties," unlike successive property relationships.  18A FED. PRAC. &
PROC. § 4461, 4462.  The Government has not advanced any argument regarding the nature of an
escrow agreement as one of concurrent or successive property relationship, or cited authority
supporting its position that an escrow agent is one of those "certain relationships" included
within the rule.  The Government bears the burden to demonstrate the applicability of claim
preclusion based upon the substantive legal relationship between JGB and Kawa, and it has
failed to do so.

At bottom, the Government argues that as an escrow agent, Mr. Kawa's right to receive
transmittal of funds was entirely derivative of JGB's right to receive them.  Because JGB had

---

[6]   Indeed, the Supreme Court has held that a disappointed plaintiff is only precluded from
relitigating the same *issue* through control of another person—claim preclusion is simply
inapposite.  *Montana v. United States*, 440 U.S. 147, 154 (1979) ("Preclusion of such nonparties
falls under the rubric of collateral estoppel rather than *res judicata* because the latter doctrine
presupposes identity between causes of action. And the cause of action which a nonparty has
vicariously asserted differs by definition from that which he subsequently seeks to litigate in his
own right."); 18 MOORE'S FEDERAL PRACTICE § 131.40; 18A FED. PRAC. & PROC. § 4451;
RESTATEMENT (SECOND) OF JUDGMENTS § 39 cmt. b (1982) ("[T]he person controlling the
litigation, as a non-party, is by definition asserting or defending a claim other than one he himself
may have.").  That is, for a "litigating agent" of a party to a prior litigation to be bound by the
result of that prior litigation, he must assert the same issue previously decided.  For example, in
*Guess v. Board of Medical Examiners of State of North Carolina*, 967 F.2d 998 (4th Cir. 1992),
the patients of a homeopathic doctor sued for an injunction against the revocation of his medical
license.  The court held that even though those patients might have standing to assert an injury to
themselves (the absence of homeopathic care), they were barred from proceeding as "litigating
agents" of the doctor, who had already litigated and lost on the issue of his right to a medical
license (applying *Rooker-Feldman* doctrine).  Even if one were to read *Taylor* to permit the
application of claim preclusion to a "litigating agent," as a factual matter Mr. Kawa's lawsuit
does not present the same claim as JGB's earlier action and the Government's claim preclusion
argument therefore fails.

previously litigated its entitlement to the money in question and lost, the Government contends, Mr. Kawa as escrow agent possessed nothing to be enforced.  Under the present circumstances, the Court disagrees.  Defendant's argument might have merit if JGB had litigated and lost on whether the funds were to be paid at all.  That is, if JGB had asserted that it performed work, the Government had claimed the work was not done, and JGB had lost in litigation on that claim, then Mr. Kawa as an escrow agent would have no right to assert, given that the underlying claim had been extinguished.  *See, e.g.*, *Rowe v. United States*, 4 Cl. Ct. 39 (1983) (second lawsuit on contract precluded by prior court finding that no underlying contract existed).[7]

But that is not the case here.  There is no question that work was performed and someone was entitled to receive payment.  The issue is to *whom* the Government was obligated to make payment.  JGB asserted that it was entitled to receive payment as a third-party beneficiary or assignee, and lost on that claim because, *inter alia*, Ms. Boscy was unaware that Mr. Kawa, whose name appears in the purchase order, had any affiliation with JGB.  Mr. Kawa, the person named in the purchase order, who was not a party to the prior litigation, asserts here a separate theory why he, and not JGB, was entitled to receive payment as a third-party beneficiary or assignee.  While there is no dispute that if Mr. Kawa were to succeed on his claim, JGB would ultimately be paid, whether JGB is a third-party beneficiary is not determinative of whether Mr. Kawa is a third-party beneficiary.  Defendant's theory of claim preclusion therefore fails.

## B.      Mr. Kawa is a Real Party in Interest

The Government reiterates its argument that Mr. Kawa is not a real party in interest, principally because JGB has already sued.  Def.'s Proposed Conclusions at 6 ("There is . . . no dispute that Michael Kawa would have had standing to sue upon behalf of JGB if JGB had not already brought suit for the same claim in its own name.").  This is, therefore, merely a restatement of the *res judicata* defense.  The Government distinguishes *American Maritime Transport, Inc. v. United States*, 18 Cl. Ct. 283 (1989), which establishes the right of a party to sue even if it is obligated to pass on the proceeds to another, arguing that the ultimate beneficiary in that case had not already failed in an attempt to recover on the same contract.  Def.'s Proposed Conclusions at 4-6.

Mr. Kawa, however, attempts to recover on an alleged agreement between himself and the Government.  The previous trial and court decision adjudicated the existence of an agreement

---

[7] Likewise, in *St. Louis Typographical Union No. 8, AFL-CIO v. Herald Co.*, 402 F.2d 553 (8th Cir. 1968), 154 employees were terminated and they then sued for severance pay under a provision of the collective bargaining agreement providing for such pay when there was a "merger or consolidation or permanent suspension of publication."  They lost on the grounds that no such merger, *etc.* had occurred.  The union then sought to recover the severance pay, asserting the same contract provision and the same events as triggering the provision.  The court found that the union was barred by the previous litigation, because it was proceeding "solely as a representative of the prior plaintiffs."

between JGB and the Government.  Defendant could, if it chose, have joined Mr. Kawa in the prior action to litigate all potential rights arising out of PO 4191 at the same time.[8]  Failing that, it left open the possibility that Mr. Kawa would attempt to establish an implied-in-fact contract or third-party beneficiary status because he was specifically named in PO 4191 and as escrow agent for JGB and Capital City.  A judicial finding that Ms. Boscy did not know that Mr. Kawa was affiliated with JGB made unlikely, but did not preclude, a finding that Ms. Boscy knew that Mr. Kawa was a third party other than Capital City.  Mr. Kawa's name appears on PO 4191, and the Court concludes that Mr. Kawa is a real party in interest.  *See* RCFC 17(a)(1)(F) (real party in interest includes "a party with whom or in whose name a contract has been made for another's benefit"); *see also American Maritime*, 18 Cl. Ct. at 290 ("[P]laintiff remains the real party in interest under Rule 17(a) because, as signatory to the contract, it possesses the substantive contractual right being enforced."); *Vassar v. United States*, 63 Fed. Cl. 166 (2004) (concluding signatory to contract was real party in interest, though not the owner of the trailers that were the subject of the contract); *Kawa*, 77 Fed. Cl. at 301 ("[T]he absence of 'escrow agent' from the list of enumerated parties in RCFC 17(a) does not preclude an escrow agent from being a real party in interest.").

In any event, defendant's *res judicata* and real party in interest arguments are as a practical matter moot because, as explained below, Mr. Kawa has litigated his claim, has failed to prove his case on the merits, and is therefore not entitled to relief.

---

[8]  The Rules of the Court of Federal Claims contain a Rule 17 that, like its Federal Rules of Civil Procedure counterpart, requires a lawsuit to be brought in the name of the "real party in interest."  *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed. Cir. 1999) (noting "the broad and general principle that actions should be brought in the name of the real party in interest and that courts should be lenient in permitting ratification, joinder, or substitution of that party"); Fed. R. Civ. P. 17 Advisory Committee Notes (Rule 17 serves primarily "to protect the Defendant against a subsequent action by the party actually entitled to recover and to insure generally that the judgment will have its proper effect as *res judicata*").  That is, if defendant were concerned about the *res judicata* effect of the JGB judgment, it might have raised the real party in interest defense in that trial, seeking to join all those who might assert a claim—that is, both JGB and Mr. Kawa.  Because the defense exists for the benefit of defendant, it may be waived.  *Steger v. General Elec. Co.*, 318 F.3d 1066, 1080 (11th Cir. 2003).

**III.     Mr. Kawa Has Failed to Prove His Case on the Merits And He Is Not Entitled to Relief**

     **A.     Mr. Kawa Was Not A Third-Party Beneficiary of Capital City Purchase Order 4191**

In 2005, the Federal Circuit stated that "for third-party beneficiary status to lie, the contracting officer must be put on notice, by either the contract language or the attendant circumstances, of the relationship between the prime contractor and the third-party subcontractor so that an intent to benefit the third party is fairly attributable to the contracting officer." *Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1263 (Fed. Cir. 2005). That is, "when a government agent with authority to contract on the government's behalf knows of a condition precedent to a third party's performance as a sub-contractor, such as receipt of payment directly from the government, and specifically modifies the prime contract so as to ensure the third party's continued performance, the agent and by implication the government itself necessarily intend to benefit the third party. That intent gives rise to standing as a third-party beneficiary to enforce the prime contract." *Id.*

Plaintiff asserts Ms. Boscy manifested an intent to benefit Mr. Kawa when Capital City asked Ms. Boscy to change the payment remittance address on PO 4191 to "Capital City Pipes, Inc., Michael Kawa, Esq." and Ms. Boscy complied. Unfortunately for plaintiff, as in *Flexfab,* 424 F.3d at 1258, "[t]he record is void of evidence that [Ms. Boscy] knew that the modification to the contract was in any way associated with [JGB's] escrow account. The record reflects that neither [Mr. Bernhardt], nor Mr. Taylor, nor [Mr. Kawa, nor] any [JGB] personnel ever communicated with the contracting officer[] to explain and memorialize the alleged demand by [JGB] that it would perform only if paid directly by the government into an escrow account for its benefit. In short, [JGB and Mr. Kawa] relied entirely on others, mainly Capital City, to assure that [Mr. Kawa], not Capital City, would receive direct payment for the delivered hose." Plaintiff nonetheless asks the Court to infer that an undocumented phone call between Ms. Boscy and Capital City employee Thelma Williams informed Ms. Boscy of the purpose for the requested change, although Ms. Boscy denies that assertion and Ms. Williams did not testify. Pl.'s Proposed Conclusions of Law (docket entry 83-2, Jan. 2, 2009) ("Pl.'s Proposed Conclusions") at 10-11; Trial Tr. at 233-46.   The Court found Ms. Boscy to be a forthright, credible witness, and no such conclusion is justified.

Plaintiff further argues that Ms. Boscy's amorphous understanding of Mr. Kawa's status, thinking he was perhaps a banker, justifies a finding that in making the change to PO 4191 she intended to benefit Mr. Kawa as someone other than Capital City, thus rendering him a third-party beneficiary. Pl.'s Proposed Conclusions at 8. But Capital City's request to change the "remit to" address from "Capital City Pipes" to "Capital City Pipes, Michael Kawa, Esq." and then, upon being informed there were insufficient lines in the computer program to allow both names, to "Michael Kawa, Esq.," is simply an insufficient series of events to put anyone on notice that Mr. Kawa was not an employee of or otherwise affiliated with Capital City. Even

14

assuming that payment was to be made by physical check, a contractor might have any number of reasons for having a check sent to a particular person, whether an employee or its banker, while remaining the ultimate recipient of the funds.

Plaintiff misapprehends the lesson of *Flexfab*: the burden is not upon the Government to carefully examine all of the contractor's addresses and employee roster and then infer whether a change of address inserts a third party into the contract. *See, e.g.*, Pl.'s Proposed Conclusions at 13 ("Any person of reasonable perception and intelligence would have noticed the 'coincidence' that Mr. Kawa was located over a thousand miles from Capital City Pipes, in the vicinity of both the manufacturer and the inspecting DCMC office."). Unless the "attendant circumstances" are much clearer than in this case, the duty lies with the contractor and/or the third party to make any third-party beneficiary status known to the person in the Government with contracting authority. Mr. Kawa concedes that he made no such effort, Trial Tr. 76-78, and Ms. Boscy credibly states that she was unaware of the purported attempt to benefit him as a third-party beneficiary. Trial Tr. at 274-77. Indeed, plaintiff himself admits that Ms. Boscy may have thought he was a banker and that a payment to a bank "obviously [does] not make clear that a third party other than Capital City Pipes was to receive payment." Pl.'s Proposed Conclusions at 14. Given that the contracting officer was not, in fact, "on notice" such that "an intent to benefit the third party is fairly attributable to the contracting officer," Mr. Kawa was not a third-party beneficiary on PO 4191. *See, e.g.*, Pl.'s Proposed Conclusions at 13 ("[A] reasonable Contracting Officer may not have been sure who Mr. Kawa was . . . .").

Plaintiff next argues that even if Ms. Boscy had no intent to benefit him, he reasonably relied upon PO 4191 as benefitting him; thus he is a third-party beneficiary. Pl.'s Proposed Conclusions at 15. Plaintiff conceives of these as *alternative* tests: even if there were no Government intent to benefit him, his reliance alone can establish third-party beneficiary status. *Id.* at 16. In reality, this "reliance" legal test is merely another way of expressing the same inquiry: "The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefitted thereby. One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (quoting *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994)). That is, the Government's intent to benefit plaintiff *as a third party* must be clearly ascertainable from the contract such that he could reasonably rely upon it. The cases plaintiff cites for the proposition that a third-party beneficiary may be identified later involve situations where it is clear that a class of third parties is to benefit, and the question is whether the plaintiff is within the specified class. *See Montana v. United States*, 124 F.3d 1269 (Fed. Cir. 1997) (agreement that protected superior lien holders included plaintiff, who held a superior lien); *Guardsman Elevator Co. v. United States*, 50 Fed. Cl. 577 (2001) (contract discussed payment of pre-receivership payables, and plaintiff qualified as a pre-receivership payable); *Sullivan v. United States*, 54 Fed. Cl. 214 (2002) (plaintiffs alleged that they, the victims of a vehicular accident involving a postal service employee, were third-party beneficiaries of a contract term requiring the contractor to possess vehicle insurance).

To be sure, plaintiff's name appears in PO 4191.  But absent any clear indication from either plaintiff, JGB or Capital City to Ms. Boscy that Mr. Kawa was anything other than an employee or person otherwise affiliated with Capital City, there was no basis for a reasonable contracting officer, applying an objective test, to have any reason to know that Mr. Kawa was not a representative of Capital City.  Moreover, the plaintiff, having made no effort to identify himself to Ms. Boscy, could not reasonably rely upon the mere appearance of his name as creating rights vesting in him as an individual.  The contract did not manifest the intent to benefit Mr. Kawa as a separate entity from Capital City (notwithstanding the withdrawal of "Capital City Pipes" from the address due to the dearth of available lines); thus, any reliance by plaintiff was unwarranted.

Of course, the appearance of an entirely new entity in the remittance address, along with specific notifications to the Government that rights under the contract were being assigned to that entity and unmistakable Government recognition of that assignment would likely create rights in the assignee.  *Riviera Finance of Texas, Inc. v. United States*, 58 Fed. Cl. 528 (2003).  But the facts here fall far short of that, and fail to create any rights in plaintiff.

Plaintiff attempts to bolster his third-party beneficiary claim by imputing the knowledge of other government employees to the contracting officer.  Pl.'s Proposed Conclusions at 22-23 ("After the award of Purchase Order 4191 the various Government contracting personnel were literally deluged with information that should have clearly informed them that Mr. Kawa was a separate entity from Capital City Pipes, and that should have informed them that Mr. Kawa was the proper payee under Purchase Order 4191."); *id.* at 31-32 ("There is no doubt here regarding the fact that a variety of responsible government employees had full knowledge and notice that Purchase Order 4191 called for payment to Mr. Kawa.  It is this totality of the circumstances during contract administration that cements Mr. Kawa's status . . . ."); *id.* at 33 ("[A]ny vagueness or lack of specific identification with regards to a third party beneficiary may be corrected if the beneficiaries' specific identity becomes clear prior to the completion of the contract.  Both the determination of Mr. Kawa's status as an assignee and his status as a third party beneficiary are dependent on considering the totality of the circumstances throughout the course of the purchase order. . . .  Mr. Kawa's identity was clearly and specifically revealed before the time that performance was due.  As well as further solidifying his status as an assignee, this identification 'corrects' any gaps in Contracting Officer's Boscy's knowledge at the time of signing Purchase Order 4191.").

Plaintiff argues that because Ms. Boscy made a change to Capital City's proposal, at its request, prior to issuing the purchase order, and other employees at some later time knew who Mr. Kawa was, including post-award CO Moore, those employees ratified Ms. Boscy's change to PO 4191 as effecting third-party beneficiary or implied-in-fact contract status.  Pl.'s Proposed Conclusions at 23.  Plaintiff appears to argue that even if Ms. Boscy's original actions were insufficient to form a contract or create a third-party beneficiary status in Mr. Kawa due to her lack of intent or knowledge, later actions by government personnel sufficed to "ratify" Ms. Boscy's actions and supply the necessary knowledge and intent.  An argument based upon

16

ratification typically arises when government employees who lack authority to enter a contract purport to do so, and those with authority later adopt or ratify the initially unauthorized contract. *See, e.g.*, *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429 (Fed. Cir. 1998); *Doe v. United States*, 58 Fed. Cl. 479 (2003).

The Court does not need to address plaintiff's contention that a lack of intent to form a contract or to establish a third-party beneficiary relationship can later be remedied by the knowledge of other personnel, because even if that were so, the law of ratification would still require more than has been shown here. "To establish ratification of a contract by a government agency, a party must show that an individual in the agency with contracting authority had 'actual or constructive knowledge' and 'demonstrated acceptance' of the contract." *Harbert/Lummus Agrifuels,* 142 F.3d at 1433-34; *Doe,* 58 Fed. Cl. at 488.

That is, ratification first requires knowledge of the unauthorized or otherwise ineffective initial agreement and then requires action to formalize that agreement by someone with appropriate authority. An action followed by later knowledge—especially when the act and the knowledge are by entirely different people—cannot constitute either a contract or a non-contract followed by a ratification. For the insertion of Mr. Kawa's name into PO 4191 to be "ratified" as a contract, CO Moore—assuming she was the contracting officer with knowledge of Mr. Kawa's status—would have had to take some action manifesting her intent to confer contractual rights upon Mr. Kawa. She took no such action.[9]

Plaintiff places great reliance on the purported authorization of personnel at DCMC Clearwater to deal with payment issues that occurred long after the change of the "remit to" address on PO 4191. Pl.'s Proposed Conclusions at 26 ("This formal and specific delegation allows DCMC Clearwater to bind the Government and the knowledge of DCMC Clearwater thus becomes tantamount to that of the Contracting Officer."). Even assuming for the sake of argument that DCMC Clearwater had "authorization" and "knowledge," there is no evidence in the record that DCMC Clearwater made any attempt to alter PO 4191 or in any other way "ratify" the earlier change of remittance address to Michael Kawa as an implied-in-fact contract, assignment of rights or creation of third-party beneficiary status. No one "with contracting authority . . . demonstrated acceptance of the contract." *Harbert/Lummus Agrifuels*, 142 F.3d at 1434 ("Silence in and of itself is not sufficient to establish a demonstrated acceptance of the contract by the CO."). While it is true that a government official with implied actual authority can bind the Government "when such authority is considered to be an integral part of the duties

---

[9] Searching for such action, plaintiff points to the "alert" messages that placed PO 4191, among other contracts, under "surveillance," and authorized "whatever contractual actions necessary" on a number of contracts, including PO 4191. The messages, which said nothing about Mr. Kawa, merely authorized future actions and thus did not themselves effect any contractual action. Plaintiff presented no evidence of any occurrence after the "alert" messages (which were sent after JGB had shipped goods on PO 4191) that was even arguably a ratification of an alleged prior agreement with Mr. Kawa with respect to PO 4191.

assigned to a government employee," *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting Cibinic & Nash, FORMATION OF GOVERNMENT CONTRACTS 43 (1982)), plaintiff does not point to, and the Court cannot find, any action by any person alleged to have implied actual authority that could constitute ratification of any agreement with Mr. Kawa with respect to PO 4191.  Thus, no ratification occurred.

Because Ms. Boscy did not intend to benefit Mr. Kawa as a third party distinct from Capital City when she modified PO 4191, and no government employee with contracting authority later took any action to create (or ratify) any such relationship, Mr. Kawa is not a third-party beneficiary of PO 4191.  He therefore "cannot maintain a suit for damages against the Government resulting from the payment to Capital City rather than to Mr. Kawa on PO 4191." *JGB Enters.*, 63 Fed. Cl. at 335.

### B.      No Implied-In-Fact Contract Existed Between Mr. Kawa and the Government

An implied-in-fact contract requires "1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance."  *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990) (citing *Russell Corp. v. United States*, 537 F.2d 474, 482 (1976)). Additionally, when the United States is a party to the alleged contract, "the Government representative 'whose conduct is relied upon must have actual authority to bind the government in contract.'" *City of El Centro*, 922 F.2d at 820 (quoting *Juda v. United States*, 6 Cl. Ct. 441, 452 (1984)).

To prove an implied-in-fact contract, plaintiff must show, based upon an objective test, that there was an unambiguous offer to contract upon specific terms and mutuality of intent between the parties to enter a contract.  *Garza v. United States*, 34 Fed. Cl. 1, 14 (1995); *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 536-37 (2003) ("Acceptance of the offer must be manifested by conduct, which, reviewed objectively, indicates assent to the proposed bargain.").  No implied-in-fact contract exists in the absence of evidence of a mutual intent to contract or a meeting of the minds with the Government.  *Smith v. United States*, 58 Fed. Cl. 374, 383 (2003), *aff'd*, 110 Fed. App'x 898 (Fed. Cir. 2004); *see also Medina Constr., Ltd. v. United States*, 43 Fed. Cl. 537, 558 (1999) ("[T]he documents before the Court do not demonstrate a meeting of the minds of the parties which is inferred from the parties' conduct such that a tacit understanding and agreement was reached as would demonstrate an implied-in-fact contract."); *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) ("In the present case, the record does not show a meeting of the minds. . . . IDP points to no circumstances to show that the parties had reached a firm and enforceable bargain.").

There is no dispute that CO Boscy possessed the authority to bind the Government when she awarded PO 4191. For the reasons enumerated above, Ms. Boscy did not manifest the requisite intent to contract or the existence of a meeting of the minds with Mr. Kawa at the time she altered, at the request of Capital City, the remit to address in the offer that became PO 4191.

18

The Government did not manifest the intent to enter into a contract with Mr. Kawa; thus there can be no implied-in-fact contract.

## C.     There Was No Assignment of Rights

The Anti-Assignment Act consists of two statutes that taken together "broadly prohibit . . . transfers of contracts involving the United States or interests therein, and assignment of claims against the United States." *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1349 (Fed. Cir. 2002). The Government may, if it chooses, nonetheless waive the Anti-Assignment Act and recognize the assignment of a claim against the United States. *Delmarva Power & Light Co. v. United States*, 542 F.3d 889, 893-94 (Fed. Cir. 2008). To determine whether the Government has waived the Anti-Assignment Act, the court looks to the totality of the circumstances, including specific factors identified by the Court of Claims in *Tuftco Corp. v. United States*, 614 F.2d 740 (Ct. Cl. 1980): whether: (1) the assignor and/or the assignee sent notice of the purported assignment to the Government; (2) the contracting officer signed the notice of assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the Government sent payments to the assignee pursuant to the assignment. *See id.* at 745-46; *Riviera Finance*, 58 Fed. Cl. at 580.

That is, the Government may recognize an assignment only where the contracting officer is specifically aware of the purported assignment, recognizes it, and communicates that knowledge to the assignee. *Id.* at 743-44. The burden lies with the purported assignee, here Mr. Kawa, to show that there was a meeting of the minds between himself and the Government. *Banco Bilbao Vizcaya v. United States*, 48 Fed. Cl. 29, 34 (2000). In this case, no notice of assignment was ever sent to the Government—just a request for a name change in the remittance address for an indefinite and unexplained purpose. The Government clearly did not sign a notice of assignment that was not sent, nor did it make payments according to any purported assignment. Therefore the Government did not act in a manner that waived the provisions of the Anti-Assignment Act.[10]

---

[10] The parties also joust over whether Mr. Kawa was the "payee" of PO 4191 or merely the individual to whom payment to Capital City was to be remitted at the remit to address. The Federal Acquisition Regulation allows the Government to pay only the contractor to whom the purchase order has been awarded or a valid assignee. *See* FAR 52.232-33(g) ("[P]ayment to an ultimate recipient other than the Contractor, or a financial institution properly recognized under an assignment of claims pursuant to subpart 32.8, is not permitted."). Given that the Court has found that there was no assignment, the Government could not legally have made Mr. Kawa the payee on PO 4191.

   Plaintiff further contends that evidence he alleges was wrongfully destroyed would have demonstrated that Mr. Kawa's name appeared in the "payee data" field of a government database as the payee. Pl.'s Responses to Def.'s Proposed Findings of Fact and Conclusions of Law (docket entry 88, Jan. 21, 2009) at 7-8. Plaintiff has failed to meet his burden to show that (1) the Government had an obligation to preserve the allegedly wrongfully destroyed evidence at the

Plaintiff's remaining contentions have been fully considered and found to be without merit.  For the reasons discussed above, the Court holds that (1) plaintiff's lawsuit is not barred by *res judicata*; (2) plaintiff is a real party in interest; (3) plaintiff was not a third-party beneficiary of PO 4191; (4) no implied-in-fact contract existed between plaintiff and the Government regarding PO 4191; and (5) there was no assignment of rights to plaintiff with respect to PO 4191.[11]  Accordingly, the Clerk is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

  s/ George W. Miller
GEORGE W. MILLER
Judge

---

time it was destroyed; (2) the records were destroyed with a culpable state of mind; and (3) the destroyed evidence was relevant and would have supported plaintiff's assertions.  *Jandreau v. Nicholson*, 492 F.3d 1372, 1375 (Fed. Cir. 2007).  Thus, the plaintiff is not entitled to an adverse inference on the basis of any purported wrongful destruction of records.

[11]  Defendant's Motion for Leave to Respond to Plaintiff's Unauthorized Letter to the Court (docket entry 91, Feb. 13, 2009) is denied.